# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

## AUSTIN DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC., MG PREMIUM LTD, MG FREESITES LTD, WEBGROUP CZECH REPUBLIC, A.S., NKL ASSOCIATES, S.R.O., SONESTA TECHNOLOGIES, S.R.O., SONESTA MEDIA, S.R.O., YELLOW PRODUCTION S.R.O., PAPER STREET MEDIA, LLC, NEPTUNE MEDIA, LLC, JANE DOE, MEDIAME SRL, MIDUS HOLDINGS, INC., | CASE NO. 1:23-cv-917<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | |
| ANGELA COLMENERO, IN HER OFFICIAL CAPACITY AS INTERIM ATTORNEY GENERAL FOR THE STATE OF TEXAS, | |
| Defendant. | |

Plaintiffs, by their undersigned counsel, bring this Complaint to enjoin the Texas Attorney General from enforcing a newly passed law targeting the free speech rights of internet platforms and individuals that goes into effect September 1, 2023, as it violates both the Constitution of the United States and the federal Communications Decency Act.

## INTRODUCTION

1.      On June 12, 2023, the Texas governor signed into law House Bill 1181 ("the Act"), which goes into effect September 1, 2023.  The Act joins a long tradition of unconstitutional—and ultimately failed—governmental attempts to regulate and censor free speech on the internet.  The Act in effect requires Plaintiffs to block access to their websites in Texas wholesale, unless they implement a system that requires all visitors to transmit their personal information to verify that they are at least eighteen years old.  The Act also purports to compel Plaintiffs to display a lengthy, controversial, and factually false "TEXAS HEALTH AND HUMAN SERVICES WARNING" on their websites—maligning the very constitutionally protected content they feature.  Both of the Act's requirements are enforceable by the Texas Attorney General.  Both requirements are unconstitutional.  Plaintiffs thus seek to enjoin the Attorney General from enforcing the unconstitutional Act.

2.      Pursuant to 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. §§ 2201-02, Plaintiffs seek injunctive and declaratory relief to vindicate rights, privileges, and immunities secured by the Constitution and laws of the United States.  The Act violates the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as section 230 of the Communications Decency Act.

3.      The Act violates the First Amendment in three fundamental ways.

3.1     *First*, the Act's age verification requirement is overbroad and fails strict scrutiny.  Despite impinging on the rights of adults to access protected speech, it fails strict scrutiny by employing the *least* effective and yet also the *most* restrictive means of accomplishing Texas's stated purpose of allegedly protecting minors.  Indeed, minors can use virtual private networks ("VPNs"), proxy servers, the "Tor" browser, and numerous other circumventions to bypass the

Act's verification requirements with ease; the law excludes search engines and most social media sites even though they pose a *greater* risk of exposure to adult content; and protected speech will be chilled as adults refuse to risk sharing and exposing their personal information that could lead to financial or reputational harm.  In contrast, content filtering at the browser and/or the device level allows anyone wishing to implement that technology on minors' devices to block access to any unwanted site, including adult sites, without impairing free speech rights or privacy.  But such far more effective and far less restrictive means don't really matter to Texas, whose true aim is not to protect minors but to squelch constitutionally protected free speech that the State disfavors.

3.2     *Second*, the Act's "health warning" requirement is a classic example of the State mandating an orthodox viewpoint on a controversial issue.  Texas could easily spread its ideological, anti-pornography message through public service announcements and the like without foisting its viewpoint upon others through mandated statements that are a mix of falsehoods, discredited pseudo-science, and baseless accusations.

3.3     *Third*, under the heightened scrutiny required by the First Amendment, the Act is incurably vague as to its fundamental requirements, providing neither a coherent standard for assessing which websites it applies to, nor adequate guidance on what "age verification" entails.

4.     The Act further violates the Supremacy Clause by violating section 230 of the Communications Decency Act, which prohibits treating website operators as if they were responsible for alleged harm caused by content created by third parties.

5.     The Act violates the Fourteenth Amendment in multiple ways, too.  *First*, because of its vagueness, it violates the procedural component of the Due Process Clause.  *Second*, by destroying Plaintiffs' protected property right in the goodwill of Texan viewers without a rational basis, it violates the substantive component of the Due Process Clause.  *Third*, because of its arbitrary exceptions for search engines and most social media sites, it violates the Equal Protection Clause even under rational basis review.

6. The Act also violates the Excessive Fines Clause of the Eighth Amendment, because it imposes fines that are grossly disproportionate to the unsubstantiated, fabricated harms it purports to protect against.

7. Accordingly, Plaintiffs seek to have the Texas Attorney General enjoined from enforcing the Act—both preliminarily, pending the hearing and determination of this action, and permanently. Plaintiffs also seek declaratory relief, as well as damages, costs, and attorneys' fees.

## JURISDICTION AND VENUE

8. This case presents federal questions within this Court's jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331 and 1343(3). Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 (deprivation of rights, privileges, and immunities secured by the Constitution and federal law) and 28 U.S.C. §§ 2201-02 (declaratory judgment as to an actual controversy).

9. Venue is proper pursuant to 28 U.S.C. § 1391(b). The challenged law was passed in Austin, Texas, which is also where the Attorney General performs her official duties.

## PARTIES

10. Defendant Angela Colmenero is a person within the meaning of Section 1983 of Title 42 of the United States Code; and she currently serves as the Interim Attorney General of the State of Texas. The Office of the Attorney General is in Austin, Texas. The Act expressly authorizes that, "[i]f the attorney general believes that an entity is knowingly violating or has knowingly violated this chapter and the action is in the public interest, the attorney general may bring an action in a Travis County district court or the district court in the county in which the principal place of business of the entity is located in this state to enjoin the violation, recover a civil penalty, and obtain other relief the court considers appropriate." Act § 129B.006. The Attorney General of Texas is thus solely and directly responsible for the enforcement of the Act.

11. Plaintiff Free Speech Coalition, Inc. ("FSC") is a not-for-profit trade association organized under the laws of California with its principal place of business in Canoga Park, California. FSC assists filmmakers, producers, distributors, wholesalers, retailers, internet

providers, performers, and other creative artists located throughout North America in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship. Founded in 1991, the Free Speech Coalition represents hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected adult content disseminated to consenting adults via the internet. FSC sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and the rights of its members' owners, officers, employees, and current and prospective readers, viewers, and customers. Many of FSC's members are individual adult performers gravely concerned about the consequences of the Act, but who fear for their safety should they come forward publicly to challenge the Act in court. FSC's members would directly benefit from an injunction enjoining the enforcement of the Act. The potential harm to FSC's members caused by the recent enactment of state age-verification statutes has caused significant concern among its members. FSC has diverted resources away from its normal day-to-day activity, which has impaired its ability to perform its usual functions. Over the last six months, both FSC's Executive Director and Director of Public Affairs have had to devote more than half their time to tracking legislative developments, meeting with FSC members to discuss risks relating to age-verification statutes, meeting with litigation attorneys and advisors, and otherwise engaging in activities to minimize the risk to its members from the age-verification statutes that states, in particular Texas, have recently enacted.

12.     Plaintiff MG Premium Ltd, is a limited liability company organized under the laws of the Republic of Cyprus, with its principal place of business in Nicosia, Cyprus, that operates SpiceVids.com ("SpiceVids"), a subscription-based website offering high quality adult content uploaded, owned, copyrighted, and controlled by third party content creators. MG Premium Ltd also operates the website Brazzers.com ("Brazzers"), a subscription-based website offering high quality adult content in which MG Premium Ltd holds all the intellectual property rights. For shoots with adult performers, MG Premium Ltd writes the scripts, hires the production team, and does the pre- and post-production work. MG Premium Ltd uploads Brazzers content both to

Brazzers.com and to the websites of other Plaintiffs, including Pornhub.com, xvideos.com, xnxx.com, and SpiceVids.  In addition, MG Premium Ltd operates the website FakeTaxi.com ("FakeTaxi"), a subscription-based website offering high quality adult content that is produced and owned by Plaintiff Yellow Production, s.r.o., discussed below.  MG Premium Ltd opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

13.     Plaintiff MG Freesites Ltd, is a limited liability company organized under the laws of the Republic of Cyprus, with its principal place of business in Nicosia, Cyprus, that operates Pornhub.com ("Pornhub"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.  MG Freesites Ltd opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

14.     Plaintiff WebGroup Czech Republic, a.s. ("WebGroup"), is a corporation organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates xvideos.com ("XVideos"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.  WebGroup opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

15.     Plaintiff NKL Associates, s.r.o. ("NKL"), is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates xnxx.com ("Xnxx"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators. NKL opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

16.     Plaintiff Sonesta Technologies, s.r.o. ("Sonesta Tech"), is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates the website BangBros.com ("BangBros"), a subscription-based website offering high quality adult content.  Sonesta Tech opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its website.

17.     Plaintiff Sonesta Media, s.r.o., ("Sonesta Media") is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that produces, and owns the intellectual property rights to, the content on BangBros.com.  It also licenses some of its content to be uploaded to other websites, including Pornhub, XVideos, Xnxx, and SpiceVids.  Sonesta Media opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force BangBros to place on its website.

18.     Plaintiff Yellow Production, s.r.o. ("Yellow Production") is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that produces, and owns the intellectual property rights to, the content on FakeTaxi.  It also licenses some of its content to be uploaded to other websites, including Pornhub, Xvideos, Xnxx, and SpiceVids.  Yellow Production opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force FakeTaxi to place on its website.

19.     Plaintiff Paper Street Media, LLC ("Paper Street"), is a limited liability company organized under the laws of Florida, with its principal place in Miami, Florida, that operates the TeamSkeet adult content network, comprised of numerous subscription-based adult websites offering high quality adult content.  Paper Street owns the content on its network sites and, for shoots with adult performers, writes the scripts, hires the production team, and does the pre- and post-production work.  Paper Street also makes some of the content available on the TeamSkeet network available to other adult websites, including Pornhub, XVideos, Xnxx, and

SpiceVids.  Paper Street opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

20.     Plaintiff Neptune Media, LLC ("Neptune Media"), is a limited liability company organized under the laws of Florida, with its principal place of business in Miami, Florida, that operates the MYLF adult content network, comprised of numerous subscription-based adult websites offering high quality adult content.  Neptune Media owns the content on its network sites and, for shoots with adult performers, writes the scripts, hires the production team, and does the pre- and post-production work.  Neptune Media also makes some of the content available on the MYLF network available to other adult websites, including Pornhub, XVideos, Xnxx, and SpiceVids.  Neptune Media opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

21.     Plaintiff Jane Doe,[1] a citizen and resident of the State of Oregon, is an adult performer who creates adult content. Their content is featured on numerous adult websites, including Pornhub.  They oppose the restrictions the Act would place on their ability to reach their audience, as well as the government-mandated speech that the Act would force adult websites to place on their websites.

22.     Plaintiff MediaME SRL is a limited liability company organized under the laws of Romania, with its principal place of business in Pipera, Romania, that operates the website Porndoe.com, a popular free adult entertainment websites that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.

23.     Plaintiff Midus Holdings, Inc., is a corporation organized under the laws of Florida, with its principal place of business in Coral Springs, Florida, that operates the

---

[1] "Jane Doe" is a pseudonym necessary to protect Plaintiff from retaliation, stalking, and other harms associated with taking legal action to defend the adult industry against the Act.  Doe's true name may be provided to the Court under seal or pursuant an appropriate protective order.

websites Letsdoeit.com and Superbe.com, each a subscription-based website offering high quality adult content within the United States.

**FACTS**

**I.      The Act**

24.      During the 2023 legislative session, the Texas Legislature passed House Bill 1181, which amended Section 1, Title 6 of the Texas Civil Practice and Remedies Code by adding Chapter 129B—herein referred to as "the Act."  The Texas Governor signed the bill into law on June 12, 2023, which goes into effect September 1, 2023.  The Act provides:

Chapter 129b. Liability for Allowing Minors to Access Pornographic Material

***Sec. 129b.001. Definitions***.

In this chapter:

(1)      "Commercial entity" includes a corporation, limited liability company, partnership, limited partnership, sole proprietorship, or other legally recognized business entity.

(2)      "Distribute" means to issue, sell, give, provide, deliver, transfer, transmute, circulate, or disseminate by any means.

(3)      "Minor" means an individual younger than 18 years of age.

(4)      "News-gathering organization" includes:

(A)      an employee of a newspaper, news publication, or news source, printed or on an online or mobile platform, of current news and public interest, who is acting within the course and scope of that employment and can provide documentation of that employment with the newspaper, news publication, or news source; and

(B)      an employee of a radio broadcast station, television broadcast station, cable television operator, or wire service who is acting within the course and scope of that employment and can provide documentation of that employment.

(5)      "Publish" means to communicate or make information available to another person or entity on a publicly available Internet website.

(6)      "Sexual material harmful to minors" includes any material that:

8

(A)     the average person applying contemporary community standards would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest;

(B)     in a manner patently offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated displays or depictions of:

(i)     a person's pubic hair, anus, or genitals or the nipple of the female breast;

(ii)     touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or

(iii)     sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(C)     taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

(7)     "Transactional data" means a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event. The term includes records from mortgage, education, and employment entities.

### Sec. 129B.002. Publication of Material Harmful to Minors.

(a)     A commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors, shall use reasonable age verification methods as described by Section 129B.003 to verify that an individual attempting to access the material is 18 years of age or older.

(b)     A commercial entity that performs the age verification required by Subsection (a) or a third party that performs the age verification required by Subsection (a) may not retain any identifying information of the individual.

### Sec. 129B.003.          Reasonable Age Verification Methods.

9

(c)     In this section, "digital identification" means information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identity of an individual.

(d)     A commercial entity that knowingly and intentionally publishes or distributes material on an Internet website or a third party that performs age verification under this chapter shall require an individual to:

(1)     display the following notices on the landing page of the Internet website on which sexual material harmful to minors is published or distributed and all advertisements for that Internet website in 14-point font or larger:

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Pornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function."

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses."

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Pornography increases the demand for prostitution, child exploitation, and child pornography."; and

(2)     display the following notice at the bottom of every page of the Internet website in 14-point font or larger:

"U.S. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION HELPLINE:

1-800-662-HELP (4357)

THIS HELPLINE IS A FREE, CONFIDENTIAL INFORMATION SERVICE (IN ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY, FOR INDIVIDUALS AND FAMILY MEMBERS FACING MENTAL HEALTH OR SUBSTANCE USE DISORDERS. THE SERVICE PROVIDES REFERRAL TO LOCAL TREATMENT FACILITIES, SUPPORT GROUPS, AND COMMUNITY-BASED ORGANIZATIONS."

**Sec. 129B.005. Applicability of Chapter.**

(a)     This chapter does not apply to a bona fide news or public interest broadcast, website video, report, or event and may not be construed to affect the rights of a news-gathering organization.

(b)     An Internet service provider, or its affiliates or subsidiaries, a search engine, or a cloud service provider may not be held to have violated this chapter solely for providing access or connection to or from a website or other information or content on the Internet or on a facility, system, or network not under that provider's control, including transmission, downloading, intermediate storage, access software, or other services to the extent the provider or search engine is not responsible for the creation of the content that constitutes sexual material harmful to minors.

### Sec. 129B.005. Applicability of Chapter.

(a)     If the attorney general believes that an entity is knowingly violating or has knowingly violated this chapter and the action is in the public interest, the attorney general may bring an action in a Travis County district court or the district court in the county in which the principal place of business of the entity is located in this state to enjoin the violation, recover a civil penalty, and obtain other relief the court considers appropriate.

(b)     A civil penalty imposed under this section for a violation of Section 129B.002 or 129B.003 may be in an amount equal to not more than the total, if applicable, of:

(1)     $10,000 per day that the entity operates an Internet website in violation of the age verification requirements of this chapter;

(2)     $10,000 per instance when the entity retains identifying information in violation of Section 129B.002(b); and

(3)     if, because of the entity's violation of the age verification requirements of this chapter, one or more minors accesses sexual material harmful to minors, an additional amount of not more than $250,000.

(c)     The amount of a civil penalty under this section shall be based on:

(1)     the seriousness of the violation, including the nature, circumstances, extent, and gravity of the violation;

(2)     the history of previous violations;

(3)     the amount necessary to deter a future violation;

(4) the economic effect of a penalty on the entity on whom the penalty will be imposed;

(5) the entity's knowledge that the act constituted a violation of this chapter; and

(6) any other matter that justice may require.

(d) The attorney general may recover reasonable and necessary attorney's fees and costs incurred in an action under this section."

25. Section 2 of the Act establishes that "[t]he Act becomes effective September 1, 2023."

## II. Communication Over the Internet

26. The internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world.  It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individuals' computers.  The internet connects an estimated 5.39 billion people—or 68% of the world's population[2]—and it is estimated that 77.0% of Texas residents are internet users.[3]

27. Because the internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the internet or limits the ability of others to access such materials.  Rather, the range of digital information available to internet users is individually created, maintained, controlled, and located on millions of separate individual computers around the world.

28. The internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it.  Unlike television, cable, radio, newspapers, magazines or books, the internet provides the average citizen and business, whether large or small, with an affordable means for communicating with, accessing, and posting content to a worldwide

---

[2] *See* http://www.internetworldstats.com/stats.htm.
[3] *See* https://www.statista.com/statistics/184691/internet-usage-in-the-us-by-state.

audience.  Although the majority of the information on the internet does not depict or describe nudity or sexual activity, such material is indeed widely available on the internet.

29.     An Internet Protocol ("IP") address is a unique address that identifies a connection to a device on the internet or a local network, much like a telephone number is used to connect a telephone to other telephones.  In essence, an IP address is the identifier that allows information to be sent between devices on a network.  Internet Service Providers ("ISPs") and telecommunications companies control "blocks" of IP addresses, and the location of an internet connection can be very roughly determined according to the geographic region those companies assign to the IP address associated with a connection.

30.     Websites can request that their host server block traffic from particular IP address regions ("geoblocking") or target specific regions with different versions of the website using the same technology ("geolocation").  They can also pay for expensive services that rely on GPS and data modeling to increase the accuracy of geoblocking and geolocation.  However, satellites and cellular towers do not respect state boundaries, and many IP-address databases are highly inaccurate.  The accuracy of geolocation technology is imperfect, and residents of one state, particularly near state borders, may be mistakenly categorized as residents of another.  Indeed, some blocks of IP addresses cover multiple States at once, and the accuracy of geolocating an internet user based on IP address can dip as low as 55%.

31.     Virtual Private Networks ("VPNs") and proxy servers bypass geoblocking and geolocation by websites.  Both function as an intermediary between an individual internet-connected device and the targeted server.  They hide the device's actual public IP address and instead "tunnel" traffic between the device and a remote server—the only difference being that communications sent through VPNs are encrypted.  Setting up a proxy server is generally free and simple, and the same is true of VPNs.  Doing so permits users to obscure their location while browsing the web, whether on wireless or cellular networks.  VPNs are extremely common—used both by consumers and businesses to establish secure, remote connections to their home networks. In fact, they are included by default in most consumer antivirus software.

32.     The freely available "Tor" browser, which is designed to be easily downloaded and used, also hides a user's IP address when browsing the internet.

33.     Even remote and virtual desktop services, which are popular among university students, allow users to appear to internet websites as though they were located wherever the cloud server (in the case of virtual desktops) or the actual computer (in the case of virtual desktops) appears to be located.  In all cases, the user can appear to be located in a different state or country whose laws do not require age verification by websites.

### III.    The Minimal Benefits of Age Verification under the Act

34.     Minors are more at risk of exposure to adult content from social media sites and search engines than traditional adult websites like Plaintiffs.[4]  Search engines, by design, enable anyone to access troves of adult images and videos in seconds—content that is no less explicit than that found directly on Plaintiffs' websites.  And Facebook alone flagged a staggering **73.3 million** pieces of content under "child nudity and sexual exploitation" from Q1 to Q3 of 2022 alone.[5] Recent research found a majority of children under 13 had their own profile on at least one social media application or site and one-third of children between the ages of 8 and 17 with a social media profile signed up with a false birthdate.[6]

35.     Because most social media sites contain so much content that they will not meet the Act's "more than one-third" threshold for "sexual material harmful to minors," the Act effectively exempts most social media sites, in addition to its explicit exemption for search engines.

---

[4]  Neil Thurman and Fabian Obster, "The regulation of internet pornography: What a survey of under-18s tells us about the necessity for and potential efficacy of emerging legislative approaches," 13 POLICY & INTERNET 415, 417 (2001).
[5]  *See* Paul Bischoff, *The Rising Tide of Child Abuse Content on Social Media*, (Jan. 25, 2023), https://www.comparitech.com/blog/vpn-privacy/child-abuse-online-statistics/.
[6]  *See* https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-and-attitudes-report-2022.pdf.

36.     There also are far riskier ways to obtain adult content, such as through the Dark Web (e.g., via the freely downloadable "Tor" browser), which is replete with more extreme adult content and also a range of black markets for ransomware, sex trafficking, drugs, and even hitmen. Those determined to access adult content are likely to be pushed by the Act towards unregulated platforms, which is a more dangerous environment for users, *including* underage users, who would then be exposed to far more problematic and hazardous online environments.

37.     In addition to these alternative pathways to adult content, state-specific restrictions on traditional adult websites can be easily bypassed by VPNs and proxy servers.

38.     All of this is magnified by the fact that minors are more tech-savvy than adults, especially older adults, and therefore will be able easily to evade the age verification requirements of the Act.

## IV.    The Burdens and Risks of Age Verification

### A.     The Risks To Adults

39.     While rapid technological progress might suggest it's easy to verify age, in fact there is no current method that does not carry inherent, unacceptable disadvantages and harms.[7] Nor does technological process excuse First Amendment violations, or make the Act any more effective at protecting kids, or any less invasive of people's privacy, or any less dangerous in light

---

[7] *See, e.g.*, Jason Kelley and Adam Schwartz, *Age Verification Mandates Would Undermine Anonymity Online,* Electronic Frontier Foundation, March 10, 2023, https://www.eff.org/deeplinks/2023/03/age-verification-mandates-would-undermine-anonymity-online (explaining the flaws of age verification systems and why they are the wrong approach to protecting young people online, as they would force websites to require visitors to prove their age by submitting information such as government-issued identification. "This scheme would lead us further towards an internet where our private data is collected and sold by default. The tens of millions of Americans who do not have government-issued identification may lose access to much of the internet. And anonymous access to the web could cease to exist.").

of the highly recognized misuse of any such data[8] and vulnerability to hackers and cybersecurity attacks.

40.     Hackers are targeting information shared on the internet at exponentially high rates, including data kept in the safest locations such as federal and state agencies, which have themselves been subjected to multiple breaches.[9]

41.     Any claimed benefit of age verification imposed by the Act does not justify the burdens imposed on adults—the vast majority of whom value their online privacy and do not wish to expose exploitable personal data simply to view constitutionally-protected material they have every right to view.  The high risk of data breaches and leaks resulting from compliance with the Act serves as an unavoidable barrier preventing adults from divulging their information over the internet.  If that is set as a condition to view legal adult content, adults will simply go elsewhere for that content instead (especially since that content is available elsewhere on the internet, not just on adult entertainment websites targeted by the Act).

42.     Online age-verification is fundamentally different from an employee at a brick-and-mortar store checking a driver's license.  Online and offline age verification do not share the same risks.  Offline age verification does not carry the threat of producing an accessible ledger of adults who view adult content (or adults whose identity has been stolen and used to view adult content) or of creating a digital trail that could expose an individual to financial or reputational harm.

---

[8] *See, e.g.*, a proposed Trade Regulation Rule on Commercial Surveillance and Data Security, https://www.federalregister.gov/documents/2022/08/22 (where the Federal Trade Commission requested public comment on the prevalence of commercial surveillance and data security practices that harm consumers, and inviting comment on whether it should implement new trade regulation rules or other regulatory alternatives concerning the ways in which companies collect, aggregate, protect, use, analyze, and retain consumer data, as well as transfer, share, sell, or otherwise monetize that data in ways that are unfair or deceptive, recognized, among others, that data is regularly collected for one purpose and used for another.).

[9] *See e.g.,* Kevin Collier, *U.S. Government Says Several Agencies Hacked As Part Of Broader Cyberattack,* https://www.nbcnews.com/tech/security/us-govement-agencies-hacked-cyberattack-moveit-rcna89525 (discussing several U.S. agencies being hacked on June 15, 2023 as part of a broader cyberattack that hit dozens of companies and organizations in recent weeks through a previously unknown vulnerability in popular file sharing software).

Someone can enter a brick-and-mortar adult bookstore or sex shop merely by briefly displaying their license, for a human worker's real-time review.  No record is made or kept, and that is the end of the matter.  Online age verification, in contrast, carries the real risk that the viewer's digital "fingerprint" will take on a life of its own, enabling a third party to determine the viewer's identity, expose the viewer as a viewer of adult content, and steal the viewer's identity to commit financial fraud, extortion, and other crimes.[10]

43.     This risk is not hypothetical.  Louisiana recently passed an age verification law that provides for age verification utilizing a state-maintained database of digital driver's licenses.  After going live, that database was breached almost immediately,[11] exposing the information of everyone who enrolled in Louisiana's optional digital identification program for the purposes of accessing adult content.  It is no coincidence that the number of identity thefts in Louisiana have increased since the age verification law became effective.

44.     Data minimization is the principle that reducing the amount of data collected in the first place reduces subsequent risk.[12]  This is true, for instance, in the case of a disreputable adult site that might take advantage of the age verification law's requirements to force visitors to provide personal information that can be used for marketing, sold to data brokers, or stolen by attackers.  This problem is exacerbated for certain vulnerable adult populations, such as the elderly, who are

---

[10] *See, e.g.*, Kim Zetter, *Hackers Finally Post Stolen Ashley Madison Data*, Wired, Aug. 18, 2015, https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data (discussing Ashley Madison data breach and hackers' threat to "release all customer records, including profiles with all the customers' secret sexual fantasies and matching credit card transactions, real names and addresses."). The Ashley Madison breach is associated with at least two suicides.  *See* Morgan Sharp, *Two people may have committed suicide after Ashley Madison hack: police*, Reuters, Aug. 24, 2015, https://www.reuters.com/article/us-ashleymadisoncybersecurity-idUSKCN0QT1O720150824//.

[11] *See* https://www.axos.com/local/new-orleans/2023/06/16/louisiana-cyberattack-dmv-moveit

[12] *See, e.g.,* Shoshana Weissmann, *Age-verification legislation discourages data minimization, even when legislators don't intend that*, Rstreet.com, May 24, 2023, https://www.rstreet.org/commentary/age-verification-legislation-discourages-data-minimization-even-when-legislators-dont-intend-that/ (discussing how data minimization lessens the potential of data breach); *see also Data Minimization Principle*, The International Association of Privacy Professionals, https://iapp.org/resources/article/data-minimization-principle/.

more susceptible to online hacks and scams.[13]  Online age verification does not comport with the principle of data minimization.

**B.    The Risks to Minors**

45.    The Act's "solution" is far worse than the purported problem it aims to solve. Today's children are "digital natives."  They are more likely than adults to be able to circumvent the Act, and thus be pushed to Tor and the Dark Web, where they will be exposed to illegal activities and more extreme material, including violent pornography and criminal gang activities.[14]

**C.    The Burden on Websites**

46.    Commercially available age verification services that are reputable are also exorbitantly expensive.  For instance, Trustmatic, the cheapest option in the table below, still costs $40,000 per 100,000 verifications and intrusively requires users to upload pictures of their face.

| Vendor | Website (pricing) | $ per verification | 100M verifications | 5M verifications | 100k verifications |
|---|---|---|---|---|---|
| Yoti | https://www.yoti.com/business/identity-verification/ | £1.20 | £120,000,000 | £6,000,000 | £120,000 |
| Ondato | https://ondato.com/plans-pricing/ | €0.95 | €95,005,180 | €4,750,259 | €95,005 |
| Stripe | https://stripe.com/identity#pricing | $1.50 | $150,000,000 | $7,500,000 | $150,000 |
| Passbase | https://passbase.com/pricing | $2.00 | $200,000,980 | $10,000,049 | $200,001 |
| veriff | https://www.veriff.com/plans | $1.49 | $149,000,000 | $7,450,000 | $149,000 |
| Trustmatic | https://trustmatic.com/pricing | €0.40 | $40,000,000 | $2,000,000 | $40,000 |
| Berbix | https://www.berbix.com/pricing | $0.99 | $99,000,000 | $4,950,000 | $99,000 |
| Faceki | https://apps.faceki.com/pricing | $0.62 | $62,000,000 | $3,100,000 | $62,000 |

47.    Faced with such costs, many smaller websites will be forced out of business.

**V.    A Less Restrictive Alternative: Blocking and Filtering**

48.    Improvements in technology have not made current online age verification methods superior to other alternatives, which do not share the same vulnerabilities and are far more effective in blocking access by minors while placing far lesser burdens on the free speech rights of adults.

---

[13]    *See, e.g.,* Emma Fletcher, Federal Trade Commission Consumer Protection, *Older adults hardest hit by tech support scams,* https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2019/03/older-adults-hardest-hit-tech-support-scams (finding that "[o]lder adults face unique barriers to adoption, ranging from physical challenges to a lack of comfort and familiarity with technology.").

[14] *See* https://www.telegraph.co.uk/news/2018/01/05/warning-age-checks-porn-sites-risks-pushing-children-dark-web/.

49.     Content filtering at the browser and/or the device level allows anyone wishing to implement that technology on minors' devices to block access to any unwanted site, including adult sites.  These methods are more effective and less restrictive in terms of protecting minors from adult content.  While adults have every reason to be concerned about providing their personal information online, parents, who should be the first line of protective defense of their children, have many tools available to them to protect their children from inappropriate adult content.

50.     Virtually every available electronic device capable of accessing content online already has built-in parental controls.  Internet service providers are also capable of filtering unwanted content and do so every day.  And there are additional software and apps freely available on the market allowing for more advanced parental control features, including, for example, from https://www.qustodio.com, https://www.bark.u, https://us.norton.com/products/norton-family, https://usa.kaspersky.com/safe-kids, https://kidlogger.net/, https://www.mobicip.com/, https://www.eset.com, https://www.webwatcher.com/, and https://www.spyrix.com/.

51.     There are websites devoted to evaluating different parent control applications, such as parentalcontrolnow.org.[15]  Similarly, buyersguide.org even offers a chart to compare filtering services:

---

[15]     *See, e.g.,* Parental Control Now, "Best Parental Control Apps for 2023," https://parentalcontrolnow.org/best-parental-control-apps-us/?gclid=EAIaIQobChMIqf6xyuKggAMVxgCtBh3m6g3YEAMYASAAEgJXt_D_BwE.

| | 1. AURA | 2. bark | 3. gabb | 4. kaspersky | 5. Qustodio | 6. norton |
|---|---|---|---|---|---|---|
| Monitors | Online activity, online gaming, app usage, online chatting (voice and text) | Texts, emails, social media, and app usage | Phone calls, texting, location, and contacts | Digital activity (app, web, and YouTube), screen time, and location | Browsing history, YouTube views, social media use, location | View child's search terms, videos watched, age-appropriate content, location |
| Devices | iOS and Android devices. Safe Gaming available on Windows PC | Android, iPhone, iPad, Chromebook, Kindle Fire | Gabb Phone, Gabb Phone Plus, Gabb Watch 2 | Windows, Mac, iOS, Android | Windows, Mac, iOS, Android, Chromebook, Kindle | Windows PC, Android, or iOS |
| Time Limits | Yes. Pause the Internet and set time limits for app and website usage | Yes. Set up customizable screen time rules and schedules | Lock mode available on watches during school and focus time | Yes, including daily time limits for specific apps and overall device use time limits | Yes. Set time limits for screen usage and pause internet access | Yes. Set time limits, schedule days and times for usage |
| Content Limits | Yes. Block inappropriate content from all devices where Aura parental controls are enabled | Yes. Block specific websites and apps on phone, gaming consoles, TV, and more | Yes. Gabb devices have simplified parental controls as they come without internet, social media, gaming, time consuming or dangerous apps | Yes. block harmful content with Safe Search and block specific apps | Yes. Filter websites, apps and games | Yes. Block certain content during schooltime, app supervision, block inappropriate sites |
| Alerts | Cyberbullying alerts, online usage insights and alerts, online predator alerts, personal information request alerts, and alert parents if a child deleted the app | Cyberbullying, online predators, suicidal ideation, sexting, and more | Safe zone location alerts, SOS emergency call option on watch devices, usage summaries and call/text logs available in the parent account | Low battery alerts for your child's device; web and app use reports | Receive weekly and monthly reports and set alerts for activity you want to know about in real time | Internet usage, search terms, app downloads and installs |
| Includes | Safe browsing, dark web monitoring and data breach alerts, password manager, antivirus, anti-malware, anti-spyware protection | Website filters, screentime schedules, location alerts, saved photo and video monitoring, child-psychologist advice and tips | Not applicable | | Call tracking and SMS for Android and iOS, location alerts, block inappropriate apps, games and websites | Antivirus, VPN, identity protection, password manager, reputation defender |

52.     Two widely used personal computer operating systems, Microsoft and Apple, include parental control features by default, straight out of the box, at no additional cost. All major browsers, including Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, likewise have parental control options. If parents want to add additional parental control features, they may easily purchase supplementary software like Bark or NetNanny or even download additional software for free, including Questodio, Kaspersky Safe Kids, FamilyKeeper, and others. These features enable parents to block access to sexually explicit materials on the Web, prevent minors from giving personal information to strangers by e-mail or in chat rooms, limit a child's screentime, and maintain a log of all online activity on a home computer. Parents can also use screening software that blocks messages containing certain words, as well as tracking and monitoring software. A parent also may restrict and observe a child's use of the internet merely by placing a computer in a public space within the home. All of these methods constitute "less restrictive means" for accomplishing the same ends.

53.     Filtering technology carries an additional benefit, in that a seventeen-year-old is very different than a twelve-year-old. Parents of an older minor can tailor exceptions for websites that offer, for instance, sexual education materials of clear benefit to an older minor but potentially inappropriate for a younger minor.

20

54.     Filtering technology is available for smartphones and cellular networks as well, such as on the Android operating system.

55.     Filtering technology includes not only Domain Name System (DNS) filtering, but also artificial intelligence (AI).  DNS filtering blocks websites based on how their domain names are categorized.  This filtering is dynamic in that once the user blocks a category like adult content, the DNS filtering services constantly scan the Internet and update that category with the latest websites.  In fact, uncategorized websites can be blocked as well, given that newly registered websites are among the most common sources of malware, viruses, and other malicious content. For families, Cisco Systems, one of the largest companies for Internet technologies, provides DNS filtering free of charge via its OpenDNS FamilyShield service.  AI is also being incorporated into filtering technology, enabling dynamic, real-time scanning and filtering of website content to block specific images, videos, and text within a webpage that are identified as falling under a blocked category.

## VI.     A Less Restrictive Alternative: Verifying Age at the Device Level

56.     Allowing parents to verify their child's age at the device level is another viable alternative.  Rather than requiring a user to verify with a website, an application can be installed on children's devices that allows parents to input their child's age.  Requests to visit a website coming from the device can imbed that information and allow the website to reject the request if the child is underage for the website.[16]  The privacy advantages of this are unmistakable, as protecting minors using this system would not rely on collecting even more data that can be used for malicious purposes.

## VII.    The Falsity Of The Required "Health Warnings"

57.     There is no scientific support for the bold assertions required by the Act's mandated "health warnings."  In fact, most are false and based on discredited (or never-credited) "pop culture science," including the statement that pornography causes mental health disorders.

---

[16]   *See* https://cyberscoop.com/age-verfication-schatz-cotton-social-media/.

58.     Furthermore, pornography is a highly controversial topic, with certain religious, political and other groups seeking to censor constitutionally protected adult content under the guise of falsely labeling pornography a public health crisis, on the basis of misconstrued studies and highly selective, self-serving anecdotes.

59.     Plaintiffs strongly disagree with every statement, express and implied, in the speech that the State purports to compel by the Act.

60.     Complying with the Act's requirement to speak messages approved by the Texas government is both impossible and unduly burdensome: impossible, because the Act requires "14-point font," but font size on websites is measured by pixels ("px") not points ("pt"), and unduly burdensome, because the length of the mandated messages would dwarf and drown out the advertisements the Act requires them to accompany.

61.     Moreover, although the messages are labeled "TEXAS HEALTH AND HUMAN SERVICES WARNING," on information and belief these messages were never approved by health professionals at that agency. The Texas Health and Human Services website provides information about Medicare coverage, Men's Health Month, low-income food programs, disaster relief programs, and "hundreds of other programs and services that help more than 7 million Texans a month live better lives."  There is a section devoted solely to mental health and substance abuse issues and provides links to information about adult mental health, adult substance abuse, children's mental health, crisis services, mental health and substance abuse resources, state hospitals, and youth substance abuse.[17] Another section consists entirely of links to data and statistics.[18]  Nowhere on its expansive website does the Texas Health and Human Services make claims that pornography has detrimental effects on adults.

62.     Similarly, the phone number the Act requires websites to published at the bottom of every page is for the US Substance Abuse and Mental Health Services Administration

---

[17] See, https://www.hhs.texas.gov/services/mental-health-substance-use/.
[18] See, https://www.hhs.texas.gov/about/records-statistics/data-statistics/.

(SAMHSA) Hotline.  Entering "pornography" into the SAMHSA website's search function returns one result, namely, an Office of Indian Services quarterly newsletter entitled Prevention and Recovery, where the following sentence is found in an article entitled "Fortifying the Circle: Changing the Future for Native Women and Girls": "According to federal statistics, Native American women are more than 2.5 times more likely to be raped or sexually assaulted than other women in the US. Reports have come from Minnesota and South Dakota that Native American girls, have been trafficked into prostitution, pornography, and strip shows over state lines and internationally into Mexico."  That's it; nothing more.  There is no indication that anyone calling this helpline looking for information about any effects of pornography will receive it there.  The required inclusion of these messages is performative and useless.

63.    Indeed, so-called "addiction" to pornography is not medically or scientifically supported.  The American Psychiatric Association (APA) does not recognize pornography or sexual addiction as a mental health disorder.  The DSM-5 TR, the standard manual of classification of mental disorders used by mental health clinicians and physicians, explicitly rejects the concept of sex addiction as unsupported by peer-reviewed evidence.  The American Association of Sexuality Educators, Counselors and Therapists (AASECT) and the Association for the Treatment and Prevention of Sexual Abuse (ATSA) have publicly rejected claims of pornography addiction as empirically unsupported.

## VIII.   Plaintiffs' Additional Injuries

64.    In addition to the "health warnings" required by the Act being false and misleading, this compelled speech deprives Plaintiffs and other adult entertainment providers of the goodwill of their Texan customers by implying that their content poses substantial health risks.  The age verification provisions of the Act similarly deprive Plaintiffs and others of the goodwill of their Texan customers, due to the burden age verification imposes and the risks it carries.

## IX.    The Act's Vagueness

65.    Because many of the terms in the Act are vague, the Act further chills the speech of providers of content online and restricts the availability of certain material to those entitled and

wishing to receive it.  The Act is riddled with vague words, phrases, and requirements, including but not limited to the following.

66.    The phrase "taken as a whole" in the definition of "sexual material harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically.  Should one consider only a specific article, certain text, or an individual image on a website?  Or should one consider the web page on which that text or image appears?  Or the entire website?  And should one include linked material?  The Act does not say, and Plaintiffs are left only to guess.

67.    The application of the Act to websites that publish or distribute material, "more than one-third of which is sexual material harmful to minors," is also vague, insofar as it fails to explain how "total material" is calculated.  Is it by the volume of data?  The number of posts?  What is the proper metric to measure?  Gigabytes?  Character count?  Number of images?  Video runtime?  Not to mention linked material.  May a website avoid the problem altogether by providing a link to all the anodyne content in the local public library?  Where a website "distributes" material, is the calculation based on the number of downloads? Where a website both "publishes" and "distributes" material, how is published material calculated vis-à-vis "distributed" material?  Again, Plaintiffs can only guess.

68.    The definition for the term "digital identification" is vague and circular.  The Act's age verification can be achieved by "require[ing] an individual to provide digital identification," and the Act defines "Digital identification" as "information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identity of an individual."  Thus, any information on a digital network accessible to commercial entities that is used for age verification is automatically sufficient to age verify users.  This is nonsensical.

69.    The statutory catch-all permitting "any commercially reasonable method that relies on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the Act.

70.     The Act does not even explain how often age verification must occur.  Individuals can access a website more than once, and from different devices and browsers.  Must age verification recur every hour; every time a web browser is closed and reopened; just once, if the website operator can find a way link a particular verification to a particular device; or something else?  The Act is once again silent.

71.      Because of the Act's vagueness, cautious operators of even non-pornographic websites must place the State's anti-pornography messaging on the landing page of their website, as well as on any advertisement for the website. Doing so labels them an "adult business"— resulting not only in potentially less internet traffic, but social stigma in some situations, lost ad revenue, and exclusion from public or private programs or curricula.  If they are a website that processes payments, they may lose the ability to accept major credit cards and be forced to use third-party billing companies that charge fees up to 15% of the purchase price, rather than the 3-5% typically charged by credit card companies.  They also may face difficulty purchasing business liability insurance and hiring employees.

## X.     The Need for Injunctive Relief

72.     The passage of the Act has placed Plaintiffs in reasonable apprehension that, if they continue their current course of conduct as they intend, they will be sued under the Act.  Indeed, the Act squarely targets Plaintiffs.

73.     The Act violates the First Amendment right to access protected speech and expressive conduct.

74.     The Act violates the First Amendment right not to speak orthodox messages dictated by the government.

75.     The Act authorizes a lawsuit in violation of section 230, which provides Plaintiffs with an immunity to court proceedings that will be irretrievably lost if the Attorney General is permitted to enforce the Act.

76.     The Act will destroy Plaintiffs' goodwill in Texas by forcing Plaintiffs to either withdraw from Texas or comply with the Act and nevertheless lose a vast number of  new and

longstanding adult visitors to their websites.  The false "health warnings" required by the Act deprives Plaintiffs and other adult entertainment providers of the goodwill of their adult Texan customers by falsely stating and implying that their content poses substantial health risks.  The age verification provisions of the Act similarly deprive Plaintiffs and other adult entertainment providers of the goodwill of their Texan customers, due to the burden age verification imposes and the risk it carries.

77. Plaintiffs thus have no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I: Section 1983 (All Plaintiffs)

### (The First Amendment)

78. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

79. The Act is facially overbroad in violation of the First Amendment (made applicable to the States through the Fourteenth Amendment) because its age verification requirement is substantially overbroad, is not narrowly tailored, and does not pursue a compelling state interest. It is substantially overbroad because it imposes a barrier to the rights of adults to access speech that is constitutionally protected for them.  It not narrowly tailored, because there are at least two superior, less restrictive alternatives: pre-blocking by internet service providers and the use of filtering technology by parents or others at the device level.  It does not pursue a compelling state interest because it is easily circumvented and dramatically underinclusive, exempting internet search engines, most social media sites, and news media.

80. The Act also violates the First Amendment because it compels website operators to speak a controversial government message that is both contrary to their views and false or unsupported.

81. The Act is further overbroad because it does not satisfy the First Amendment's heightened standards for clarity.  It is incurably vague regarding to whom it applies and what it

26

requires, thus chilling protected speech as website operators seek to avoid liability by steering clear of the law by a wider margin than would otherwise be required.

## COUNT II: Section 1983 (All Plaintiffs)

### (The Fourteenth Amendment)

82.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

83.     The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (procedural component) because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

84.     The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (substantive component) because it deprives Plaintiffs of a protected property right, in the form of their goodwill in Texas, without a rational basis.

85.     The Act violates the Equal Protection Clause of the Fourteenth Amendment because, with no rational basis for doing so, it exempts, for example, internet search engines and most social media sites while targeting adult entertainment platforms.

## COUNT III: Section 1983

### (Plaintiffs FSC, MG Premium Ltd as to SpiceVids, MG Freesites Ltd as to Pornhub,

### WebGroup, NKL, and MediaME SRL)

### (The Supremacy Clause and Section 230)

86.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

87.     Under the Supremacy Clause of the United States Constitution, the laws of the United States are "the supreme law of the land."

88.     Federal law confers a right of immunity against proceedings where the theory of liability equates websites with third-party publishers.  47 U.S.C. § 230(c)(1) states:  "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(e)(3) states: "No

cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

89.     Plaintiffs, as website platforms, are providers of an "interactive computer service" under section 230.

90.     As applied to Plaintiffs, the Act is preempted through the Supremacy Clause as a violation of section 230, because it imposes liability on website operators for putative harm caused by the content of third-party publishers.

**COUNT IV: Section 1983 (All Plaintiffs except Jane Doe)**

**(The Eighth Amendment)**

91.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

92.     Plaintiffs have a right against Excessive Fines under the Eighth Amendment.

93.     The Act authorizes civil penalties that are grossly disproportionate to any putative harm addressed by the Act.

**COUNT V: Section 1983 & 28 U.S.C. §§ 2201-02  (All Plaintiffs)**

**(Declaratory Judgment)**

94.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

95.     There is a present and justiciable dispute as to whether enforcement of the Act by Defendant violates the Plaintiffs' rights under the U.S. Constitution and federal law, as stated in Counts I-IV.

96.     The interests of Plaintiffs, on the one hand, and Defendant, on the other, are real and adverse.

97.     Absent court intervention, which would resolve the dispute over the Act's lawfulness, Defendant will proceed to enforce the Act even though the Act is unconstitutional and void.

98.    Plaintiffs accordingly seek a declaratory judgment that the Act is unconstitutional and unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.    Preliminarily and permanently enjoin Defendant, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with those who receive actual notice of the injunction, from enforcing the Act;

B.    Declare the Act unconstitutional and unenforceable, as a violation of the First Amendment, Fourteenth Amendment, Eighth Amendment, and Supremacy Clause of the U.S. Constitution.

C.    Award Plaintiffs damages and their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D.    Grant Plaintiffs such other and further relief as the Court deems just and proper.

DATED:  August 4, 2023                    QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                          By _____/s/ Scott Cole_____
                                             Scott Cole
                                             scottcole@quinnemanuel.com
                                             **QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP**
                                             300 West 6th Street
                                             Suite 2010
                                             Austin, TX 78701
                                             Telephone: (737) 667-6104

                                             Michael T. Zeller (*pro hac vice* forthcoming)
                                             Derek L. Schaffer (*pro hac vice* forthcoming)
                                             Thomas Nolan (*pro hac vice* forthcoming)
                                             Arian Koochesfahani (*pro hac vice* forthcoming)
                                             michaelzeller@quinnemanuel.com
                                             derekshaffer@quinnemanuel.com
                                             thomasnolan@quinnemanuel.com
                                             ariankoochesfahani@quinnemanuel.com
                                             **QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP**
                                             865 South Figueroa Street, 10th Floor
                                             Los Angeles, CA 90017-2543
                                             Telephone: (213) 443 3000
                                             Fax: (213) 443 3100

                                             Jeffrey Keith Sandman (*pro hac vice*
                                             forthcoming)
                                             jeff.sandman@webbdaniel.law
                                             **WEBB DANIEL FRIEDLANDER LLP**
                                             5208 Magazine St Ste 364
                                             New Orleans, LA 70115
                                             Phone: (978) 886 0639

                                             *Attorneys for Plaintiffs*

30