# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC., MG PREMIUM LTD, MG FREESITES LTD, WEBGROUP CZECH REPUBLIC, A.S., NKL ASSOCIATES, S.R.O., SONESTA TECHNOLOGIES, S.R.O., SONESTA MEDIA, S.R.O., YELLOW PRODUCTION S.R.O., PAPER STREET MEDIA, LLC, NEPTUNE MEDIA, LLC, JANE DOE, MEDIAME SRL, MIDUS HOLDINGS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ANGELA COLMENERO, IN HER OFFICIAL CAPACITY AS INTERIM ATTORNEY GENERAL FOR THE STATE OF TEXAS <br><br> Defendant. | **CASE NO.** 1:23-cv-917 <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR EXPEDITED PRELIMINARY INJUNCTION

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on the date and time of earliest convenience for the Court, at the United States Courthouse, 501 West 5th Street, Austin, Texas 78701, Plaintiffs will move for expedited preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65, on the grounds that the recently passed Texas law requiring website operators to perform age verification violates the First Amendment of the U.S. Constitution and, as to a subset of Plaintiffs operating website platforms hosting third party content, Section 230 of the Communications Decency Act.  Plaintiffs respectfully ask the Court to set an expedited hearing date and briefing schedule that will allow the Court to enter an Order on Plaintiffs' motion by September 1, 2023. Good cause exists because the law at issue goes into effect on September 1, 2023, and an Order issued after this date will expose Plaintiffs to irreparable harm.  Plaintiffs base this motion on the attached memorandum of points and authorities, declarations of Scott Cole, Richard L. Sonnier III, David J. Ley, Andreas Alkiviades Andreou, Alison Boden, Jane Doe, Jonathan Todd, Robert Seifert, and Sadiq Muhamed, and exhibits attached thereto.

DATED:  August 4, 2023                     QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP


                                    By_____/s/ Scott Cole_____
                                       Scott Cole (Bar No. 00790481)
                                       scottcole@quinnemanuel.com
                                       QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP
                                       201 West 5th Street
                                       11th Floor
                                       Austin, TX 78701
                                       Telephone: (737) 667 6110
                                       Fax: (737) 667 6110

Michael T. Zeller (*pro hac vice* forthcoming)
Derek L. Schaffer (*pro hac vice* forthcoming)
Thomas Nolan (*pro hac vice* forthcoming)
Arian Koochesfahani (*pro hac vice* forthcoming)
michaelzeller@quinnemanuel.com
derekshaffer@quinnemanuel.com
thomasnolan@quinnemanuel.com
ariankoochesfahani@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443 3000
Fax: (213) 443 3100

Jeffrey Keith Sandman (*pro hac vice*
forthcoming)
jeff.sandman@webbdaniel.law
WEBB DANIEL FRIEDLANDER LLP
5208 Magazine St Ste 364
New Orleans, LA 70115
Phone: (978) 886 0639

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ..............................................................................................................3

LEGAL STANDARD.........................................................................................................5

ARGUMENT ...................................................................................................................6

I.      PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
        MERITS ...............................................................................................................6

        A.      Plaintiffs Have Standing To Bring A Pre-Enforcement Challenge ........................6

        B.      The Act Violates The First Amendment Because It Is Overbroad And
                Imposes Content-Based Regulations That Fail Strict Scrutiny.............................7

                1.      The Act's "age verification" requirement is overbroad. ...........................7

                2.      The Act's "age verification" requirement fails strict scrutiny
                        because it is not narrowly tailored. ..........................................9

                3.      The Act's "age verification" requirement fails strict scrutiny
                        because it is too underinclusive to further a compelling interest..............11

                4.      The Act violates the First Amendment by compelling websites to
                        speak a government message. ..................................................13

                5.      The Act is impermissibly vague. ...............................................16

        C.      The Act Violates Section 230 Of The CDA ........................................17

II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN
        INJUNCTION ......................................................................................................19

III.    THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR AN
        INJUNCTION......................................................................................................20

IV.     SCOPE OF THE INJUNCTION ...........................................................................20

CONCLUSION................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
   600 U.S. __ (2023) ...........................................................................................................16

*ACLU v. Johnson*,
   194 F.3d 1149 (10th Cir. 1999) ..........................................................................................7

*ACLU v. Mukasey*,
   534 F.3d 181 (3rd Cir. 2008) ..........................................................................................1, 17

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*,
   851 F.3d 507 (5th Cir. 2017) ...............................................................................................6

*Am. C.L. Union v. Ashcroft*,
   322 F.3d 240 (3d Cir. 2003).............................................................................................17

*Am. C.L. Union v. Gonzales*,
   478 F. Supp. 2d 775 (E.D. Pa. 2007) .............................................................................10, 20

*American Booksellers Foundation v. Coakley*,
   2010 WL 4273802 (D. Mass. 2010) .....................................................................................7

*American Booksellers Foundation v. Dean*,
   342 F.3d 96 (2d Cir. 2003).................................................................................................7

*American Booksellers Foundation v. Sullivan*,
   799 F. Supp. 2d 1078 (D. Alaska 2011) ................................................................................7

*American Library Association v. Pataki*,
   969 F. Supp. 160 (S.D.N.Y. 1997) .......................................................................................7

*Ashcroft v. Am. C.L. Union*,
   542 U.S. 656 (2004).......................................................................................................9, 10

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002).........................................................................................................8

*Backpage.com, LLC v. Cooper*,
   939 F. Supp. 2d 805 (M.D. Tenn. 2013).............................................................................18

*Bennett v. Google, LLC*,
   882 F.3d 1163 (D.C. Cir. 2018) .........................................................................................18

*Bolger v. Youngs Drug Prod. Corp.*,
   463 U.S. 60 (1983)..........................................................................................................15

*Branzburg v. Hanes*,
    408 U.S. 665 (1972) ................................................................................................... 13

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011) ............................................................................................. 13, 14

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
    508 U.S. 520 (1993) ................................................................................................... 12

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ..................................................................................................... 11

*CTIA - The Wireless Ass'n v. City of Berkeley, California*,
    928 F.3d 832 (9th Cir. 2019) .................................................................................... 14

*Cyberspace Communications, Inc. v. Engler*,
    238 F.3d 420 (6th Cir. 2000) ...................................................................................... 7

*De Leon v. Perry*,
    975 F. Supp. 2d 632 (W.D. Tex. 2014) .................................................................... 19

*Disc. Tobacco City & Lottery, Inc. v. United States*,
    674 F.3d 509 (6th Cir. 2012) .................................................................................... 14

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) .................................................................................. 17

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................................................... 19

*Ent. Software Ass'n v. Blagojevich*,
    469 F.3d 641 (7th Cir. 2006) .................................................................................... 14

*Fabulous Associates v. Pennsylvania Public Utility Commission*,
    896 F.2d 780 (3d Cir. 1990) ................................................................................ 10, 11

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) .................................................................................. 19

*Florida Med. Ass'n v. United States Dep't of Health, Educ. & Welfare*,
    601 F.2d 199 (5th Cir. 1979) ...................................................................................... 6

*Fund Texas Choice v. Paxton*,
    2023 WL 2558143 (W.D. Tex. Feb. 24, 2023) ......................................................... 20

*Garden Dist. Book Shop, Inc. v. Stewart*,
    184 F. Supp. 3d 331 (M.D. La. 2016) ........................................................................ 7

*Garrett v. Estelle*,
    556 F.2d 1274 (5th Cir. 1977) .................................................................................. 13

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ...................................................................20

*Gorran v. Atkins Nutritionals, Inc.*,
   464 F. Supp. 2d 315 (S.D.N.Y. 2006), ....................................................15

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ..................................................................................16

*Henson Patriot Co., LLC v. Medina*,
   2014 WL 4546973 (W.D. Tex. Sept. 11, 2014) .......................................19

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
   804 F.2d 1390 (5th Cir. 1986) ..................................................................19

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ......................................................................5

*Langan v. Abbott*,
   518 F. Supp. 3d 948 (W.D. Tex. 2021) .......................................................6

*Ex parte Lo*,
   424 S.W.3d 10 (Tex. Crim. App. 2013) ..................................................1, 7

*Matal v. Tam*,
   582 U.S. 218 (2017) ............................................................................15, 16

*Miller v. California*,
   413 U.S. 15 (1973) ......................................................................................5

*Miller v. Davis*,
   2015 WL 9460311 (E.D. Ky. Sept. 23, 2015) ..........................................20

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018) ................................................................2, 13, 14, 16

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ....................................................................19

*NetChoice, L.L.C. v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) .....................................................................14

*Opulent Life Church v. City of Holly Springs, Miss.*,
   697 F.3d 279 (5th Cir. 2012) ....................................................................20

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*,
   475 U.S. 1 (1986) ......................................................................................14

*People for Ethical Treatment of Animals v. Hinckley*,
   526 F. Supp. 3d 218 (S.D. Tex. 2021) ......................................................20

*PSINet, Inc. v. Chapman,*
  362 F.3d 227 (4th Cir. 2004) (Virginia) ...................................................................7

*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155 (2015)...................................................................................................9, 11

*Reno v. ACLU,*
  521 U.S. 844 (1997)...................................................................................1, 7, 9, 16, 17

*Riley v. National Federation of Blind of N. C., Inc.,*
  487 U.S. 781 (1988)...................................................................................................13

*Serafine v. Branaman,*
  810 F.3d 354 (5th Cir. 2016) .....................................................................................8

*Smith v. Daily Mail Publishing Co.,*
  443 U.S. 97 (1979)......................................................................................................12

*Smith v. Goguen,*
  415 U.S. 566 (1974)...................................................................................................16

*Southeast Booksellers v. Ass'n v. McMaster,*
  282 F. Supp. 2d 389 (D.S.C. 2003)...........................................................................7

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) .....................................................................................6, 7

*Texas Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) .....................................................................................6

*Texas Ent. Ass'n, Inc. v. Hegar,*
  10 F.4th 495 (5th Cir. 2021) ......................................................................................6

*U.S. v. Williams,*
  553 U.S. 285 (2008)...................................................................................................16

*United States v. Stevens,*
  559 U.S. 460 (2010)...................................................................................................7

*Virginia v. Am. Booksellers Ass'n, Inc.,*
  484 U.S. 383 (1988)...................................................................................................6, 7

*Whole Woman's Health v. Hellerstedt,*
  579 U.S. 582 (2016)...................................................................................................20

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015)...................................................................................................12

*Worth v. Harrington,*
  2023 WL 2745673 (D. Minn. Mar. 31, 2023) ...........................................................20

*Zauderer v. Office of Disciplinary Counsel,*
    471 U.S. 626 (1985) ............................................................................................................ 14

## Constitutional Provisions

U.S. Const. amend. I ................................................ 1, 2, 5, 7, 8, 10, 13, 15, 16, 19, 20

## Statutes

47 U.S.C. § 230(c)(1) ........................................................................................................ 17

47 U.S.C. § 230(e)(3) .................................................................................................... 17, 19

Tex. Civ. Prac. & Rem. Code § 129B *et seq.* ................................................. 1, 3-5, 8, 11

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs, consisting of content creators, internet platforms that host third-party adult content, and studios seek a preliminary injunction preventing the Texas Attorney General from enforcing Tex. Civ. Prac. & Rem. Code § 129B *et seq.* (the "Act"), in violation of the U.S. Constitution. The Act takes effect on September 1, 2023, and on pain of fines and enjoinment, the Act will require website operators that host constitutionally protected adult content to collect personal information verifying that users are at least eighteen years old. The Act also requires many Plaintiffs to transform their websites into billboards for government speech by compelling them to post supposed "health warnings" maligning the content they feature. Both requirements are patently unconstitutional. As set forth below, this Court should enter a preliminary injunction barring enforcement of the Act, because Plaintiffs are overwhelmingly likely to succeed on the merits and the Act's infringement of Plaintiffs' free speech rights constitutes, by definition, irreparable harm.

*First*, court after court has invalided analogous state and federal laws seeking to regulate the publication of material harmful to minors on the internet on First Amendment grounds. *See, e.g. Reno v. ACLU*, 521 U.S. 844 (1997); *ACLU v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009); *Ex parte Lo*, 424 S.W.3d 10 (Tex. Crim. App. 2013). As these numerous precedents confirm, the Act is unconstitutionally overbroad, because it sweeps in and penalizes vast amounts of protected speech for adults. It therefore triggers strict scrutiny, which it cannot withstand. First, the Act is not "narrowly tailored" because there are less restrictive alternatives, including the content filtering and blocking of adult content at the level of minors' devices. By contrast, age verification at the level of adult platforms is ineffective because it is easily circumvented, especially by minors. Furthermore, the Act chills protected speech because adult users will avoid compliant websites, while smaller platforms will be forced out of business due to the costs of compliance. Moreover, the age verification requirement serves no "compelling interest," because it is too underinclusive to actually further the purported interest. If the Act's goal were truly to protect minors, it would not exempt search engines and most social media sites,

which teem with adult content.  Simply put, the Act unconstitutionally targets websites that host adult content and the protected speech therein.

*Second*, and independently, the Act's "health warning" requirement violates the First Amendment.  While guised as promoting public health, it is a classic example of government-compelled speech prescribing orthodoxy on a controversial issue.  It, too, is not narrowly tailored, because Texas could spread its message by other means—through a public education campaign, for example, as the Supreme Court has held.  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2367 (2018).  Nor does any supposed interest in public health withstand scrutiny.  The statements required by the "health warnings" lack evidentiary support, and many are demonstrably false.  Any attempt to characterize the "health warnings" as mere regulation of commercial speech also fails under settled law.  Not only are the warnings unsupported and controversial, their target is not a fungible good like cigarettes, but rather constitutionally protected speech.

*Third*, the Act violates section 230 of the Communications Decency Act as applied to the Plaintiffs that operate online platforms hosting only third-party content.  Section 230 bars state-law causes of action against websites if the cause of action would hold those websites responsible for content produced by third parties.  The Act's cause of action for the Attorney General does exactly that by imposing liability on platforms for putative harms that flow from the content those platforms passively host.  Federal law thus preempts the Act.

*Finally*, Plaintiffs satisfy all the remaining requirements for a preliminary injunction.  State infringement of First Amendment rights constitutes irreparable harm as a matter of law.  Violations of Section 230 likewise give rise to irreparable harm because the statute confers an immunity from suit that would be lost if the Attorney General enforced the Act.  In addition, enforcement will cause economic injury to Plaintiffs that cannot be calculated, particularly through the loss of goodwill, as Texas adults turn away from Plaintiffs to seek adult content on, for example, search engines, to which the Act does not apply; less reputable websites, which will never comply; or even the Dark Web, where the internet's black market thrives.  The Act confers no meaningful benefits and inflicts grave constitutional injuries, and thus the balance of harms weighs heavily in

Plaintiffs' favor.  The public interest favors an injunction for corresponding reasons.  Plaintiffs'
motion for a preliminary injunction should be granted.

## BACKGROUND

Plaintiffs have filed suit against Angela Colmenero, the interim Attorney General for the
State of Texas, in her official capacity, seeking injunctive relief against the enforcement of Tex.
Civ. Prac. & Rem. Code § 129B *et seq.* (the "Act").  Plaintiffs are entities and individuals who
will be harmed and burdened by the Act, including the Free Speech Coalition, Inc. ("FSC"), the
adult industry's primary trade association; MG Freesites Ltd, the operator of the popular adult
website Pornhub.com; Sonesta Media, s.r.o., which creates the content for BangBros.com; and
Jane Doe, an adult performer and content creator.  All oppose the restrictions that the Act places
on adults' rights to share and enjoy legal adult content, and object to the unsupported, false,
harmful messages the Act forces adult websites to display.  Declaration of Alison Boden ("Boden
Decl.") at ¶ 13; Declaration of Andreas Alkiviades Andreou ("Andreou Decl.") at ¶¶ 4-5, 12, 14;
Declaration of Robert Seifert ("Seifert Decl.") at ¶¶ 5-6, 10-11, 17-18; Declaration of Sadiq
Muhamed ("Muhamed Decl.") at ¶¶ 4, 6, 11, 13; Declaration of Jonathan Todd ("Todd Decl.") at
¶¶ 4-5; Declaration of Jane Doe ("Doe Decl.") at ¶¶ 5-6.

The Act goes into effect September 1, 2023.  *See* Act of June 12, 2023, Ch. 676, § 2 (H.B.
1181) Tex. Sess. Law Serv. (Vernon's).  It applies to "commercial entities" that "operate[] an
Internet website."   §§ 129B.002(a), 006(b)(1).   A website operator who "knowingly and
intentionally publishes or distributes material on an Internet website, including a social media
platform, more than one-third of which is sexual material harmful to minors, shall use reasonable
age verification methods . . . to verify that an individual attempting to access the material is 18
years of age or older." § 129B.002(a).  To implement "reasonable age verification" under the Act,
website operators must require that individuals either "provide digital identification" or "comply
with a commercial age verification system" that utilizes "government-issued identification" or "a
commercially reasonable method that relies on public or private transactional data." § 129B.0003.
The Act defines "transactional data" as any "sequence of information that documents an exchange,

agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event," including "records from mortgage, education, and employment entities." § 129B.001(7). The entity performing age verification "may not retain any identifying information of the individual." § 129B.002(b).

The Act further requires that website operators subject to the age verification requirement must display—on the website's landing page and on every advertisement for the website—an extensive "TEXAS HEALTH AND HUMAN SERVICES WARNING," as well as a bulletin on every webpage for the "U.S. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES" helpline. § 129B.004. The Act mandates the "warning" on the landing page to state that "[p]ornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function"; that "[e]xposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses"; and that "[p]ornography increases the demand for prostitution, child exploitation, and child pornography." § 129B.004(1). The Act additionally requires that every webpage must include the U.S. government's helpline telephone number and state (§ 129B.004(2)):

> THIS HELPLINE IS A FREE, CONFIDENTIAL INFORMATION SERVICE (IN ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY, FOR INDIVIDUALS AND FAMILY MEMBERS FACING MENTAL HEALTH OR SUBSTANCE USE DISORDERS. THE SERVICE PROVIDES REFERRAL TO LOCAL TREATMENT FACILITIES, SUPPORT GROUPS, AND COMMUNITY-BASED ORGANIZATIONS.

The Act exempts search engines and the media. § 129B.005. It "does not apply to a bona fide news or public interest broadcast, website video, report, or event and may not be construed to affect the rights of a news-gathering organization." § 129B.005(a). Nor does it apply to an "Internet service provider, or its affiliates or subsidiaries, a search engine, or a cloud service provider" that solely provides "access or connection to or from a website or other information or content on the Internet or on a facility, system, or network not under that provider's control, including transmission, downloading, intermediate storage, access software, or other services to

the extent the provider or search engine is not responsible for the creation of the content that constitutes sexual material harmful to minors." § 129B.005(b).

The Act defines "sexual material harmful to minors" as "any material" that:

(A) the average person applying contemporary community standards would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest;

(B) in a manner patently offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated displays or depictions of: (i) a person's pubic hair, anus, or genitals or the nipple of the female breast; (ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or (iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

§ 129B.001(6). This definition attempts to rely on the Supreme Court's definition of obscenity unprotected by the First Amendment, but adds the phrases "with respect to minors" and "for minors." *See Miller v. California*, 413 U.S. 15, 24 (1973). A "minor" is defined as any "individual younger than 18 years of age." § 129B.001(3).

If the Attorney General "believes" that a website operator "knowingly" does not comply with the Act's requirements, the Act empowers the Texas Attorney General to "enjoin [violations], recover a civil penalty, and obtain other relief the court considers appropriate." § 129B.006(a). The Act authorizes civil penalties of up to $10,000 a day, plus an additional amount "up to $250,000" if any minor in fact accesses the website. § 129B.006(b).

## LEGAL STANDARD

To obtain preliminary injunctive relief, Plaintiffs must demonstrate "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) the grant of the injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). A stronger showing on one element can

compensate for a weaker showing on another.  *See Florida Med. Ass'n v. United States Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

## ARGUMENT

## I.      PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

### A.      Plaintiffs Have Standing To Bring A Pre-Enforcement Challenge

As "an equitable exception to Eleventh Amendment sovereign immunity," plaintiffs can "sue a state official, in his official capacity, in seeking to enjoin enforcement of a state law that conflicts with federal law," *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515 (5th Cir. 2017), where, as here, the state official is statutorily tasked with enforcing the challenged law.  *Texas Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020); *see also Langan v. Abbott*, 518 F. Supp. 3d 948, 953 (W.D. Tex. 2021) (Judge Pitman explaining the same).  Plaintiffs also have Article III standing because they face imminent injuries, both to their constitutional rights and in the form of monetary penalties and enjoinment, fairly traceable to the Act and redressable by an injunction barring enforcement by the Attorney General.  *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).  Indeed, standing is guaranteed because all "[l]itigants ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *Virginia v.  Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386, 392–93 (1988) (cleaned up) (permitting booksellers to challenge, on behalf of the general public of book buyers, a law imposing penalties on the display of "visual or written material that depicts sexually explicit nudity . . . which is harmful to juveniles").   As a representative of its members, FSC has associational standing because its "members would otherwise have standing to sue in their own right," the interests FSC seeks to protect fall squarely within its mission, and "neither the claim asserted nor the relief requested requires the participation of individual members."  *Texas Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022) (cleaned up) (claims for injunctive relief do not require individual participation); *see also* Boden

Decl. at ¶¶ 3-7.  Plaintiffs' injuries are imminent because "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."  *Speech First*, 979 F.3d at 335 (cleaned up).  Moreover, "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures," which suffices to show pre-enforcement injury.  *Virginia*, 484 U.S. at 392.

###### B.      The Act Violates The First Amendment Because It Is Overbroad And Imposes Content-Based Regulations That Fail Strict Scrutiny

####### 1.      The Act's "age verification" requirement is overbroad.

Courts repeatedly have struck down laws, like the Act, that limit adult content in the name of ostensibly protecting minors, because such laws are overbroad and fail strict scrutiny.[1]  A statute is overbroad and "may be invalidated . . . if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 473 (2010).  While there may be a "governmental interest in protecting children from harmful materials . . . that interest does not justify an unnecessarily broad suppression of speech addressed to adults," who have the "right to receive and to address to one another . . . sexual expression that is indecent but not obscene[.]"  *Reno v. Am. C.L. Union*, 521 U.S. 844, 874–75 (1997).  Thus, even if the Act constitutionally regulates minors' access to speech—a point Plaintiffs need not address here (*see infra* at pp. 16-17)—the Act still must be invalidated where, as here, it effects an "unnecessarily broad suppression of speech addressed to adults."  *Id.* at 875.

---

[1] *See, e.g.*, *Ex Parte Lo*, 424 S.W.3d 10, 23 (Tex. Crim. App. 2013) (Texas); *Garden Dist. Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331 (M.D. La. 2016) (Louisiana); *American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia); *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont); *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico); *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina); *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

The first step in an overbreadth analysis is construing the statute.  *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016).  Here, the Act cannot be construed fully because it is impermissibly vague (*see infra* at pp. 16-17).  But this much is plain: the Act provides that a website operator who "knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors, shall use reasonable age verification methods . . . to verify that an individual attempting to access the material is 18 years of age or older." § 129B.002(a).  Regardless of what phrase is modified by the "more than one-third" threshold—whether it is the published "material," or rather the "Internet website" that must comprise more than one-third sexual material harmful to minors—makes no functional difference in this case.  The Act applies only to websites whose content in the aggregate meets the threshold.  The word "material" functions as a "mass noun," referring to an "aggregation of people or things taken as an indeterminate whole."  Bryan A. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 22 (2016).  "Material" thus refers to uploads to a website in the aggregate.  Indeed, this is the only reasonable interpretation that makes the Act internally consistent.[2]  The Act thus applies to websites meeting the "more than one-third" threshold for content harmful to minors as defined in reference to the *Miller* standard for obscenity as applied to minors.  § 129B.001(6).

The Act's invocation of the *Miller* standard for obscenity brings the First Amendment problem into stark relief.  Although the Act invokes the words of *Miller* to create a veneer of lawfulness, by tailoring that standard to minors it overreaches and violates the First Amendment,

---

[2]  If the word "material" instead refers to individual uploads and the "over one-third" threshold modifies the word "material," the Act would require *all* website operators to divide *all* uploads into parts "harmful to minors" and parts not, and to place even one upload that meets the threshold behind an age verification wall.  This burdensome exercise cannot be squared with the rest of the Act.  It would contradict the Act's definition of "sexual material harmful minors," which commands that materials be "taken as a whole," not divided up.  *See also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 248 (2002) (whether speech is obscene "does not depend on the presence of a single explicit scene").  It would also make the Act's "health warning" requirement even more problematic, by requiring websites with even the tiniest amount of adult content to identify as adult content platforms and to disseminate those "warnings."

because it subjects adults to age verification even when they seek to access content that is not obscene for them.  The Act thus qualifies as a content-based restriction subject to strict scrutiny. *See Reno*, 521 U.S. at 879 (applying strict scrutiny after a finding of "facial overbreadth"); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015) ("[A] speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed.") In other words, the Act must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *see also Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 670 (2004).  To pass muster, the Act must not only employ the least restrictive means of protecting minors, *see Reno*, 521 U.S. at 874, but it also must actually serve that goal.  *Ashcroft*, 542 U.S. at 670.  The government bears the burden of showing both, *id.* at 663, but in this case it can show neither.

> 2.     The Act's "age verification" requirement fails strict scrutiny because it is not narrowly tailored.

There are less restrictive alternatives that could produce similar or superior outcomes.  First and foremost, Texas could make freely available or require the use or pre-installation of filtering technology on minors' devices.  Declaration of Richard Sonnier ("Sonnier Decl.") at ¶¶ 13-44.  The Supreme Court explained this less restrictive alternative in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666–73 (2004).  There, the Court addressed the Child Online Protection Act ("COPA"), which barred the transmission of material harmful to minors over the internet.  The Court held that "[b]locking and filtering software is an alternative that is less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them."  *Id.* at 666–67.  The Court explained that filtering software is less restrictive because "adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information.  Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers."  *Id.* at 667.  The Court further explained that filtering is likely more effective than targeting speech at its source, because "a filter can prevent minors from seeing all pornography, not just pornography posted to the Web from America," and "filters are more

effective than age-verification requirements." *Id.*; *see also Am. C.L. Union v. Gonzales*, 478 F. Supp. 2d 775, 815 (E.D. Pa. 2007) (finding that filtering technology is more effective).

Courts have also found that requiring service providers—in this case, internet service providers ("ISPs")—to pre-block adult content, subject to an adult's un-blocking request, is another less restrictive means.  The Third Circuit explained this alternative in *Fabulous Associates v. Pennsylvania Public Utility Commission*, 896 F.2d 780, 788 (3d Cir. 1990).  There, the court held that phone-sex companies could not be forced to verify the ages of their customers, because the government could instead require telephone companies to block adult content until an adult requests access.  *Id.*  The state law at issue required phone-sex companies to verify the age of their customers using an "access code" system.  *Id.* at 781–82.  The court held that the law violated the First Amendment because it burdened phone-sex companies and infringed the right to access speech anonymously.  *Id.* at 785–87.  As the court explained, there was at least one less restrictive alternative, insomuch as the state could have required telephone companies to pre-block adult content until receiving a request for access from an adult.  *Id.* at 788.  That approach would have been less restrictive because revealing one's identity "to the telephone company is far less chilling than is loss of anonymity to the message service."  *Id.* "[P]re-blocking [would also not] necessitate . . . increased operating costs by the message services[.]"  *Id.*  The court thus affirmed that responsibility for minors' wellbeing lies "where our society has traditionally placed it—on the shoulders of the parent."  *Id.*; *see also* Sonnier Decl. at ¶¶ 37-41.

Here, Texas disregarded less restrictive alternatives in favor of a discredited approach that is far less effective, more dangerous, and more costly.  Sonnier Decl. at ¶¶ 18-31.  While the Act will do little or nothing specifically to protect minors, it profoundly burdens and harms adults. Most minors are far more tech-savvy than the average adult.  Thus, minors who wish to view adult content can and will continue to do so with ease, bypassing the nominal virtual barrier imposed by the Act by, e.g., using freely available VPN services that hide the IP addresses of devices connected to the internet and thereby allow users to appear as though they are operating elsewhere

geographically.  Sonnier Decl. at ¶¶ 23-31; Declaration of Scott Cole ("Cole Decl.") (Exh. 1).  In addition to turning to less reputable websites, minors might turn to the dark web using the "Tor" browser, exposing themselves to the internet's criminal underbelly.  Sonnier Decl. at ¶ 28; Cole Decl. (Exh. 2 at p. 11).  Similarly, minors will continue to accidentally encounter adult content at scale, because the Act exempts search engines and most social media sites (*see infra* at pp. 12-13).

As a result, the Act will primarily just force many adults to choose between exercising their constitutional right to access adult content and safeguarding their personal and private information.  Sonnier Decl. at ¶¶ 42-43; Boden Decl. at ¶ 6.  The Act authorizes age verification by capacious means, including by "records from mortgage, education, and employment entities," yet offers no remedy to individuals harmed by hacks or leaks.  § 129B.001(7).  While the Act forbids entities performing age verification from retaining personal information, it makes this prohibition enforceable only by the Attorney General.  §§ 129B.002(b), 129B.006.  Worse yet, the Act's plain wording allows information to be transferred away to third parties *during* the verification process, gutting the Act's already-threadbare "protections" for personal information.  And the Act's financial impact on smaller websites will further chill protected speech, as the cost of implementing age verification can be prohibitive.  Boden Decl. at ¶ 11; *see also Fabulous Associates*, 896 F.2d at 788 (considering the costs of compliance for distributors of protected speech).  Because less restrictive, more effective means exist, the Act cannot withstand strict scrutiny.

        3.    <u>The Act's "age verification" requirement fails strict scrutiny because it is too underinclusive to further a compelling interest.</u>

While allegedly aimed at protecting minors, the Act fails this purpose.  Instead, it suggests viewpoint discrimination against the adult industry—a "blatant and egregious form of content discrimination" targeting particular speakers.  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015) (cleaned up).  When a statute is dramatically underinclusive, that is a red flag that it pursues forbidden viewpoint discrimination under false auspices, or at a minimum simply does not fit its purported purpose.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 36 (1994) (explaining that when a law is underinclusive, it "diminish[e]s the credibility of the government's rationale for restricting

speech in the first place"). As the Supreme Court has explained, "underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint . . . [Thus,] we invalidated a city's ban on ritual animal sacrifices because the city failed to regulate vast swaths of conduct that similarly diminished its asserted interests in public health and animal welfare." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448–49 (2015) (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 543–547 (1993)). "Underinclusiveness can also reveal that a law does not actually advance a compelling interest. For example, a State's decision to prohibit newspapers, but not electronic media, from releasing the names of juvenile defendants suggested that the law did not advance its stated purpose of protecting youth privacy." *Id.* (citing *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 104–105 (1979)).

*Smith v. Daily Mail Publishing Company* is particularly instructive. 443 U.S. 97, 104 (1979). There, the Court struck down a law purporting to protect the identities of juvenile criminal defendants by banning newspapers from publishing their names. *Id.* at 98. As the Court explained, "even assuming the statute served a state interest of the highest order, it does not accomplish its stated purpose." *Id.* at 105. "In this very case, three *radio* stations announced the alleged assailant's name before the Daily Mail decided to publish it." *Id.* (emphasis added). Justice Rehnquist put it bluntly: "It is difficult to take very seriously West Virginia's asserted need to preserve the anonymity of its youthful offenders when it permits other, equally, if not more, effective means of mass communication to distribute this information without fear of punishment." *Id.* at 110.

Just as the law struck down in *Smith* ignored "equally, if not more, effective" mediums of communication, the Act arbitrarily exempts internet search engines—the primary method for accessing content online, including adult content that is just as explicit as the content on adult websites. Sonnier Decl. at ¶ 41. Bing, for example, is the default search engine for the web browser Microsoft Edge. Cole Decl. (Exh. 3 at p. 18). It comes pre-installed in most computers using the Windows operating system. Cole Decl. (Exh. 4 at pp. 23-24). Because Bing is exempted

from the Act, any minor can continue to use Bing to access endless amounts of adult content in seconds.  Sonnier Decl. at ¶ 41.  Similarly, while the Act singles out adult websites for adverse treatment, it leaves unregulated all the equally explicit adult content found on social media sites whose large volume of non-adult content brings them outside the Act' scope.  *See* Cole Decl. (Exh. 5 at p. 31).  Such underinclusivity is independently fatal.[3]  *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011) (the "regulation is wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it. . . . California has singled out the purveyors of video games for disfavored treatment . . . compared to booksellers, cartoonists, and movie producers[.]").  If the Act pursues a coherent goal at all, it is not protecting minors; it is discriminating against the adult industry and adults who would otherwise patronize it.  This is all the more clearly revealed by the Act's "warning label" requirement, discussed below, which bears no relation to protecting minors from viewing adult content.

    4.    <u>The Act violates the First Amendment by compelling websites to speak a government message.</u>

Separate and apart from the Act's unconstitutional *restrictions* on accessing adult content, the Act compels website operators to *affirmatively express* the government's message as their own, contrary to their actual views.  Such compulsion of speech poses a separate constitutional violation as a distinct content-based restriction subject to strict scrutiny.  *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("By compelling individuals to speak a particular message, such notices alter the content of [petitioners'] speech." (citing *Riley v. National Federation of Blind of N. C., Inc.,* 487 U.S. 781, 795 (1988))).  This aspect of the Act is similarly incapable of withstanding strict scrutiny.  It fails to use the least restrictive means, because Texas could instead convey its message "without burdening a speaker with unwanted speech. . . . Most obviously, it could inform [the public directly] with a public-information campaign."  *Id.* at 2376 (cleaned up).  Nor does the Act pursue a compelling interest, because it is nonsensical to provide

---

[3]  The Act also exempts news media and employees of news media, despite the fact that neither enjoys greater First Amendment rights than the general public.  *See Garrett v. Estelle*, 556 F.2d 1274, 1277 (5th Cir. 1977) (citing *Branzburg v. Hanes*, 408 U.S. 665, 684 (1972)).

"health warnings" to protect minors who, by virtue of the "age verification" requirement, should never be on adult websites in the first place.  To the extent Texas might here assert (*post hoc*, contrary to the Act's title and premises) a general interest in the health and safety of *all* its citizens, that interest is undeserving of credit where, as here, it is premised on falsehoods, biased statements, and unsupported accusations.  *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (no compelling interest where state failed to prove the existence of a societal problem by presenting inconclusive evidence linking violent video games to violence in minors); Declaration of David Ley ("Ley Decl.") at ¶ 17.  Texas cannot constitutionally hijack private speakers and enlist them as its mouthpieces.  *See, e.g., Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 4, 21 (1986) (holding California could not force "a privately owned utility company to include in its billing envelopes speech of a third party with which the utility disagrees").[4]

To be clear, there is no analog between what the Act requires and permissible health warnings on cigarette sales and direct advertising of same, as permitted by *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).  *See Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 551 (6th Cir. 2012) (upholding textual warnings on cigarette cartons under *Zauderer*).  *Zauderer* established that the government can require disclosures of "purely factual and uncontroversial" information about goods or services to advance a legitimate interest, so long as the disclosures do not unduly burden free speech.  *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022); *see also Becerra*, 138 S. Ct. at 2372.  But the test is conjunctive: a mandated disclosure must be *both* factual *and* uncontroversial.  *See, e.g.*, *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 845 (9th Cir. 2019) (explaining *Zauderer* did not apply to forcing anti-abortion clinics to disclose the existence of state-sponsored abortion services because, while factual, the disclosure "took sides in a heated political controversy, forcing the clinic to convey a message fundamentally at odds with its mission"); *see also Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (strict scrutiny, not *Zauderer*, applied to a

---

[4]  It is also incoherent.  The Act demands "14-point font," but text size on webpages is measured by pixel, not font size.  Cole Decl. (Exh. 6 at p. 49).

requirement that video game packages display a symbol reflecting the state's definition of "sexually explicit," a "subjective and highly controversial message").

Here, the mandated disclosures are neither factual nor uncontroversial. Ley Decl. at ¶¶ 7-17. Some are pulled from thin air, such as the requirement to place *on every webpage* a bulletin for the U.S. substance abuse and mental health hotline, which thus associates pornography with substance abuse despite the absence of any supporting evidence. *Id.* at ¶¶ 8-12. Some are patently false, such as the inscrutable claim that pornography "weaken[s] brain function" and is associated with mental health disorders. *Id.* at ¶ 8. Yet others, such as the claim that the existence of pornography increases the demand for child pornography, falsely conflate entirely separate issues. *Id.* at ¶¶ 13-14. Every last statement required by the Act is controversial, taking sides in political disputes over lawful adult content. *See* Cole Decl. (Exh. 7 at p. 58).

More fundamentally, "the core notion of commercial speech [is] speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (cleaned up). By no means do Plaintiffs' websites answer to that description. Andreou Decl. at ¶¶ 3, 9, 10, 11; Seifert Decl. at ¶¶ 3, 9; Muhamed Decl. at ¶¶ 3, 10. Further, government compulsion cannot hold sway when a plaintiff "advertises an activity itself protected by the First Amendment." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 68 n.14 (1983). Just so here: the "health warnings" do not target a fungible consumer product like a pack of cigarettes, but instead target *constitutionally protected speech*. *Cf. Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 325, 328 (S.D.N.Y. 2006), *aff'd*, 279 F. App'x 40 (2d Cir. 2008) (speech found on a website does not give rise to product liability, because it is protected by the First Amendment). "[I]t is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 582 U.S. 218, 221 (2017). As the court in *Volokh v. James* explained, a New York law requiring social media sites to disclose a "policy for responding to complaints of hateful content . . . [is] different in character and kind from commercial speech and amounts to more than mere disclosure of factual information, such as caloric information or mercury content[.]"   2023 WL 1991435, at *8

15

(S.D.N.Y. Feb. 14, 2023) (enjoining New York's "hate speech" law).  Thus, because the service provided by social media sites is to facilitate protected speech, including hate speech, the court rejected New York's attempted invocation of the lower standard for commercial speech to justify disclosures specifically attaching to such speech.  *Id.*  The same principle applies here.  Regardless of the purported societal ills Texas points to—all of which are false or unsupported—Texas cannot constitutionally turn adult websites into government billboards waging a governmental war against adult content.  *See 303 Creative LLC v. Elenis*, 600 U.S. __, __ (2023) (slip op., at 8) ("the government may not compel a person to speak its own preferred messages").  The extension of the "health warning" requirement to online advertisements is also unduly burdensome because the required statements will dwarf the advertisements themselves, drowning out private speech in favor of government speech.  *See Becerra*, 138 S. Ct. at 2376–77; *see also* Andreou Decl. at ¶ 13; Muhamed Decl. at ¶¶ 5, 12.

### 5.   The Act is impermissibly vague.

The Act is overbroad in yet another way.  "If a law is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."  *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (cleaned up).  "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms."  *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up); *see also Reno*, 521 U.S. at 870 ("Regardless of whether the CDA is so vague that it violates the Fifth Amendment, the many ambiguities concerning the scope of its coverage render it problematic for purposes of the First Amendment.").  Accordingly, "[t]o avoid the chilling effect a vague law might have on speech," laws must "give persons reasonable notice of what is prohibited."  *U.S. v. Williams*, 553 U.S. 285, 304 (2008).

The Act fails even to make clear to whom it applies.  The Act is silent about how to perform the "over one-third" calculation, because it is silent about what counts as an individual instance of material on an Internet website.  Indeed, the Act is vague as to whether the unit of counting is whole videos, seconds of a video, file size, or something else.  Do duplicates of a video found on

different webpages count twice?  If a webpage hyperlinks to another webpage, does the material on the linked page count?  One can only speculate.  Further, although the Act purports to address speech that is obscene for minors, the phrase "with respect to minors" has no one meaning.  *See Am. C.L. Union v. Mukasey*, 534 F.3d 181, 205 (3d Cir. 2008).  The Act defines "minors" as persons of all ages under 18.  Yet "[t]he type of material that might be considered harmful to a younger minor is vastly different—and encompasses a much greater universe of speech—than material that is harmful to a minor just shy of seventeen years old. . . . [S]ex education materials may have 'serious value' for, and not be 'patently offensive' as to, sixteen-year-olds. The same material, however, might well be considered 'patently offensive' as to, and without 'serious value' for, children aged, say, ten to thirteen[.]"  *Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 268 (3d Cir. 2003), *affirmed in relevant part*, 542 U.S. 656 (2004).  Under the Act, it is impossible for website operators to know what standard to use.  Nor does the Act make clear what it demands.  The Act says nothing about how often age verification must be performed.  The Act is silent as to whether website access may be granted on an hourly basis, for a single browsing session, forever on the same device, or something else.  In short, the Act contains multiple "ambiguities concerning the scope of its coverage," making the statute void for vagueness under the First Amendment's heightened standard for clarity.  *Reno*, 521 U.S. at 870.

### C.     The Act Violates Section 230 Of The CDA

The Communications Decency Act ("CDA") provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  As courts uniformly hold, "[w]ebsites are the most common interactive computer services."  *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019).  The statute further provides that, "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).  "The intent of the CDA is . . . to promote rather than chill internet speech . . . [paving] the way for a robust new forum for public speech as

well as a trillion-dollar industry centered around user-generated content." *Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018) (cleaned up).

In *Doe v. MySpace, Inc.*, the Fifth Circuit held that "Congress provided broad immunity under the CDA to Web-based service providers for *all claims* stemming from their publication of information created by third parties[.]" 528 F.3d 413, 418 (5th Cir. 2008) (emphasis added); *see also, e.g.*, *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 813, 828 (M.D. Tenn. 2013) (applying section 230 to a Tennessee law "criminaliz[ing] the sale of certain sex-oriented advertisements"). Under section 230, "[p]arties complaining that they were harmed by a Web site's publication of user-generated content . . . may sue the third-party user who generated the content." *MySpace*, 528 F.3d at 419. But they cannot sue "the interactive computer service that enabled them to publish the content online." *Id.* Thus, when a state law holds a website responsible for failing to protect minors from harm allegedly caused by adult content, the law does what section 230 forbids: it treats the website as the publisher who should be held responsible for that content. *See id.* at 419–20.

*MySpace* governs here. In that case, the plaintiff sued the interactive social media site "MySpace" for negligence in failing to take precautions to prevent sexual predators from communicating with minors. *Id.* at 416. Specifically, the plaintiff accused MySpace of "declining to implement age-verification software[.]" *Id.* at 422. But that claim was barred by Section 230. *Id.* at 420. As the Court of Appeals explained, "notwithstanding their assertion that they only seek to hold MySpace liable for its failure to implement measures that would have prevented Julie Doe from communicating with Solis . . . [t]heir allegations are merely another way of claiming that MySpace was liable for publishing the communications[.]" *Id.* Here, just as in *MySpace*, the Act would hold platforms liable for not implementing age verification protocols; the root cause of the alleged harm to minors would be content created by third parties; and enforcement of the Act would be just "another way" of trying to hold platforms—precisely the Plaintiffs that are website operators hosting third-party content here—responsible for that harm. Under *MySpace*, the

Attorney General's cause of action under the Act is barred and preempted.  *See* 47 U.S.C. § 230(e)(3).

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

To show irreparable harm, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).  Here, the Act poses a significant threat of imminent injury to constitutional rights across the board (*see supra* at pp. 7-17).  It is axiomatic that money damages cannot fully repair constitutional injuries.  *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law.").  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Independently, the Act's violations of section 230 pose irreparable harm because section 230 creates an immunity from court proceedings.  The statute expressly provides that "*[n]o cause of action may be brought* and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3) (emphasis added).  Thus, courts have held that "section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008).  Since section 230 creates "an immunity from suit" that would be "effectively lost if a case is erroneously permitted to go to trial," irreparable harm follows. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (cleaned up).

"[I]mmeasurable loss [of] goodwill" constitutes further irreparable harm. *Henson Patriot Co., LLC v. Medina*, 2014 WL 4546973, at *4 (W.D. Tex. Sept. 11, 2014).  Here, Plaintiffs will suffer loss of goodwill as Texas adults abandon Plaintiffs' platforms in response to the demand that they reveal personal information and the false "health warnings" the Act requires.

## III.   THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR AN INJUNCTION

Given these irreparable harms, Texas "would need to present powerful evidence of harm to its interests to prevent [Plaintiffs] from showing that the threatened injury outweighs any harm [Texas] would suffer as a result of the injunction." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012).  Texas cannot overcome this burden, not least because it has no legitimate interests at stake (*see supra* at pp. 11-13) and minors can easily circumvent the Act's restrictions.  And "[w]here constitutional rights are concerned, 'enforcement of an unconstitutional law is always contrary to the public interest.'" *Fund Texas Choice v. Paxton*, 2023 WL 2558143, at *27 (W.D. Tex. Feb. 24, 2023) (Judge Pitman) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

## IV.   SCOPE OF THE INJUNCTION

"[I]f the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is proper." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, (2016) (cleaned up), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).  A statute that is unconstitutional on its face "is invalid *in toto*—and therefore incapable of any valid application." *People for Ethical Treatment of Animals v. Hinckley*, 526 F. Supp. 3d 218, 226 (S.D. Tex. 2021) (cleaned up); *see also, e.g.*,  *Am. C.L. Union v. Gonzales*, 478 F. Supp. 2d 775, 821 (E.D. Pa. 2007) (enjoining enforcement "at any time for any conduct."); *Fund Texas Choice v. Paxton*, 2023 WL 2558143, at *27 (W.D. Tex. Feb. 24, 2023) (similar).  Likewise, an injunction for as-applied challenges should reach similarly situated parties.  *See, e.g.*, *Worth v. Harrington*, 2023 WL 2745673, at *22 (D. Minn. Mar. 31, 2023); *Miller v. Davis*, 2015 WL 9460311, at *2 (E.D. Ky. Sept. 23, 2015).  Here, an injunction as to Plaintiffs' First Amendment challenge should enjoin the law *in toto*, while an injunction based on Plaintiffs' section 230 challenge should enjoin the law as applied to the Plaintiffs whose websites host third-party content and similarly situated platforms.

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin enforcement of the Act.

DATED:  August 4, 2023    QUINN EMANUEL URQUHART &
             SULLIVAN, LLP

             By   /s/  *Scott L. Cole*

              Scott L. Cole (Bar No. 00790481)
              scottcole@quinnemanuel.com
              QUINN EMANUEL URQUHART &
              SULLIVAN, LLP
              300 West 6th Street
              Suite 2010
              Austin, TX 78701
              Telephone: (737) 667 6110
              Fax: (737) 667 6110

              Michael T. Zeller (*pro hac vice* forthcoming)
              Derek L. Schaffer (*pro hac vice* forthcoming)
              Thomas Nolan (*pro hac vice* forthcoming)
              Arian Koochesfahani (*pro hac vice*
              forthcoming)
              michaelzeller@quinnemanuel.com
              derekshaffer@quinnemanuel.com
              thomasnolan@quinnemanuel.com
              ariankoochesfahani@quinnemanuel.com
              QUINN EMANUEL URQUHART &
              SULLIVAN, LLP
              865 South Figueroa Street, 10th Floor
              Los Angeles, CA 90017-2543
              Telephone: (213) 443 3000
              Fax: (213) 443 3100

              Jeffrey Keith Sandman (*pro hac vice*
              forthcoming)
              jeff.sandman@webbdaniel.law
              WEBB DANIEL FRIEDLANDER LLP
              5208 Magazine St Ste 364
              New Orleans, LA 70115
              Phone: (978) 886 0639