# EXHIBIT A

INT THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **FREE SPEECH COALITION, INC.,** | § | |
| ***et. al.,*** | § | |
| Plaintiffs, | § | |
| | § | |
| **vs.** | § | |
| | § | **Civil Action No. 1:23-cv-917** |
| | § | |
| **ANGELO COLMENERO, in her** | § | |
| **Capacity as Interim Attorney** | § | |
| **General for the State of Texas** | § | |
| Defendant. | § | |

**BRIEF OF STATE SENATOR BOB HALL AND STATE REPRESENTATIVE NATE
SCHATZLINE AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTION FOR
EXPEDITED PRELIMINARY INJUNCTION**

**INTRODUCTION[1]**

1.      *Amici* State Senator Bob Hall and State Representative Nate Schatzline are elected legislators from the State of Texas, who co-authored and co-sponsored the legislation that is the subject of this lawsuit. In their capacity as elected representatives, who participated in the drafting and debate of the legislation that forms the basis of this lawsuit, *amici* have championed Texas' overwhelming aim[2] at protecting children from the secondary effects of online commercial pornography and reducing the demand for prostitution, child exploitation, and child pornography that such commercial content creates. As elected officials with a keen awareness of the process through which this legislation came into being, the reasons for its enactment, and a responsibility for the protection of their constituents' children, *amici* have a distinctive and undeniable interest in the outcome of this case and Plaintiffs' Motion for Expedited Preliminary

---

[1] No party (or counsel for a party) participated in the preparation of this brief or made any monetary contribution intended to fund its creation or submission.

[2] *See infra* ¶ 45.

1

Injunction.

2.      A*mici* file this brief in opposition to Plaintiff's Motion for Expedited Preliminary Injunction to highlight the lack of any cognizable interest that Plaintiffs possess in the affairs of the State of Texas, the clear pathway that the Supreme Court has carved for legislation such as HB 1181, and to **urge the Court to refrain from interfereing with the State's right to prioritize the protection of its minors above the interests of overseas commercial pornography businesses**.

## BACKGROUND

3.      Since the inception of the internet, pornography – particularly commercial pornography – has grown at an exorbitant rate and shows no signs of slowing. [3]

4.      For those outside the pocketbooks of the $97 billion commercial porn industry,[4] this presents a substantial problem. Pornography consumption has well-documented social, emotional, psychological, and societal negative side effects.[5] Among these, and as particularly relevant here, the State of Texas has determined that: (1) pornography is harmful to brain development, desensitizes brain reward circuits, increases conditioned responses, weakens brain function, and is potentially biologically addictive, (2) is associated with low self-esteem, body images issues, eating disorders, and other emotional and mental illness, and (3) increases demand for prostitution, child exploitation, and child pornography.[6]

5.      Understanding the gravity of this problem, the Texas legislature took action to protect against these side-effects. Specifically, the State followed the clearly lit path illuminated by Supreme Court precedent and drafted HB 1181 – legislation narrowly tailored to protect

---

[3] See dkt. 26-2, pp. 2-3.
[4] See https://fightthenewdrug.org/how-does-the-porn-industry-actually-make-money-today/
[5] Dkt. 26-3, 26-4, and 26-8.

minors against these secondary effects of commercial pornography consumption – all the while leaving completely untouched the ability of adult consumers and producers to continue their consumption and production by merely verifying the age of online consumers.

6.     Now, a coalition of commercial pornography businesses – who own websites such as TeensLoveAnal.Com, TeensLoveBlackCocks.Com, and PervTherapy.Com[7] – challenge HB 1181 as an unconstitutional restriction on speech. Specifically, Plaintiffs – the majority of whom are based overseas – incorrectly argue that HB 1181 is subject to strict scrutiny analysis and that the only solution to the problem that they have created is for the State to adopt a "safe injection site" approach so that minors can "safely" consume porn scenes like the one described in Defendant's Response Brief[8] in the same way that drug addicts in New York City can "safely" consume heroine at supervised facilities.[9]

## ARGUMENT

7.     The fundamental question before this Court is whether Plaintiffs have met their exceedingly high burden of establishing that the Age-Verification requirement created by HB 1181 unduly restricts[10] adult access to commercial pornography. The answer is that they have not. HB 1181 is a constitutionally permissible time, manner, and place restriction that is designed to deter the secondary effects of commercial pornography on children. Because Plaintiffs cannot

---

[6] Tex. H.B. 1181, 88th Leg., R.S. (2023)

[7] Ex. 1.5.

[8] Dkt. 26-2, p. 1 (describing the pornographic videos on Plaintiffs' websites as "'gangbangs of a tied-up young woman, who, over the course of a 36-minute video is bound with rope and electrical tape, strangled, gagged, slapped, and then penetrated by the penises of five men—at points, three at a time—all of whom eventually ejaculate on her face while her mouth is forced open.")

[9] *See* supra n. 66.

[10] *Reno v. ACLU*, 521 U.S. 844, 888 (1997) (O'Connor, J., Rehnquist, C.J. concurring in part). Other terminology that has been used to determine whether a law's impact on adult access is

demonstrate a substantial likelihood of success on their facial challenge, the Court should deny Plaintiff's request for a preliminary injunction.

**A. Plaintiffs' Facial Challenge to HB 1181 Bears an Exceedingly Difficult Burden That Plaintiffs Cannot Carry.**

8.      "To obtain a preliminary injunction plaintiffs must show (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest."[11]

9.      By this lawsuit and the preliminary injunction that Plaintiffs seek, Plaintiffs present a facial challenge to a law that has been the subject of public debate and, which not only survived the full-play of the democratic process,[12] but received overwhelming bi-partisan support along the way, passing the Texas House of Representatives by a vote of 133 to 1.[13]

10.     Whereas the burden under intermediate scrutiny will ultimately rest on the State of Texas, in the course of this preliminary facial challenge, the full weight of the burden rests squarely on Plaintiffs.[14] And, in the words of the Supreme Court, "a facial challenge to a legislative Act is… the most difficult challenge to mount successfully."[15] To prevail in their pursuit of a preliminary injunction, Plaintiffs must demonstrate that there is not a single

---

permissible is whether the regulation "allows for reasonable alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1986).

[11] *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005).

[12] *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008).

[13] H.J. of Tex., 88th Leg., R.S., p. 5374 (5/25/2023).

[14] *See Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) ("a preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four elements") (internal citations omitted).

[15] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

constitutional application of HB 1181.[16] This task is made even more difficult because, on the other end of the pendulum, the Court should also construe the law as narrowly as possible during the challenge to avoid encountering any constitutional complications.[17]

**B.  Plaintiffs Universally Lack Standing to Challenge HB 1181 in the First Place.**

11.     Standing is an indispensable component of the separation of powers and requires that a claimant demonstrate concrete, particularized, and actual or imminent (as opposed to conjectural or hypothetical) injury.[18] A court "cannot strike down [a law] on its face based on a mere possibility…"[19]

12.     For purposes of the standing analysis, Plaintiffs can be divided into four (4) distinct categories: (1) overseas porn businesses, (2) Florida porn businesses,[20] (3) a porn actress who resides in Oregon, and (4) a self-proclaimed porn trade association based in California.

13.     The central harm that Plaintiffs complain of is their claim that the Age-Verification Requirement will deter online consumption of pornography by Texas adults because the adults will abstain from consuming online pornography for fear that their information might be hacked, stolen, or surreptitiously taken if they are required to provide it. This purported First Amendment "injury" suffers several fatal flaws.

14.     First – and most glaringly – this isn't a fear advanced by any real Texans.

---

[16] *See Id.* ("…the challenger must establish that no set of circumstances exists under which the Act would be valid"); *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008).

[17] *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); *see also Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 658 (5th Cir. 2006)

[18] *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208-09 (5th Cir. 2011).

[19] *Washington State Grange*, 552 U.S. at 455.

[20] *See infra* ¶ 24.

Although Plaintiffs include an anonymous porn actress under the pseudonym of "Jane Doe," **the class of Plaintiffs notably lacks – even under the guise anonymity – a single adult consumer (much less one from Texas) of online pornography who has actually expressed this fear**. Rather, this "fear" is a tangential theory fabricated by the online pornography businesses for the exclusive purpose of challenging HB 1181. Indeed, even beyond the absence of a plaintiff with a cognizable injury, there is a complete absence of evidence in the record to support Plaintiff's theory with respect to Texas' implementation of the law.[21]

15.    Second, Plaintiffs' fabrication of the consumer fear concern defies the terms of HB 1181 and Plaintiffs' very own practices. Whereas Plaintiffs go to great lengths to rationalize the purported fear of consumers, they neglect to mention that HB 1181 expressly prohibits Plaintiffs' websites and other online pornography businesses like them from storing or retaining consumer information collected for Age-Verification purposes.[22]

16.    Likewise, Plaintiffs also neglect to mention that the majority of the pornographic websites in this suit are self-identified "subscription-based website[s]" who – by definition – are already collecting personal information from their consumers.[23] In fact, **not only do the commercial porn websites appear to uniformly track and collect user data by default, but some of them collect Facebook and Google account data from their websites' visitors**.[24]

     **i.    Romanian, Czech, and Cypriot Porn Businesses Lack First Amendment Rights Under the United States Constitution.**

---

[21] *Washington State* Grange, 552 U.S. at 455-56 (rejecting a facial freedom of association challenge to a voting law and holding "we cannot strike down [a law] on its face based on the mere possibility of voter confusion," and noting that the correct inquiry was whether the law could "conceivably" be implemented in a way that eliminated widespread danger.)

[22] Tex. H.B. 1181, 88th Leg., R.S. (2023) ("a commercial entity that performs the age verification… may not retain any identifying information of the individual.")

[23] According to their pleadings, the Florida-based porn companies exclusively operate subscription-based websites. Dkt. 1, ¶¶ 19, 20, and 23.

[24] Exs. 1.1, 1.2.

17.     The largest category of plaintiffs is overseas porn businesses. These businesses are organized under the laws of Romania, Czech Republic, and Cyprus, and make up eight (8) of the thirteen (13) plaintiffs. According to their own pleadings, each of these plaintiffs operate their principal place of business in their respective country of incorporation.[25]

18.     According to Supreme Court precedent, as foreign entities operating abroad, these overseas porn businesses "do not possess rights under the U.S. Constitution," and accordingly, lack standing to challenge HB 1181. This issue was addressed by the Supreme Court in 2020 and the relationship of the entities involved was remarkably similar to the dynamic at issue here.[26] In 2013, American HIV/AIDS relief organizations challenged a congressional mandate that required them to adopt a policy in opposition to prostitution and sex trafficking as a condition of government funding.[27] The challenge was brought under the First Amendment and the American relief organizations prevailed.[28]

19.     On the heels of that decision, in 2020 the foreign affiliates of those American relief organizations challenged the same policy as it related to their receipt of funds in *Agency for International Development*.[29] The foreign affiliates, however, were not met with the same success and for good reason.[30] First, according to Justice Kavanaugh writing on behalf of the majority, it is "long-settled" that foreign entities operating outside the United States "do not possess rights under the U.S. Constitution."[31] And second, despite the business affiliation of the

---

[25] Dkt. 1, ¶¶ 12-22.

[26] *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086-88 (2020) ("*AID II*").

[27] *Agency for Intern. Dev. v. All. for Open Soc'y Intern., Inc.*, 570 U.S. 205 (2013) ("*AID I*").

[28] *Id.* at 221.

[29] *AID II*, 140 S. Ct. 2082, 2086.

[30] *Id.* at 2089.

[31] *Id.* at 2086.

foreign entities with the American entities, "separately incorporated organizations are separate legal units with *distinct legal rights* and obligations."[32]

20.     Under the facts and reasoning of *Agency for International Development*, this case demands the same conclusion. The overseas porn companies are foreign organizations who – by their own acknowledgment – operate their commercial porn businesses in Romania, Czech Republic, and Cyprus. As businesses incorporated under, and operating in, those countries, the overseas porn companies lack rights under the United State Constitution and, in turn, lack standing to challenge HB 1181. What is more, under the Supreme Court's express reasoning in *Agency for International Development*, the fact that these overseas porn companies are commercial affiliates of Florida porn businesses is of no consequence to the Constitutional analysis.

      **ii.     The Florida Porn Businesses Do Not Allege That They Operate in Texas and Their Classification as Florida Businesses is Questionable.**

21.      Unlike the overseas porn companies and websites, which are widely recognized as the most popular commercial pornography websites in the world, the Florida businesses do not carry the same recognition. Indeed, it is unclear how widely known and accessed the websites are, or whether the audiences and marketing of these websites are limited to specific geographical regions. One thing is for certain: they have not alleged that they have Texas consumers, and in turn, they have no basis to claim that any adult pornography consumers will turn away from their websites as a result of HB 1181.

22.     Even if the Florida businesses scrape past their failure to allege the existence of any Texas consumers, the purported consumer fear of providing personal information wholly collapses under the invasive weight of their privacy policies. Among all of the commercial

---

[32] *Id.* at 2087 (emphasis added).

pornography websites involved in this lawsuit, the Florida businesses have – by far – the most invasive data collection practices: claiming access to Facebook and Google account data of their websites' visitors.[33]

23.     Finally, *amici* would respectfully encourage the Court and Defendant to inquire further into the legitimacy of the Florida business' citizenship to determine whether they are indeed entitled to Constitutional protections. To illustrate this point, under the "who we are" heading of the privacy policy for LetsDoeIt.Com,[34] the website provides:

> We ALL 4 HEALTH Srl, Natiunile Boulevard no 4, Building 107A, 050121 Bucharest, Romania, for the rest of the world and for North America, MIDUS HOLDINGS INC, 5944 Coral Rudge Drive #247, Coral Springs, Florida 33076, USA (hereinafter "LetsDoeIt") are responsible for the processing of your personal data in connection with the use of our products and services under letsdoeit.com.[35]

The policy then goes on to identify a single Data Protection Officer, located at the Romanian address.[36]

24.     Thus, while it appears to be true that the Florida businesses maintain certificates of incorporation in the State of Florida, it seems highly suspect whether a single webpage can claim multiple different legal identities depending solely on the location of the end user.

### iii.   The Anonymous Oregon Porn Actress Lacks Standing.

25.      The anonymous Oregon porn actress does not allege that she owns or operates a website subject to HB 1181, and similarly, hardly even attempts to claim an injury. Her best attempt is only to say that she opposes the legislation and will be restricted from accessing "her" audience. This is insufficient conjecture that is broken further by the gap between the actress as a performer and the indirect downstream consumers. Without additional information, but a general

---

[33] *See* Exs. 1.1, 1.2.
[34] Website owned by Plaintiff Midus Holdings, Inc. Dkt. 1, ¶ 23.
[35] Ex. 1.1; *see also* Ex. 1.2. (similar provision for SuperBe.Com).

recognition of how acting contracts operate, it is also questionable whether the actress even maintains downstream rights to the content that she creates.

26.     The Oregon actress does not claim to be a Texas internet user and does not allege that she will be prohibited from continuing to create or access commercial pornography online in any way.

### iv.     The California Porn Trade Association Lacks Standing.

27.     The only harms alleged by the California porn trade association are a vague and unparticularized "significant concern" with the legislation and a complaint that its Executive Director and Director of Public Affairs have spent time tracking HB 1181 and other similar legislation in various states across the country.

28.     In an apparent recognition of its standing argument's fragility, the trade association invokes *Virginia v. American Booksellers Association* to claim that it can sue on behalf of "others not before the court."[37] However, while it is true that the standing analysis is more flexible in the First Amendment arena, the trade association is not just asking the Court to let it sue as a proxy for its members (and apparently, consumers), but the trade association is asking the Court to go a step-further and create a new frontier for standing jurisprudence.

29.     The trade association asks this Court to accept a speculative and subjective fear of future illegal hacking as a sufficient injury to warrant a facial constitutional challenge and bestow standing. This injury, however, is nothing more than a "mere possibility," that cannot support standing.[38]

30.     The problem presented by this novel request is further exacerbated by the fact that

---

[36] Ex. 1.1; *see also* Ex. 1.2.
[37] Dkt. 5, p. 6.

neither the trade association nor any other Plaintiff has offered a single justification as to why Texas' Age-Verification requirement would put an online adult consumer's identity at any greater risk of hacking or surreptitious collection than the cookies, plug-ins, credit cards, and other data that Plaintiffs are already using to track their consumers.[39]

### C. HB 1181 Is A Constitutionally Permissible Time, Manner, and Place Restriction Narrowly Aimed at Protecting Minors From the Secondary Effects Associated With Pornography Consumption.

31.     Time, manner, and place restrictions to ensure adult-only access to commercial pornography and protect children from the health-related side-effects associated with such content are treated as content-neutral restrictions[40] and subject only to "intermediate scrutiny."[41] That is, the regulations must be targeted at, and narrowly tailored to serve, an important government interest.[42] Importantly, **unlike strict scrutiny – regulations evaluated under this lesser standard "need not be the least restrictive or least intrusive means of" accomplishing**

---

[38] *Washington State Grange*, 552 U.S. at 455; *Nat'l Fed'n of the Blind of Tex., Inc.*, 647 F.3d at 209.
[39] *See e.g.* Ex. 1 (and attachments thereto).
[40] *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986) ("At first glance, the Renton ordinance… does not appear to fit neatly into either the 'content-based' or 'content-neutral' category. To be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters…. In short, the Renton ordinance is completely consistent with our definition of 'content-neutral' speech regulations as those that 'are justified without reference to the content of the regulated speech.'") (internal emphasis omitted); *see also* Elena Kagan, Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L. Rev. 413 (1996) (arguing that the controlling inquiry in First Amendment law is whether the government's motive is proper or improper).
[41] *Id.* at 46-50; Erwin Chemerinsky, Constitutional Law: Principles and Policies 965, 4th ed., 2011 ("the Supreme Court has indicated that a facial content-based restriction will be deemed content-neutral if it is motivated by a permissible content-neutral purpose."); *see also* Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 676 (2004) (Scalia, J., dissenting) (advocating for an even lesser standard and stating that sexually explicit commercial speech is constitutionally unprotected).
[42] *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).

**the government's objective**.[43]

32.     Three Supreme Court decisions are important to understanding this area of the law: *Ginsberg v. New York*, *Renton v. Playtime Theatres*, and *Reno v. ACLU*.

33.     Well before the rise of the internet, in 1968 the Supreme Court considered and upheld the constitutionality of a state law criminalizing the commercial distribution of sexually explicit magazines to minors in *Ginsberg v. New York*.[44] The importance of that case is twofold. First, it established that the government can regulate children's access to sexually explicit materials in ways that it cannot for adults.[45] And second, it set the table for the rule that was expressly recognized later in *City of Renton* (discussed *infra*), that content-based restrictions on speech are exempt from strict scrutiny if the government's objective is to protect children from the secondary impacts of sexually explicit content.[46]

34.     Later, in *City of Renton*, the City of Renton, Washington passed a municipal ordinance that prohibited adult theaters from existing within 1,000 feet of residential areas, churches, parks, or schools.[47] By its terms, the regulation was created to "prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserve[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life.'"[48] When two adult theaters challenged the ordinance, the district court denied their request for injunctive relief,[49] and the ninth circuit reversed. On appeal before the Supreme Court, Justice

---

[43] *Id.* (internal citations omitted).
[44] *Ginsberg v. State of N. Y.*, 390 U.S. 629 (1968).
[45] *Id.* at 639.
[46] *Id.* at 641.
[47] *City of Renton*, 475 U.S. at 44.
[48] *City of Renton*, 475 U.S. at 48.
[49] The district court initially granted a preliminary injunction, but after the parties agreed to submit the case for a final decision on the record, the district court vacated the injunction and denied further relief. *Id.* at 44-45.

Rehnquist, writing for **the majority plainly held that it is constitutionally permissible to treat commercial sexually-oriented businesses differently from other entertainment businesses if the predominate intent of the regulation is the secondary impact that such businesses cause rather than disdain for the content itself.**[50]

35.     Approximately a decade later, in the early and explosive years of the internet, Congress enacted the Communications Decency Act of 1996 (the "CDA"). Among the extensive provisions therein, the CDA broadly criminalized (1) the knowing transmission of obscene or indecent messages to recipients under 18, and (2) the knowing sending or displaying of patently offensive messages in a manner available to persons under 18.[51] Both of these provisions were quickly challenged in *Reno v. ACLU*,  correctly analyzed as content-specific regulations subject to strict scrutiny review, and struck down as unconstitutional.[52] The Court noted a key consideration that required it to implement strict scrutiny review. Namely, the Court pointed-out that unlike the focus of the legislation in *City of Renton*, the objective of the CDA was not to target the secondary effects of sexually-oriented business, but in the CDA's own words, it was designed to limit "indecent" and "patently offensive" speech from reaching minors.[53] In other words, the government's purpose for regulating the speech was a sort of animus towards the speech itself. It was not regulating the messages because of the secondary effects (i.e. health concerns) that the messages would have on children, as *City of Renton* allowed.

36.     Even beyond this, however, the CDA provisions possessed a number of other constitutionally damning characteristics that imposed a heavier burden on the government. First,

---

[50] *Id.* at 47-50; *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) ("[a] facial challenge must fail where the statute has a 'plainly legitimate sweep'") (internal citations omitted).
[51] *Reno v. ACLU*, 521 U.S. 844, 859-60 (1997).
[52] *Id.* at 868.

the Court twice emphasized that,[54] unlike other regulations aimed at protecting minors that it had

upheld in the past, the CDA's applicability was not limited to commercial speech, but applied

with "wholly unprecedented" ubiquity to all speech throughout the full universe of cyber-

space.[55] Second, because there was no effective age-verification technology in 1997, the only

way to prevent minor access to the restricted content was to deny adults access to the same

content. Along this same line, the Court also recognized that any attempt at age-verification by

non-commercial speakers covered by the law would be cost-prohibitive. Third, and finally, the

CDA was a criminal statute punishable by imprisonment.[56]

37.     Notably, looking well-ahead of her time, Justice O'Connor, writing on behalf of

herself and Chief Justice Rehnquist, made explicit a caveat that the majority also appreciated: [57]

With advancements in technology, laws such as HB 1181 would find a home within First

Amendment jurisprudence. Justice O'Connor preemptively blessed this idea with her

endorsement of constitutionality, writing:

> Although the prospects for the eventual zoning of the Internet appear promising, I
> agree with the Court that we must evaluate the constitutionality of the CDA as it
> applies to the Internet as it exists today… Until gateway technology is available
> throughout cyberspace, and it is not in 1997, a speaker cannot be reasonably
> assured that the speech he displays will reach only adults because it is impossible
> to confine speech to an 'adult zone.'

Now – 26 years later – with the technology in place and online pornography occupying a

---

[53] *Reno*, 521 U.S. at 868.

[54] *Id.* at 865, 877

[55] *Id.* at 877 ("the breadth of the CDA's wholly unprecedented. Unlike the regulations upheld [in prior cases], the scope of the CDA is not limited to commercial speech or commercial entities"); The same cannot be said of HB 1181. The application of HB 1181 is limited to commercial entities who publish material on a website, the content of which, is more than 1/3 sexual material harmful to minors). Tex. H.B. 1181, 88th Leg., R.S. (2023).

[56] *Reno*, 521 U.S. at 872; here, there are no criminal penalties associated with HB 1181.

substantial portion of cyberspace,[58] the time has come and "adult zones" are available.

38.    Notably too, at the time of *Reno*, the district court also found that "almost all sexually explicit images [online] [were] preceded by warnings as to the content."[59] As is self-evident by Plaintiffs' lawsuit, this is no longer the case. Plaintiffs are now expressly challenging the requirement that they display a warning on their websites prior to viewing.

> **i.   *City of Renton* Remains the Controlling Precedent that Resolves this Case.**

39.    Although Plaintiffs attempt to spin *Reno* as a retreat from *City of Renton*, the rule established by *City of Renton* remains the controlling precedent that resolves this case. The Supreme Court made this clear at least twice after *Reno* in *City of Erie v. PAP's A.M.* in 2000 and *Los Angeles v. Alameda Books* in 2002.[60] In both cases, the Court treated facially content-specific regulations aimed at the secondary effects of adult businesses as content-neutral and subject only to intermediate scrutiny.[61]

40.    By its very terms, here, like in *City of Renton*, the Texas Legislature enacted HB 1181 to protect minors out of a recognition that: (1) "pornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function," (2) "is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illness," and (3) increases demand for prostition, child exploitation, and child

---

[57] *Id.* at 876 ("…at the time of trial existing technology did not include any effective method for the sender to prevent minors from obtaining access to its communications without also denying access to adults.")

[58] Dkt. 26-6.

[59] *Reno*, 521 U.S. at 854.

[60] 535 U.S. 425 (2002)

[61] *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296-97 (2000); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434-36 (2002).

pornography."[62]

**D. Even if Strict Scrutiny is Applied (It Should Not Be), Plaintiffs Misunderstand the State's Burden and the Court Should Reject Plaintiff's "Safe Injection Site" Policy Argument.**

41.     Among other things, Plaintiffs argue that HB 1181 is not sufficiently narrowly tailored because they argue that it is an inefficient means of accomplishing the State's compelling interest. According to Plaintiffs, there are easy methods for minors to circumvent the Age-Verification Requirement,[63] and implementation of such a requirement will only drive children to the dark-web or Tor browsers.[64] According to Plaintiffs, the State should accept these less comprehensive approaches[65] that provide a "safer" pathway to pornography if a child tries to circumvent them. Notably, this is the same approach that New York City adopted when it gave up on its heroin epidemic and retreated to opening "safe injection sites."[66]

42.     To support this argument, Plaintiffs propose two *private* methodologies that they argue are less restrictive and more efficient means of solving the *public* problem: content filtering and blocking at the device level.

43.     The problem for Plaintiffs is that the "least restrictive means" standard under strict scrutiny (which, again, is inappropriate here, but addressed for purposes of Plaintiffs'

---

[62] Tex. H.B. 1181, 88th Leg., R.S. (2023).

[63] These bypass procedures and the alternatives to age-verification are *so simple* that Plaintiffs only needed an expert with 35-years of experience and a 10-page resume to review over 100 sources, and prepare 19-pages of testimony to explain them. See Dkt. 5-2.

[64] Following Plaintiffs' reasoning, even if their approaches were adopted by parents, children might just as easily steal an alternative device from someone else to get around these barriers. After all, this would probably be much easier than reading and understanding the convoluted "how-to" drafted by Plaintiffs' expert.

[65] *See infra* ¶ 45.

[66] *See* https://www.aei.org/op-eds/there-is-no-proof-safe-injection-sites-in-nyc-actually-work/

argument), is a *comparative standard between legislative options available to the government*.[67] The existence of private alternatives to triage a compelling government interest – such as a public health epidemic in minors created by the consumption of online pornography – is irrelevant to the First Amendment analysis. And thankfully so. If "least restrictive means" was a comparative standard of all available options, legislative bodies would possess minimal to zero power to resolve public health crises. Even more concerning, the government's inability to act would create a disparate impact on disadvantaged and lower-income children and families for the very reasons that are exemplified by Plaintiffs' proposed alternatives. Parents who work multiple jobs to provide for their family (or earn less income) will have a lesser ability to maintain oversight of their children's 24/7 internet usage and they will be less capable of affording the software, much less the accompanying hardware, that Plaintiffs suggest they must buy. These same parents may also possess a less advanced education and have less operational knowledge about how technology and the internet work.

44.     Lower socioeconomic children are more likely to be funneled towards public computers in public libraries, where their parents lack control, and the government's hands will be tied.[68] What is more, for all parents, rich and poor, the explosive growth of technology over the past thirty (30) years – including that which has occurred in schools – has made it virtually impossible for parents to control all of the devices through which their children consume internet content. And even if a parent could manage this within their own household, the same may not be true of their neighbor or the parents of their child's best friend. What Plaintiffs suggest is a

---

[67] *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 815 (2000) ("if a less restrictive means is *available for the Government* to achieve its goals, the *Government must use it*.") (emphasis added).

"gun-to-the-head"[69] approach for parents: spend money to do the government's job or risk the well-being of your children.

45.      Luckily for Texans, the people's elected representatives get to determine Texas policy – not overseas online pornography businesses. And speak the elected officials did. The Texas House of Representatives voted 133-1 in favor of HB 1181,[70] The Texas Senate passed the measure, and the Texas Governor signed the bill into law. That is how our system of government is supposed to work.[71]

**E. Beyond Plaintiffs Lackluster Likelihood of Success on the Merits, the Court Should Deny Plaintiffs' Motion for Expedited Preliminary Injunction Because Plaintiffs' Interests Are Far Outweighed by the Texas Public's Overwhelming Interest in the Protection of Minors.**

46.      HB 1181 does absolutely nothing to prohibit adult creation or consumption of commercial pornography. Regardless of how the Court rules, new commercial pornography will inevitably be created – and Texas adults will continue to have full-unfettered access to the full gamut of commercial pornography through all mediums. Likewise, Plaintiffs can continue their operation of websites – even, TeensLoveAnal.com TeensLoveBlackCocks.Com, and PervTherapy.Com – where they can create and sell content, and generate revenue from across the entire world and all 50 United States.

47.      The reverse is not true. If HB 1181 is enjoined, doors will be opened for young

---

[68] No doubt, Plaintiffs would cry foul if a governmental body implemented Plaintiffs' suggestions on publicly accessible computers, where the implementation would interfere with the ability of adults to access the same content.
[69] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012).
[70] *Supra* n. 13.
[71] *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008) ("…facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people") (internal citations omitted).

and curious minds, that cannot be easily shut. In the interim between an injunction and dissolution or reversal, young boys and girls will visit their first porn website. Those boys and girls will be exposed to a warped understanding of healthy sexual relationships and all of the other lasting health consequences that the State has sought to prevent. On top of that, more demand will be created for prostitution, child exploitation, and child pornography.

48.     The State's interest in protecting these children from the secondary effects of pornography dwarfs the impact that HB 1181 will have on these overseas pornography companies.  A preliminary injunction will negatively alter the lives of certain children forever. If the Court denies Plaintiffs' request, and upholds HB 1181, the commercial pornography industry won't feel a thing – and neither will its adult consumers.

## <u>CONCLUSION</u>

49.     Plaintiffs' request for a preliminary injunction should be denied. Not only do the Plaintiffs lack standing to challenge HB 1181, but HB 1181 is a constitutionally permissible time, manner, and place regulation that was drafted to closely tailor to Supreme Court precedent and achieve permissible purposes. When the Court reads HB 1181 as narrowly as possible – as it must – Plaintiffs simply have no hope of meeting their most difficult burden on this facial challenge.


Dated: August 21, 2023

Respectfully submitted,

`

**Stinson LLP**

*/s/ Robert E. Farquharson*
Robert E. Farquharson
Texas Bar Number 24100550
robert.farquharson@stinson.com
2200 Ross Ave., Suite 2900
Dallas, Texas 75201
Telephone: (214)560-2201
Fax: (214)560-2203

## **CERTIFICATE OF SERVICE**

I certify that I caused a true and correct copy of the foregoing document to be served on all parties of record via e-service on this 21st day of August 2023.

*/s/ Robert E. Farquharson*
Robert E. Farquharson