IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al., | § § § | No. 1:23-CV-917-DAE |
| Plaintiffs, | § § § | |
| vs. | § § | |
| ANGELA COLMENERO, in her official capacity as Interim Attorney General for the State of Texas, | § § § § | |
| Defendant. | § § | |
| _____ | § § § § § | |

ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION

Before the Court is Plaintiff Free Speech Coalition, et al.'s ("Plaintiffs")

motion for a preliminary injunction (Dkt. # 5). On August 23, the Court held a

hearing on the matter. Upon careful consideration of the arguments raised by the

parties in the briefing and at the hearing, the Court—for reasons that follow—

**GRANTS** Plaintiffs' motion as to their First Amendment claims and **GRANTS** the

motion in part as to their Section 230 claims. Defendant Colmenero is

preliminarily **ENJOINED** from enforcing H.B. 1181.

## I. BACKGROUND

This case concerns a law passed by the State of Texas that restricts access to pornographic websites by requiring digital age verification methods and warnings about the alleged harms caused by pornography. *See* Act of June 12, 2023, Ch. 676, § 2 (H.B. 1181) Tex. Sess. Law Serv. (Vernon's) (hereinafter, "HB 1181"). Plaintiffs, comprised of online pornography websites, performers, and advocates, bring suit to stop the law from being enforced before it takes effect on September 1, 2023.

### A.     The Parties

Plaintiffs can largely be split into three categories. First is Free Speech Coalition, Inc. ("Free Speech Coalition"), a nonprofit trade association of adult content performers, producers, distributors, and retailers. (Compl., Dkt. # 1, at 4). Free Speech Coalition assists its members in their First Amendment expression, and its members include adult content performers and businesses that produce and sell adult content. (Id.) Free Speech Coalition alleges that "many of [its] members are . . . gravely concerned about the consequences of [H.B. 1181], but who fear for their safety should they come forward to challenge [H.B. 1181] in court." (Id.). Free Speech Coalition also alleges that it has been forced to divert resources from its normal day-to-day activities in order to track legislation, meet with attorneys,

and engage in risk-management to minimize the harm that age-verification statutes like H.B. 1181 pose to their members.

Second, several Plaintiffs are companies that produce, sell, and license adult content. Many of these are incorporated abroad, while others are U.S.-based companies. Plaintiff MG Premium Ltd. is a Cypriot company that operates SpiceVids.com, Brazzers.com, and FakeTaxi.com, all of which are subscription-based adult-content websites. (Id. at 4–5). MG Premium Ltd writes, hires, and does pre- and post-production work for the adult videos, uploading them to their own sites and to others. (Id. at 5). Similarly, Plaintiff MG Freesites Ltd operates Pornhub.com, which hosts uploaded content owned, copyrighted, and controlled by third parties. (Id.) Plaintiff WebGroup Czech Republic, a.s., operates xvideos.com, a free website that hosts adult videos. (Id.) Plaintiff NKL Associates, s.r.o, operates xnxx.com, which similarly hosts free adult videos. (Id.) Plaintiff Sonesta Technologies, s.r.o. operates BangBros.com, a subscription-based website offering adult videos. (Id. at 6). Plaintiff Yellow Production, s.r.o. owns and produces FakeTaxi and licenses its content to other adult websites, including Pornhub, Xvideos, Xnxx, and SpiceVids.

Three website Plaintiffs reside and principally operate in the United States. Plaintiff Paper Street Media, LLC resides in Florida and operates TeamSkeet, a network of subscription-based adult websites. Paper Street owns the intellectual

3

property rights to these videos, and shoots with adult performers, writes the scripts, and hires and employs the production teams. (Id.) Plaintiff Neptune Media likewise resides in Florida and operates the MYLF adult content network, which is similarly comprised of several adult-content subscription services and websites. (Id. at 7). Plaintiffs MediaME SRL, a Romanian company, hosts free adult entertainment websites, while Plaintiff Midus Holdings, Inc., another Florida company, operates subscription-based sites. (Id. at 7–8). These companies operating in and outside the United States (collectively, "the Adult Video Companies") oppose H.B. 1181 and allege that it would unconstitutionally restrict their free expression and compel them to post government-mandated speech. They also oppose the law on the basis that it violates the immunity vested on website publishers by Section 230 of the Communications Decadency Act ("CDA").

Third and finally, Plaintiff Jane Doe is an adult performer whose content is featured on several adult websites, including Pornhub.com, as well as CamSoda, Sextpanther, and MyFreeCams. (Id.; Doe Decl., Dkt. 5-6).[1] Doe opposes the restrictions that H.B. 1181 would place on their ability to reach audiences and is

---

[1] As of the date of this order, Defendant has not challenged Jane Doe's pseudonymity. Because her standing is not independently necessary for Plaintiffs' motion to succeed and because Doe has presented facially legitimate concerns regarding intimidation, the Court will allow her to proceed pseudonymously at this early and expedited stage. See U.S. Navy SEALs 1-26 v. Austin, 594 F. Supp. 3d 767, 782 n.5 (N.D. Tex. 2022) (allowing preliminary injunction to proceed before resolving question of anonymity), stay pending appeal denied by 27 F.4th 336 (5th Cir. 2022), appeal dismissed as moot 72 F.4th 666 (5th Cir. 2023). However, the Court will order briefing on Doe's ability to proceed pseudonymously following the issuance of this order.

against the messages websites would have to convey about the purported harmful

effects of pornography. (Id.)

Defendant Angela Colmenero is sued in her official capacity as Interim

Attorney General for the State of Texas. Plaintiffs bring suit against her under the

*Ex parte Young* exception to sovereign immunity, arguing that she has the authority

to enforce H.B. 1181. (Id. at 3).

    B.    H.B. 1181

On June 12, 2023, Texas Governor Greg Abbott signed H.B. 1181 into law.

(Id. at 8). H.B. 1181 is set to take effect on September 1, 2023. H.B. 1181 contains

two requirements, both of which are challenged in this litigation. First, the law

requires websites to use "reasonable age verification methods . . . to verify that an

individual attempting to access the material is 18 years of age or older." H.B. 1181

§ 129B.002. Second, the law requires adult content websites to post a warning

about the purported harmful effects of pornography and a national helpline for

people with mental health disorders. H.B. 1181 § 129B.003.

The law defines "sexual material harmful to minors" as including any

material that "(A) the average person applying contemporary community standards

would find, taking the material as a whole is and designed to appeal or pander to

the prurient interest" to minors, (B) is patently offensive to minors, and (C) "taken

5

as a whole, lacks serious literary, artistic, political, or scientific value for minors."
Id. § 129b.001.

The law regulates a "commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors . . . ." Id. § 129B.002. H.B. 1181 requires these companies to "comply with a commercial age verification system that verifies age using: (A) government-issued identification; or (B) a commercially reasonable method that relies on public or private transactional data to verify the age of an individual." H.B. 1181 § 129B.003. "Transactional data" refers to a "sequence of information that documents an exchange . . . used for the purpose of satisfying a request or event. The term includes records from mortgage, education, and employment entities." Id. H.B. 1181 does not allow the companies or third-party verifiers to "retain any identifying information of the individual." Id. § 129B.002.

In addition to the age verification, H.B. 1181 requires adult content sites to post a "public health warning" about the psychological dangers of pornography. In 14-point font or larger, sites must post:

> TEXAS   HEALTH   AND   HUMAN   SERVICES
> WARNING:
> Pornography is potentially biologically addictive, is
> proven to harm human brain development, desensitizes
> brain reward circuits, increases conditioned responses, and
> weakens brain function.

6

> TEXAS HEALTH AND HUMAN SERVICES
> WARNING:
> Exposure to this content is associated with low self-esteem
> and body image, eating disorders, impaired brain
> development, and other emotional and mental illnesses.
> TEXAS HEALTH AND HUMAN SERVICES
> WARNING:
> Pornography increases the demand for prostitution, child
> exploitation, and child pornography.

Id. § 129B.004.

Although these warnings carry the label "Texas Health and Human

Services," it appears that the Texas of Health and Human Services Commission has

not made these findings or announcements.

Finally, the law requires that websites post the number of a mental health

hotline, with the following information:

> 1-800-662-HELP (4357) THIS HELPLINE IS A FREE,
> CONFIDENTIAL INFORMATION SERVICE (IN
> ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY,
> FOR INDIVIDUALS AND FAMILY MEMBERS
> FACING MENTAL HEALTH OR SUBSTANCE USE
> DISORDERS. THE SERVICE PROVIDES REFERRAL
> TO LOCAL TREATMENT FACILITIES, SUPPORT
> GROUPS, AND COMMUNITY BASED
> ORGANIZATIONS.

Id.

H.B. 1181 authorizes the Texas Attorney General to bring an action in state

court to enjoin the violation and recover up to $10,000.00 for each day of a

violation, if it is "in the public interest." Id. § 129B.005. If a minor accesses sexual

7

material, the Attorney General may seek an additional amount up to $250,000.00 per violation. Id.

## II. LEGAL STANDARDS

### A.     Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. Valley v. Rapides Par. Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. PCI Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION – LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs' motion and Defendant's response raise four merits issues: (1) do Plaintiffs have standing to bring suit, (2) is the age verification requirement unconstitutional, (3) is the health warning unconstitutional, and (4) does Section 230 of the CDA preempt the law? The Court will address each in turn.

A.    <u>Standing</u>

Plaintiffs have standing to bring suit. To have Article III standing, a plaintiff

must "(1) have suffered an injury in fact, (2) that is fairly traceable to the

challenged action of the defendant, and (3) that will likely be redressed by a

favorable decision." <u>Speech First, Inc. v. Fenves</u>, 979 F.3d 319, 330 (5th Cir. 2020)

*as revised* (Oct. 30, 2020) (citing <u>Lujan v. Def's. of Wildlife</u>, 504 U.S. 555, 560–61

(1992)). Here, Plaintiffs bring a pre-enforcement challenge to a statute that

threatens substantial civil penalties. In the context of pre-enforcement challenges,

an injury-in-fact is established when the plaintiff "(1) has an intention to engage in

a course of conduct arguably affected with a constitutional interest, (2) his intended

future conduct is arguably proscribed by the policy in question, and (3) the threat

of future enforcement of the challenged policies is substantial." <u>Fenves</u>, 979 F.3d at

330 (quoting <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 158 (2014)).

i.    <u>Injury in Fact</u>

Plaintiffs' expression is afforded a constitutional interest. Plaintiffs seek to

produce, distribute, and post legal adult content online, free of overbroad

restrictions and without being compelled to speak about the purported harms of

sexually explicit videos. Jane Doe and members of Free Speech Coalition seek to

continue performances in adult videos with wide audiences. This conduct is

regulated by H.B. 1181, which sets restrictions on when and how adult videos can

9

be posted. Beyond the restrictions on speech, the law interferes with the Adult Video Companies' ability to conduct business, and risks deterring adults from visiting the websites. Finally, "the law is aimed directly at plaintiffs, who . . . will have to take significant and costly compliance measures," which suffices to show pre-enforcement injury. Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 386, 392 (1988). The compliance costs here are substantial, because commercially available age verifications services are costly, even prohibitively so. Plaintiffs' complaint includes several commercial verification services, showing that they cost, at minimum, $40,000.00 per 100,000 verifications.

As to the required disclosures, compelled speech necessarily involves a constitutional interest. Janus v. Am. Fed'n. of State, Cnty., and Mun. Employees, Council 31, 138 S. Ct. 2448 (2018) ("When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions."); see also W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 633 (1943) (noting that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence).

H.B. 1181 imposes substantial liability for violations, including $10,000.00 per day for each violation, and up to $250,000.00 if a minor is shown to have viewed the adult content. Finally, the threat of future enforcement is substantial—

10

the Attorney General has not disavowed enforcement of the law, and there is no reason to believe that the law will not be enforced against those who violate it. "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First*, 979 F.3d at 335 (cleaned up).

Free Speech Coalition has associational standing. An association has standing to bring claims on behalf of its members when "(1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin, 37 F.4th 1078, 1084 (5th Cir. 2022). Free Speech Coalition's members would have standing to sue in their own right, as they suffer the same injuries as the named Adult Video Companies. These interests fall within Free Speech Coalition's mission, which is to advocate for the distribution of adult videos and the First Amendment rights of its performers and producers. *See* Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 429 (1963) ("[T]he First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion.").

Defendant contends that Free Speech Coalition lacks associational standing because it has not identified one member with individual standing in its motion for a preliminary injunction. (Def.'s Resp., Dkt. # 27, at 5 (citing NAACP v. City of Kyle, 626 F.3d 233, 237 (5th Cir. 2010)). While an association does have to identify a member with individual standing, it need not do so in the preliminary injunction motion in addition to the complaint. In Plaintiffs' complaint, they identify members of the association, including directors, distributors, and actors. And in their reply, Plaintiffs identify Paper Street Media, LLC, an American company, as a member. (Boden Decl., Dkt. # 28-5, at 2). NAACP v. City of Kyle itself examined associational standing based upon the "evidence in the record," and Plaintiffs likewise identified a member with individual standing in their reply brief. 626 F.3d at 237; *see also* All. for Hippocratic Med. v. U.S. Food & Drug Admin., 23-10362, 2023 WL 5266026, at *11–14 (5th Cir. Aug. 16, 2023) (discussing associational standing based in part on declarations made in support of preliminary injunction).

Beyond their own First Amendment injuries, Plaintiffs have standing for their overbreadth challenge. Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court

12

to refrain from constitutionally protected speech or expression."); <u>Sec. of State of Md. v. Joseph H. Munson Co., Inc.</u>, 467 U.S. 947, 956 (1984) ("[W]hen there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.").

  ii. <u>Foreign Websites have First Amendment Protection for Domestic Operations</u>

  Defendant repeatedly emphasizes that the foreign website Plaintiffs "have no valid constitutional claims" because they reside outside the United States. (Def.'s Resp., Dkt. # 27, at 6–7). First, it is worth noting that this argument, even if successful, would not bar the remaining Plaintiffs within the United States from bringing their claims. Several website companies, including Midus Holdings, Inc., Neptune Media, LLC, and Paper Street Media, LLC, along with Jane Doe and Free Speech Coalition (with U.S. member Paper Street Media, LLC), are United States residents. Defendant, of course, does not contest that these websites and Doe are entitled to assert rights under the U.S. Constitution. Regardless of the foreign websites, the domestic Plaintiffs have standing.

  As to the foreign websites, Defendant cites <u>Agency for Intl. Dev. v. All. for Open Socy. Intl., Inc.</u>, 140 S. Ct. 2082 (2020) ("<u>AOSI</u>"), which reaffirmed the principle that "foreign citizens outside U.S. territory do not possess rights under

the U.S. Constitution." Id. at 2086. AOSI's denial of standing is distinguishable

from the instant case. That case involved foreign nongovernmental organizations

("NGOs") that received aid—outside the United States—to distribute outside the

United States. These NGOs operated abroad and challenged USAID's ability to

condition aid based on whether an NGO had a policy against prostitution and sex

trafficking. The foreign NGOs had no domestic operations and did not plan to

convey their relevant speech into the United States. Under these circumstances, the

Supreme Court held that the foreign NGOs could not claim First Amendment

protection. Id.

 AOSI differs from the instant litigation in two critical ways. First, Plaintiffs

do not seek to challenge rule or policymaking with extraterritorial effect, as the

foreign plaintiffs did in AOSI. By contrast, the foreign Plaintiffs here seek to

exercise their First Amendment rights only as applied to their conduct inside the

United States and as a preemptive defense to civil prosecution. Indeed, courts have

typically awarded First Amendment protections to foreign companies with

operations in the United States with little thought. See, e.g., Manzari v. Associated

Newspapers Ltd., 830 F.3d 881 (9th Cir. 2016) (in a case against British

newspaper, noting that defamation claims "are significantly cabined by the First

Amendment"); Mireskandari v. Daily Mail and Gen. Tr. PLC,

CV1202943MMMSSX, 2013 WL 12114762 (C.D. Cal. Oct. 8, 2013) (explicitly

noting that the First Amendment applied to foreign news organization); <u>Times Newspapers Ltd. v. McDonnell Douglas Corp.</u>, 387 F. Supp. 189, 192 (C.D. Cal. 1974) (same); <u>Goldfarb v. Channel One Russia</u>, 18 CIV. 8128 (JPC), 2023 WL 2586142 (S.D.N.Y. Mar. 21, 2023) (applying First Amendment limits on defamation to Russian television broadcast in United States); <u>Nygård, Inc. v. Uusi-Kerttula</u>, 159 Cal. App. 4th 1027, 1042 (2008) (granting First Amendment protections to Finnish magazine); <u>United States v. James</u>, 663 F. Supp. 2d 1018, 1020 (W.D. Wash. 2009) (granting foreign media access to court documents under the First Amendment). It would make little sense to allow Plaintiffs to exercise Frist Amendment rights as a defense in litigation but deny them the ability to raise a pre-enforcement challenge to imminent civil liability on the same grounds.

Second, unlike the foreign plaintiffs in <u>AOSI</u>, the foreign website Plaintiffs in the instant case *do* operate in the United States for all purposes relevant to this litigation. As regulated by H.B. 1181, their speech and conduct occurs in Texas. Their pre-enforcement challenge, by definition, requires Plaintiffs to show that the risk of civil prosecution in Texas is concrete and imminent. <u>AOSI</u> itself reaffirmed that "foreign citizens in the United States may enjoy certain constitutional rights . . . ." <u>Id.</u> at 2086. To the extent their conduct "operates" in the United States and

subjects them to real or imminent liability here, the foreign website Plaintiffs receive First Amendment protection.[2]

The constitutional rights of foreign companies operating in the United States is particularly important in the First Amendment context. "The First Amendment protects speech for the sake of both the speaker and the recipient." <u>Thunder Studios, Inc. v. Kazal</u>, 13 F.4th 736, 743–44 (9th Cir. 2021), *cert. denied* 142 S. Ct. 1674 (2022). "It is now well established that the Constitution protects the right to receive information and ideas. This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." <u>Stanley v. Georgia</u>, 394 U.S. 557, 564 (1969) (citations omitted); *see also* <u>Va. State Bd. of</u>

---

[2] Defendant repeatedly suggests that Plaintiffs should not able to avail themselves of First Amendment protections when they have not availed themselves of personal jurisdiction in Texas. (Def.'s Resp., Dkt. #27, at 7, 21). To this end, they rely on a single district court opinion where a foreign plaintiff was determined not to be subject to personal jurisdiction for posting online pornography as related to child sex-trafficking claims. <u>Doe v. WebGroup Czech Republic</u>, No. 221CV02428VAPSKX, 2022 WL 982248 (C.D. Cal. Jan. 13, 2022). Although personal jurisdiction is not strictly before us, the Court is skeptical of this analysis as applied to H.B. 1181. Unlike child sex-trafficking claims, viewing pornography in a state is more directly related to the claims that would be brought by the Attorney General under H.B. 1181. *See* <u>Luv N'care, Ltd. v. Insta-Mix, Inc.</u>, 438 F.3d 465, 469 (5th Cir. 2006) (examining, among other things, whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts). And foreign pornography websites have been held subject to U.S. jurisdiction in other contexts. <u>Hydentra HLP Int. Ltd. v. Sagan Ltd.</u>, 783 Fed. Appx. 663 (9th Cir. 2019) (unpublished); <u>George S. May Intern. Co. v. Xcentric Ventures, LLC</u>, 409 F. Supp. 2d 1052 (N.D. Ill. 2006) (holding out-of-state defendant subject to personal jurisdiction in similar analysis); <u>AMA Multimedia LLC v. Sagan Ltd.</u>, CV-16-01269-PHX-DGC, 2016 WL 5946051 (D. Ariz. Oct. 13, 2016). But if there was any doubt, purposeful availment would likely be established when a website knowingly accepts driver's license data from a state resident, transmits that data to the state, and then proceeds to grant that visitor access to the site, as H.B. 1181 requires. *See* <u>Zippo Mfg. Co. v. Zippo Dot Com, Inc.</u>, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (examining website interactivity as keystone for personal jurisdiction); *see also* <u>Johnson v. TheHuffingtonPost.com, Inc.</u>, 21 F.4th 314, 318 (5th Cir. 2021) (noting that courts in the circuit use the <u>Zippo</u> test). At any rate, it is the threat of enforcement, not the existence of personal jurisdiction, that would lead to First Amendment chill.

Pharmacy, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists, the protection afforded is to the communication, to its source and to its recipients both."). To hold otherwise would drastically expand the government's ability to restrict ideas based on their content or viewpoint. States could ban, for example, the Guardian or the Daily Mail based on their viewpoint, because those newspapers are based in the United Kingdom. Alternatively, those websites could be subject to relaxed defamation laws without any First Amendment protection. This is not the law, and the Court does not read AOSI to abrogate First Amendment protection for speech occurring in the United States and directed at the United States but hosted by foreign entities. *See* Thunder Studios, Inc., 13 F.4th at 743–44 (extending First Amendment rights to foreign plaintiff for purposes of civil lawsuit in the United States); Kleindienst v. Mandel, 408 U.S. 753 (1972) (acknowledging the First Amendment rights of listeners in the United States but noting that they do not override discretionary immigration decisions).

iii.   Traceability and Redressability

Plaintiffs' injuries are traceable to Defendant, and Defendant does not contest this in her response. (Def.'s Resp., Dkt. # 27). The Texas Attorney General is tasked with bringing civil prosecutions under H.B. 1181. Their injuries will be redressed by an injunction or declaration that the law is unconstitutional. *See* Natl. Press Photographers Assn. v. McCraw, 594 F. Supp. 3d 789, 800–01 (W.D. Tex.

17

2022), *appeal docketed* No. 22-500337 (May 3, 2022) ("[A] declaratory judgment will have the practical effect of allowing them to exercise their First Amendment rights by removing the fear of prosecution . . . .") (citing *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

    B.    <u>Sovereign Immunity</u>

While Plaintiffs raise the issue of sovereign immunity in their preliminary injunction motion, Defendant does not contest the issue in her response. (Def.'s Resp., Dkt. # 27). Because the issue is jurisdictional, the Court will briefly address it. *See, e.g.*, <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994). The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." <u>Moore v. La. Bd. of Elementary & Secondary Educ.</u>, 743 F.3d 959, 963 (5th Cir. 2014). Under the <u>Ex parte Young</u> exception to sovereign immunity, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations. 209 U.S. 123, 159–60 (1908). "For the [<u>Ex parte Young</u>] exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and

18

thereby attempting to make the state a party.'" City of Austin v. Paxton, 943 F.3d 993, 997 (5th Cir. 2019) (quoting Young, 209 U.S. at 157).

Neither a specific grant of enforcement authority nor a history of enforcement is required to establish a sufficient connection. City of Austin, 943 F.3d 993 at 1001; Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp., 851 F.3d 507, 519 (5th Cir. 2017). There need be only a "scintilla of enforcement by the relevant state official" for Ex parte Young to apply. City of Austin, 943 F.3d at 1002 (quotations omitted). Actual threat of or imminent enforcement is "not required." Air Evac, 851 F.3d at 519.

Colmenero is plainly tasked with enforcing H.B. 1181. Section 129B.006 vests the Attorney General with the exclusive authority to bring an action. H.B. 1181 § 129B.006(a) ("If the attorney general believes that an entity is knowingly violating . . . this chapter[,] the attorney general may bring an action . . . to enjoin the violation, recover a civil penalty, and obtain other relief the court considers appropriate."). Moreover, the attorney general "may recover reasonable and necessary attorney's fees and costs incurred in an action under this section." Id. § 129B.006(b)(6).

Once it is clear that the named defendant is proper, the Court conducts a Verizon "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."

19

<u>Verizon Maryland, Inc. v. Pub. Serv. Commn. of Maryland</u>, 535 U.S. 635, 645 (2002). The complaint meets these requirements. It alleges a violation of the United States Constitution through the First, Fifth, and Fourteenth Amendments. And the complaint further alleges that the law is preempted by Section 230 of the CDA. The relief is prospective because Plaintiffs seek an injunction prohibiting future enforcement of the law. Plaintiffs' relief falls under the <u>Ex parte Young</u> exception.

      C.    <u>The Age Verification Requirement is Subject to Strict Scrutiny</u>

           i.    <u>Strict Scrutiny Applies</u>

First, the Court must determine which level of scrutiny to apply. H.B. 1181 differentiates between sexual and non-sexual material for minors, so a short overview of historical regulations on minors' access to pornography is helpful. In 1968 in <u>Ginsberg v. State of New York</u>, the Supreme Court upheld a conviction of a person under a state statute that criminalized knowingly providing obscene materials "for minors" to minors. 390 U.S. 629, 638 (1968). Because obscene materials fell outside the scope of First Amendment protection, the Court analyzed the statute under rational basis scrutiny and upheld the law. <u>Id.</u>

However, beginning in the 1990s, use of the "for minors" language came under more skepticism as applied to internet regulations. In <u>Reno v. ACLU</u>, the Supreme Court held parts of the CDA unconstitutional under strict scrutiny. 521

20

U.S. 844, 850 (1997). The Court noted that the CDA was a content-based

regulation that extended far beyond obscene materials and into First Amendment

protected speech, especially because the statute contained no exemption for

socially important materials for minors. Id. at 865. The Court noted that accessing

sexual content online requires "affirmative steps" and "some sophistication,"

noting that the internet was a unique medium of communication, different from

both television broadcast and physical sales. Id. at 854. The Court held Ginsberg

distinct on four separate grounds and largely found it inapplicable to digital

regulations like the CDA. Id. at 864–68.

  After Reno v. ACLU, the federal government tried again, passing the Child

Online Protection Act ("COPA"), which restricted the ability to post content online

that was harmful to minors for commercial purposes. Ashcroft v. ACLU, 535 U.S.

564 (2002); Child Online Protection Act, 47 U.S.C. § 231 (1998). In separate

decisions, the Third Circuit held that the law was similarly unconstitutional under

strict scrutiny. Am. Civ. Liberties Union v. Ashcroft, 322 F.3d 240 (3d Cir. 2003),

aff'd and remanded, 542 U.S. 656 (2004); Am. Civ. Liberties Union v. Mukasey,

534 F.3d 181 (3d Cir. 2008), cert denied 555 U.S. 1137 (2009). Most notably, the

Third Circuit held COPA subject to strict scrutiny because its "definition of

harmful material is explicitly focused on minors, it automatically impacts non-

obscene, sexually suggestive speech that is otherwise protected for adults." ACLU

v. Ashcroft, 322 F.3d at 252. COPA has remained enjoined since the Third Circuit
and Supreme Court's <u>ACLU</u> decisions.

Just like COPA, H.B. 1181 regulates beyond obscene materials. As a result,
the regulation is based on whether content contains sexual material. Because the
law restricts access to speech based on the material's content, it is subject to strict
scrutiny. <u>Id.; Ent. Software Ass'n v. Blagojevich</u>, 469 F.3d 641, 649–50 (7th Cir.
2006) (noting courts have applied strict scrutiny to "a number of statutes . . . that
included the <u>Miller</u> language or some hybrid of <u>Miller</u> and <u>Ginsberg</u>"); <u>ACLU v.
Reno</u>, 521 U.S. at 864–68.

Defendant largely concedes that strict scrutiny applies, (Def.'s Resp., Dkt. #
27, at 6, 9), but hopes that H.B. 1181 should "be subject to a lower standard of
judicial scrutiny because it regulates only 'commercial entities, publication and
distribution of material harmful to minors." (<u>Id.</u> at 9 (citing <u>Ashcroft v. ACLU</u>, 542
U.S. at 676 (Scalia, J., dissenting))). As Defendant tacitly acknowledges, a district
court is not at liberty to disregard existing Supreme Court precedent in favor of a
dissenting opinion. Nor is Defendant entitled to contest Plaintiffs' likelihood of
success based on the possibility that the Supreme Court may revisit its precedent.
This Court cannot reduce the applicable level of scrutiny based on a non-binding,
dissenting opinion.

In a similar vein, Defendant argues that Plaintiffs' content is "obscene" and therefore undeserving of First Amendment coverage. (Id. at 6). Again, this is precedent that the Supreme Court may opt to revisit, but we are bound by the current Miller framework. Miller v. California, 413 U.S. 15, 24 (1973).[3] Moreover, even if we were to abandon Miller, the law would still cover First Amendment-protected speech. H.B. 1181 does not regulate obscene content, it regulates all content that is prurient, offensive, and without value *to minors*. Because most sexual content is offensive to young minors, the law covers virtually all salacious material. This includes sexual, but non-pornographic, content posted or created by Plaintiffs. *See* (Craveiro-Romão Decl., Dkt. # 28-6, at 2; Seifert Decl., Dkt. # 28-7, at 2; Andreou Decl., Dkt. # 28-8, at 2). And it includes Plaintiffs' content that is sexually explicit and arousing, but that a jury would not consider "patently offensive" to adults, using community standards and in the context of online webpages. (Id.); *see also* United States v. Williams, 553 U.S. 285, 288 (2008); Ashcroft v. Free Speech Coal., 535 U.S. 234, 252 (2002). Unlike Ginsberg, the regulation applies regardless of whether the content is being knowingly distributed to minors. 390 U.S. at 639. Even if the Court accepted that many of Plaintiffs' videos are obscene to adults—a question of fact typically reserved for juries—the

---

[3] In particular, Miller requires that patently offensive material be so defined by the applicable state statute. Id. That cannot be the case here for H.B. 1181, which defines material only with reference to whether it is obscene for minors.

law would still regulate the substantial portion of Plaintiffs' content that is not "patently offensive" to adults.[4] Because H.B. 1181 targets protected speech, Plaintiffs can challenge its discrimination against sexual material.

Defendant also suggests that the Court consider H.B. 1181 a "time, place, and manner" restriction. (Def.'s Resp., Dkt. # 27, at 6 ("A law requiring porn sites to turn away children is no different than one that prohibits a strip club from operating next to an elementary school or allowing a 13-year-old to enter.")). Again, this seems to be inserted largely for the purposes of Supreme Court review as the notion is plainly foreclosed by ACLU v. Reno. There, the Supreme Court held that a law that "applies broadly to the entire universe of cyberspace" and seeks to protect children from offensive speech "is a content-based blanket restriction on speech, and, as such, cannot be 'properly analyzed as a form of time, place, and manner regulation.'" ACLU v. Reno, 521 U.S. at 868 (quoting Renton v. Playtime Theatres, 475 U.S. 41, 46 (1986)).[5] And while Defendant and amici[6]

---

[4] See, e.g., United States v. Cary, 775 F.3d 919, 926 (7th Cir. 2015) ("[A]dult pornography, unlike child pornography, generally has First Amendment protection."); Farrell v. Burke, 449 F.3d 470, 497 (2d Cir. 2006) ("Pornographic materials—at least those that are not obscene—receive full First Amendment protection when in the possession of ordinary adults . . . ."); United States v. Eaglin, 913 F.3d 88, 99 (2d Cir. 2019) (same).

[5] It is worth further noting that H.B. 1181 does not operate like the sort of "strip club" restriction that Defendant analogizes to. It does not just regulate the virtual equivalent of strip clubs or adult DVD stores. Rather, a more apt analogy would be that H.B. 1181 forces movie theaters to catalog all movies that they show, and if at least one-third of those movies are R-rated, H.B. 1181 would require the movie theater to screen everyone at the main entrance for their 18+ identification, regardless of what movie they wanted to see. Defendant is fully entitled to seek appellate review and reconsideration of existing precedent. But the law is still broader than even those time, place, and manner restrictions.

[6] (Amicus Br., Dkt. # 29-2).

argue that H.B. 1181 is akin to a time, place, and manner restriction because of pornography's secondary effects, they ignore the well-established precedent that "'[r]egulations that focus on the direct impact of speech on its audience' are not properly analyzed under <u>Renton</u>." <u>Boos v. Barry</u>, 485 U.S. 312, 321 (1988); *see also* <u>ACLU v. Reno</u>, 521 U.S. at 868 (same); <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation.").

Because the law regulates speech based upon the content therein, including content deserving of First Amendment protection, it must survive strict scrutiny. To endure strict scrutiny, H.B. 1181 must: (1) serve a compelling governmental interest, (2) be narrowly tailored to achieve it, and (3) be the least restrictive means of advancing it. <u>Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n</u>, 492 U.S. 115, 126 (1989).

ii.     <u>H.B. 1181 Nominally Protects a Compelling State Interest</u>

Plaintiffs concede for the purposes of this motion that Defendant's stated interest here is compelling. It is uncontested that pornography is generally inappropriate for children, and the state may regulate a minor's access to pornography. <u>Ginsberg</u>, 390 U.S. at 63. The strength of that interest alone, however, is not enough for a law to survive strict scrutiny. The state must still show

that H.B. 1181 is narrowly tailored and the least restrictive means of advancing that interest. It fails on both these grounds.

      D.    <u>The Statute is not Narrowly Tailored</u>

           i.    <u>The law is underinclusive</u>

Although the state defends H.B. 1181 as protecting minors, it is not tailored to this purpose. Rather, the law is severely underinclusive. When a statute is dramatically underinclusive, that is a red flag that it pursues forbidden viewpoint discrimination under false auspices, or at a minimum simply does not serve its purported purpose. *See* <u>City of Ladue v. Gilleo</u>, 512 U.S. 43, 52 (1994).

H.B. 1181 will regulate adult video companies that post sexual material to their website. But it will do little else to prevent children from accessing pornography. Search engines, for example, do not need to implement age verification, even when they are aware that someone is using their services to view pornography. H.B. 1181 § 129B.005(b). Defendant argues that the Act still protects children because they will be directed to links that require age verification. (Def.'s Resp., Dkt. # 27, at 12). This argument ignores visual search, much of which is sexually explicit or pornographic, and can be extracted from Plaintiffs' websites regardless of age verification. (Sonnier Decl., Dkt. # 31-1, at 1–2). Defendant's own expert suggests that exposure to online pornography often begins with "misspelled searches[.]" (Dines Decl., Dkt. # 27-1, at 2).

26

Even more problematic is that H.B. 1181 applies only to the subset of pornographic websites that are subject to personal jurisdiction in Texas. Indeed, Defendant implicitly concedes this when they argue that the foreign Adult Video Company Plaintiffs are not subject to jurisdiction in the United States. If foreign websites are not subject to personal jurisdiction in Texas, then H.B. 1181 will have no valid enforcement mechanism against those websites, leaving minors able to access any pornography as long as it is hosted by foreign websites with no ties to the United States.

In addition, social media companies are de facto exempted, because they likely do not distribute at least one-third sexual material. This means that certain social media sites, such as Reddit, can maintain entire communities and forums (i.e., subreddits), dedicated to posting online pornography with no regulation under H.B. 1181. (Sonnier Decl., Dkt. # 31-1, at 5). The same is true for blogs posted to Tumblr, including subdomains that only display sexually explicit content. (Id.) Likewise, Instagram and Facebook pages can show material which is sexually explicit for minors without compelled age verification. (Cole Decl., Dkt. # 5-1, at 37–40). The problem, in short, is that the law targets websites as a whole, rather than at the level of the individual page or subdomain. The result is that the law will likely have a greatly diminished effect because it fails to reduce the online

pornography that is most readily available to minors. (Id. at 36–38; Dines Decl.,

Dkt. # 27-1, at 2).

   The compelled disclosures are especially underinclusive. H.B. 1181's health

warnings apply to websites with one-third sexual material, but these websites will

already screen out minors through age verification. By contrast, websites with less

than one-third sexual material do not need to post any warning at all, even though

they have no age verification requirement. The result is that a health disclaimer,

ostensibly designed for minors, will be seen by adults visiting Pornhub, but not by

minors visiting pornographic subreddits.

   In sum, the law is severely underinclusive. It nominally attempts to prevent

minors' access to pornography, but contains substantial exemptions, including

material most likely to serve as a gateway to pornography use. Williams-Yulee v.

Fla. Bar, 575 U.S. 433, 448–49 (2015) ("[U]nderinclusiveness can raise doubts

about whether the government is in fact pursuing the interest it invokes, rather than

disfavoring a particular speaker or viewpoint . . . ."); Brown v. Ent. Merchants

Ass'n, 564 U.S. 786, 802 (2011) ("[The] regulation is wildly underinclusive when

judged against its asserted justification, which in our view is alone enough to

defeat it . . . ."). The Court need not determine whether the under-inclusiveness is

independently fatal at this stage. Rather, it is one of many elements of H.B. 1181

that show the law is not narrowly tailored.

28

ii.   <u>The statute's sweep is unclear</u>

The statute's tailoring is also problematic because of several key ambiguities in H.B. 1181's language. Although the Court declines to rest its holding on a vagueness challenge, those vagueness issues still speak to the statute's broad tailoring. First, the law is problematic because it refers to "minors" as a broad category, but material that is patently offensive to young minors is not necessarily offensive to 17-year-olds. As previously stated, H.B. 1181 lifts its language from the Supreme Court's holdings in <u>Ginsberg</u> and <u>Miller</u>, which remains the test for obscenity. H.B. 1181 § 129B.001; <u>Miller</u>, 413 U.S. at 24; <u>Ginsberg</u>, 390 U.S. at 633. As the Third Circuit held, "The type of material that might be considered harmful to a younger minor is vastly different—and encompasses a much greater universe of speech—than material that is harmful to a minor just shy of seventeen years old. . . ." <u>ACLU v. Ashcroft</u>, 322 F.3d at 268.[7] H.B. 1181 provides no guidance as to what age group should be considered for "patently offensive" material. Nor does the statute define when material may have educational, cultural, or scientific value "for minors," which will likewise vary greatly between 5-year-olds and 17-year-olds.

---

[7] H.B. 1181 is even more problematic than COPA, because it defines "minor" as all individuals under 18, while COPA set the limit at 17. <i>See</i> <u>ACLU v. Reno</u>, 521 U.S. at 865–66 (noting that CDA was problematic because it defined minors to include 17-year-olds).

The result of this language as applied to online webpages is that constitutionally protected speech will be chilled. A website dedicated to sex education for high school seniors, for example, may have to implement age verification measures because that material is "patently offensive" to *young* minors and lacks educational value for *young* minors. Websites for prurient R-rated movies, which likewise are inappropriate and lacking artistic value for minors under the age of 17, would need to implement age verification (and more strangely, warn visitors about the dangers of pornography).

Second, H.B. 1181 is subject to multiple interpretations as to the scope of its liability. H.B. 1181 limits its coverage to a "commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors." H.B. 1181 § 129B.002(a). But it is unclear whether "one-third" modifies "material" or "website." Does "material" refer to all content posted on a site, or does it apply to any single piece of content? By example, if a small fraction of YouTube's videos contain sexual material, does it need to verify user's ages with the State? The law's text is vague on this point, but risks enormous financial harm, including fines up to $250,000 per violation if Defendant opts for the broader

interpretation.[8] And the law offers no guidance as to how to calculate the "one-third"—whether it be the number of files, total length, or size.

Third, H.B. 1181 similarly fails to define proper age verification with sufficient meaning. The law requires sites to use "any commercially reasonable method that relies on public or private transactional data" but fails to define what "commercially reasonable" means. Id. § 129B.03(b)(2)(B). "Digital verification" is defined as "information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identify of an individual." Id. § 129B.003(a). As Plaintiffs argue, this definition is circular. In effect, the law defines "identity verification" as information that can verify an identity. Likewise, the law requires "14-point font," but text size on webpages is typically measured by pixels, not points. See Erik D. Kennedy, *The Responsive Website Font Size Guidelines*, Learn UI Design Blog (Aug. 7, 2021) (describing font sizes by pixels) (Dkt. # 5-1 at 52–58). Overall, because the Court finds the law unconstitutional on other grounds, it does not reach a determination on the vagueness question. But the failure to define key terms in a comprehensible way in the digital age speaks to the

---

[8] This interpretation is problematic because it is severely underinclusive. If the Attorney General adopts the narrower definition, then a website could quite easily evade the law by simply adding non-sexual material up to the point that it constitutes at least two-thirds of the site. Indeed, the cost of hosting additional content may be much lower than the costs of age verification and compelled speech. See (Compl., Dkt. # 1, at 24 (raising the possibility that "a link to all the anodyne content in the local public library" could circumvent the law)). And at that point, the law would effectively become moot, doing little to regulate adult video companies beyond forcing them to host non-sexual materials. If the Attorney General opts for the broader interpretation, then the law encounters other grave challenges by sweeping far beyond its purported effects.

lack of care to ensure that this law is narrowly tailored. *See* Reno, 521 U.S. at 870

("Regardless of whether the CDA is so vague that it violates the Fifth Amendment,

the many ambiguities concerning the scope of its coverage render it problematic

for purposes of the First Amendment.").

### iii.   The law is overbroad, even under narrow constructions

Even if the Court were to adopt narrow constructions of the statute, it would

overburden the protected speech of both sexual websites and their visitors. Indeed,

Courts have routinely struck down restrictions on sexual content as improperly

tailored when they impermissibly restrict adult's access to sexual materials in the

name of protecting minors. *See, e.g.*, Ex Parte Lo, 424 S.W.3d 10, 23 (Tex. Crim.

App. 2013) (striking down restrictions on "grooming" as overbroad and not

narrowly tailored); Garden Dist. Book Shop, Inc. v. Stewart, 184 F. Supp. 3d 331,

338–40 (M.D. La. 2016) (striking down law that criminalized publication of

"material harmful to minors" under strict scrutiny); Am. Booksellers Found. for

Free Expression v. Sullivan, 799 F. Supp. 2d 1078 (D. Alaska 2011) (striking down

law that restricted dissemination of material depicting sexual activity under strict

scrutiny); ACLU v. Johnson, 194 F.3d 1149, 1158–60 (10th Cir. 1999)

(distinguishing Ginsberg and following Reno to find a statute criminalizing

dissemination of material harmful to minors was overbroad); PSINet, Inc. v.

Chapman, 362 F.3d 227, 234–36 (4th Cir. 2004) (same).

Plaintiffs are likely to succeed on their overbreadth and narrow tailoring challenge because H.B. 1181 contains provisions largely identical to those twice deemed unconstitutional in COPA. *See* ACLU v. Ashcroft, 322 F.3d 240 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004); ACLU v. Mukasey, 534 F.3d 181 (3d Cir. 2008), *cert denied* 555 U.S. 1137 (2009).[9] COPA defined material "harmful to minors" as:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

*ACLU v. Mukasey*, 534 F.3d at 191 (citing 47 U.S.C. § 231(e)(6)).

By comparison, H.B. 1181 defines material "harmful to minors" as:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest; (B) in a manner patently

---

[9] The Supreme Court's affirmance of the Third Circuit's decision in ACLU v. Ashcroft focused on the type of restriction used, not whether the law was narrowly tailored. *See* Ashcroft v. ACLU, 542 U.S. at 665 ("[W]e decline to consider the correctness of the other arguments relied on by the Court of Appeals."). However, upon remand, the Third Circuit again held that the law was not narrowly tailored in a final decision on the merits. ACLU v. Mukasey, 534 F.3d at 197–98 ("[W]e are quite certain that . . . the Government has not met its burden of showing that [the law] is narrowly tailored so as to survive strict scrutiny analysis and thereby permit us to hold it constitutional."). The Supreme Court declined a petition for writ of certiorari as to the nationwide permanent injunction. Accordingly, while the ACLU discussion of narrow tailoring is not strictly binding authority, the Court affords it substantial weight.

33

offensive with respect to minors, exploits, is devoted to, or
principally consists of descriptions of actual, simulated, or
animated display or depiction of: (i) a person's pubic hair,
anus, or genitals or the nipple of the female breast; (ii)
touching, caressing, or fondling of nipples, breasts,
buttocks, anuses, or genitals; or (iii) sexual intercourse,
masturbation, sodomy, bestiality, oral copulation,
flagellation, excretory functions, exhibitions, or any other
sexual act; and (C) taken as a whole, lacks serious literary,
artistic, political, or scientific value for minors.

H.B. 1181 § 129B(6)(B).

The statutes are identical, save for Texas's inclusion of specific sexual

offenses. Unsurprisingly, then, H.B. 1181 runs into the same narrow tailoring and

overbreadth issues as COPA. In particular, the use of "for minors" and "with

respect to minors" has been held overbroad in the context of internet speech. As

ACLU v. Ashcroft held:

> The term "minor," as Congress has drafted it, thus applies
> in a literal sense to an infant, a five-year old, or a person
> just shy of age seventeen. In abiding by this definition,
> Web publishers who seek to determine whether their Web
> sites will run afoul of COPA cannot tell which of these
> "minors" should be considered in deciding the particular
> content of their Internet postings. Instead, they must guess
> at which minor should be considered in determining
> whether the content of their Web site has "serious ... value
> for [those] minors." 47 U.S.C. § 231(e)(6)(C). Likewise,
> if they try to comply with COPA's "harmful to minors"
> definition, they must guess at the potential audience of
> minors and their ages so that the publishers can refrain
> from posting material that will trigger the prurient interest,
> or be patently offensive with respect to those minors who
> may be deemed to have such interests.

322 F.3d at 254.

Despite this decades-long precedent, Texas includes the exact same drafting language previously held unconstitutional. H.B. 1181 only exempts sexual material that "taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." H.B. 1181 § 129B.001(6)(C). Material that is sexual will likely satisfy H.B. 1181's test, because it is inappropriate for minors, even though it is not obscene for adults. Any prurient material risks being regulated, because it will likely be offensive to minors and lack artistic or scientific value to them. Although this may be permissible when someone knowingly sells material to a minor, such as in Ginsberg, it is constitutionally problematic applied to online speech, where the speech is necessarily broadcast widely. See ACLU v. Ashcroft, 535 U.S. at 568; Am. Booksellers Found. for Free Expression v. Sullivan, 799 F. Supp. 2d 1078, 1082 (D. Al. 2011) (noting an online statute is "dramatically different" from another statute that "applies only to personally directed communication between an adult and a person that the adult knows or should know is a minor."); Ent. Software Ass'n, 469 F.3d at 649–50 (noting that "a number of statutes have been found unconstitutional that included the Miller language or some hybrid of Miller and Ginsberg" in the context of restrictions on material for minors).

Defendant argues that its language is permissible because the Supreme Court in Sable allowed the government to protect minors from non-obscene material.

(Def.'s Resp., Dkt. # 27, at 17 (citing <u>Sable Commun. of California, Inc.</u>, 492 U.S. at 126)). Defendant stretches the holding of <u>Sable</u> too far. While <u>Sable</u> upheld the government's interest in "shielding minors from the influence of literature that is not obscene by adult standards," it still noted that those restrictions must survive strict scrutiny. <u>Sable</u>, 492 U.S. at 126. Nothing in <u>Sable</u> or Defendant's response differentiates this analysis or restricts the broad scope of H.B. 1181. Moreover, in the <u>ACLU</u> decisions, the Third Circuit found that the addition of "for minors" was constitutionally problematic because it chills substantial speech for adults based on whether it is inappropriate for minors. 322 F.3d at 266–71; 534 F.3d at 190–93, 205–07. And the Supreme Court reaffirmed in <u>Reno v. ACLU</u> that the government may not "reduce the adult population to only what is fit for children." 521 U.S. 875 (cleaned up) (quoting <u>Denver Area Ed. Telecommunications Consortium, Inc. v. FCC</u>, 518 U.S. 727, 759 (1996)).

Accordingly, the <u>ACLU</u> decisions control here. The law sweeps far beyond obscene material and includes all content offensive to minors, while failing to exempt material that has cultural, scientific, or educational value to adults only. At the same time, the law allows other websites to show and display explicit material,

as long as they have two-thirds non-obscene content. The result is that H.B. 1181's age verification is not narrowly tailored and fails strict scrutiny.[10]

E.     H.B. 1181 is Overly Restrictive

To endure strict scrutiny, a statute must employ the least restrictive means of protecting minors. Reno, 521 U.S. at 874 ("That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."). The government bears the burden to show that less restrictive means would not be as effective. Ashcroft v. ACLU, 542 U.S. at 669. Again, because H.B. 1181 substantially restricts adults' protected speech, it is not sufficiently tailored. Nonetheless, the Court also finds that the age verification enforcement mechanism is overly restrictive.

i.     Compelled verification chills protected speech

Like the narrow tailoring, this issue has been addressed by the Third Circuit and Supreme Court regarding COPA. In particular, whereas the Supreme Court did

---

[10] Plaintiffs also ask the Court to hold that H.B. 1181 is unconstitutionally overbroad. In general, "[t]he overbreadth doctrine is strong medicine" that should be employed "only as a last resort." Los Angeles Police Dept. v. United Reporting Pub. Corp., 528 U.S. 32, 39 (1999). Plaintiffs have standing to challenge H.B. 1181 under strict scrutiny. The law is unconstitutional as it regulates Plaintiffs' websites because it discriminates broadly and uses restrictive means to do so. Plaintiffs' websites are the target of the H.B. 1181, which cannot constitutionally regulate their sites. It necessarily follows, then, that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473 (2010); Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 HARV. L. REV. 1321, 1344–48. (2000) (suggesting that certain doctrinal tests logically lead to the conclusion that a statute is facially invalid). It is the structure of the law, and not its application to any particular Plaintiff, that renders it unconstitutional.

not discuss COPA's overbreadth, its did discuss less restrictive means, making it binding precedent. Id. at 666–73. As the district court found, and the Supreme Court affirmed, "Blocking and filtering software is an alternative that is less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." Id. The Court elaborated that filtering software is less restrictive because "adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information. Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers." Id. at 667.

Defendant argues that Ashcroft v. ACLU's analysis no longer applies because it was based on the evidentiary record made by the district court in 1999, which is not applicable to the instant case and of limited relevance to modern internet usage. (Def.'s Resp., Dkt. # 27, at 8–12). As Defendant argues, H.B. 1181 uses more secure information, requires companies to delete their data, and is designed for convenience and privacy protection. (Id. at 11). The Court does not dispute that online interactions have changed since the Supreme Court's decisions in 1997 and 2004. See Reno v. ACLU, 521 U.S.; Ashcroft v. ACLU, 542 U.S. But as determined by the facts on the record and presented at the hearing, age verification laws remain overly restrictive. Despite changes to the internet in the

38

past two decades, the Court comes to the same conclusion regarding the efficacy

and intrusiveness of age verification as the ACLU courts did in the early 2000s.

First, the restriction is constitutionally problematic because it deters adults'

access to legal sexually explicit material, far beyond the interest of protecting

minors. The Third Circuit's holding regarding COPA applies equally to H.B. 1181:

> "[The law] will likely deter many adults from accessing restricted content because they are unwilling to provide identification information in order to gain access to content, especially where the information they wish to access is sensitive or controversial. People may fear to transmit their personal information, and may also fear that their personal, identifying information will be collected and stored in the records of various Web sites or providers of adult identification numbers."

ACLU v. Ashcroft, 322 F.3d at 259.[11]

Indeed, as the Third Circuit noted, the "Supreme Court has disapproved of

content-based restrictions that require recipients to identify themselves

affirmatively before being granted access to disfavored speech . . . ." Id. (collecting

cases). The same is true here—adults must affirmatively identify themselves before

accessing controversial material, chilling them from accessing that speech.

Whatever changes have been made to the internet since 2004, these privacy

concerns have not gone away, and indeed have amplified.

---

[11] If anything, the language from ACLU v. Ashcroft is more relevant to today than it was when it was written, given the ubiquity of modern technology.

Privacy is an especially important concern under H.B. 1181, because the government is not required to delete data regarding access, and one of the two permissible mechanisms of age-verification is through government ID. People will be particularly concerned about accessing controversial speech when the state government can log and track that access. By verifying information through government identification, the law will allow the government to peer into the most intimate and personal aspects of people's lives. It runs the risk that the state can monitor when an adult views sexually explicit materials and what kind of websites they visit. In effect, the law risks forcing individuals to divulge specific details of their sexuality to the state government to gain access to certain speech. Such restrictions have a substantial chilling effect. *See* Denver Area Educ. Telecomm. Consortium, Inc., 518 U.S. at 754 ("[T]he written notice requirement will further restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the patently offensive channel.").

The deterrence is particularly acute because access to sexual material can reveal intimate desires and preferences. No more than two decades ago, Texas sought to criminalize two men seeking to have sex in the privacy of a bedroom. Lawrence v. Texas, 539 U.S. 558 (2003). To this date, Texas has not repealed its

law criminalizing sodomy. [12] Given Texas's ongoing criminalization of homosexual intercourse, it is apparent that people who wish to view homosexual material will be profoundly chilled from doing so if they must first affirmatively identify themselves to the state.[13]

Defendant contests this, arguing that the chilling effect will be limited by age verification's ease and deletion of information. This argument, however, assumes that consumers will (1) know that their data is required to be deleted and (2) trust that companies will actually delete it. Both premises are dubious, and so the speech will be chilled whether or not the deletion occurs. In short, it is the deterrence that creates the injury, not the actual retention. Moreover, while the commercial entities (e.g., Plaintiffs) are required to delete the data, that is not true for the data in transmission. In short, any intermediary between the commercial websites and the third-party verifiers will not be required to delete the identifying data.

Even beyond the capacity for state monitoring, the First Amendment injury is exacerbated by the risk of inadvertent disclosures, leaks, or hacks. Indeed, the State of Louisiana passed a highly similar bill to H.B. 1181 shortly before a vendor

---

[12] The attorney general has explicitly taken the position that state laws remain in place even when held unconstitutional. Fund Texas Choice v. Paxton, 1:22-CV-859-RP (W.D. Tex. filed Aug. 24, 2022) (Def.'s Resp., Dkt. # 33, at 28 (citing Pidgeon v. Turner, 538 S.W.3d 73, 88 n.21 (Tex. 2017)).

[13] See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756 (1976) ("[T]he protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both.").

41

for its Office of Motor Vehicles was breached by a cyberattack. In a related challenge to a similar law, Louisiana argues that age-verification users were not identified, but this misses the point. *See* Free Speech Coalition v. Leblanc, No. 2:23-cv-2123 (E.D. La. filed June 20, 2023) (Defs.' Resp., Dkt. # 18, at 10). The First Amendment injury does not just occur if the Texas or Louisiana DMV (or a third-party site) is breached. Rather, the injury occurs because individuals know the information is at risk. Private information, including online sexual activity, can be particularly valuable because users may be more willing to pay to keep that information private, compared to other identifying information. (Compl. Dkt. # 1, at 17); Kim Zetter, *Hackers Finally Post Stolen Ashley Madison Data*, Wired, Aug. 18, 2015, https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data (discussing Ashley Madison data breach and hackers' threat to "release all customer records, including profiles with all the customers' secret sexual fantasies and matching credit card transactions, real names and addresses."). It is the threat of a leak that causes the First Amendment injury, regardless of whether a leak ends up occurring.

In short, while the internet has changed since 2004, privacy concerns have not. Defendant offers its digital verification as more secure and convenient than the ones struck down in COPA and the CDA. This simply does not match the evidence and declarations supported in the parties' briefing. Users today are more cognizant

of privacy concerns, data breaches have become more high-profile, and data related to users' sexual activity is more likely to be targeted. (Sonnier Decl., Dkt. #5-2, at 44–56; Allen Decl., Dkt. # 27-4, at 4–5). The risks of compelled digital verification are just as large, if not greater, than those in <u>ACLU v. Ashcroft</u>. 322 F.3d at 259.

ii.    <u>Less restrictive alternatives are available</u>

Plaintiffs offer several alternatives that would target minor's access to pornography with fewer burdens on adults' access to protected sexually explicit materials. First, the government could use internet service providers, or ISPs, to block adult content until the adults opt-out of the block. This prevents the repeated submission of identifying information to a third party, and operating at a higher level, would not need to reveal the specific websites visited. If implemented on a device-level, sexual information would be allowed for adults' devices but not for children when connected to home internet.

In addition, Plaintiffs propose adult controls on children's devices, many of which already exist and can be readily set up. This "content filtering" is effectively the modern version of "blocking and filtering software" that the Supreme Court proposed as a viable alternative in <u>Ashcroft v. ACLU</u>. 542 U.S. at 666–73. Blocking and filtering software is less restrictive because adults may access information without having to identify themselves. And the Court agreed with the

43

finding that "filters are more effective than age-verification requirements." Id. at 667. Nor is this cabined to the early 2000s—a 2016 district court in Louisiana likewise expressed a preference for blocking and filtering over age verification. Garden Dist. Book Shop, Inc., 184 F. Supp. 3d at 339.

(a) <u>Defendant's expert highlights alternatives that H.B. 1181<br>does not allow</u>

Defendant's own expert shows how H.B. 1181 is unreasonably intrusive in its use of age verification. Tony Allen, a digital technology expert who submitted a declaration on behalf of Defendant, suggests several ways that age-verification can be less restrictive and costly than other measures. (Allen Decl., Dkt. # 26-6). For example, he notes that age verification can be easy because websites can track if someone is already verified, so that they do not have to constantly prove verification when someone visits the page. But H.B. 1181 contains no such exception, and on its face, appears to require age verification for each visit. H.B. 1181 § 129B.003. Commercial age verification systems must use "public or private transactional data" which by its definition includes "records from mortgage, education, and employment entities" but does include third-party verification. Id. § 129B.001. The same goes for Allen's discussion of "vouching"—where age is verified based on others' credibility. (Allen Decl., Dkt. # 26-6, at 12). H.B. 1181

44

does not appear to allow for vouching because it is not based on transactional data.

H.B. 1181 § 129B.003.

Similarly, Allen discusses how websites may check age using age estimation

based on a user's voice or face. (Allen Decl., Dkt. # 26-6, at 8, 10–12). But it is not

clear that "transactional" data includes biometric verification. H.B. 1181 §

129B.003. Allen also suggests digital identity apps can make the process easier, but

then acknowledges that "Texas does not yet have a state issued digital

identification card or app." (Id. at 9). In short, Allen identifies multiple ways that

age verification can be less intrusive on users and websites. But H.B. 1181 does not

allow these methods.

      (b) <u>Defendant's scientific research emphasizes the benefits of</u>
<u>parental-led content filtering</u>

Beyond Defendant's technical expert, one of their medical surveys also

suggests that content filtering can be effective compared to legal bans. The

position, taken from a literature review of medical research on children's access to

online sexual material, is worth quoting at length:

> In order to contain the risk of inadvertent exposure for
> children, some technical measures may be adopted by
> websites, social networks, Internet search engines and
> Internet providers. **Most search engines offer options for**
> **safe browsing and are able to block pop-up ads, which**
> **are one of the most prominent causes of unintended**
> **exposition to age-inappropriate content**. However,
> **many authors agree that despite the existence of legal**

**bans for minors' use of adult sites and the implementation of these measures, it is concretely extremely difficult to block access**. Although the web is indeed the major source of pornographic material, the problem can hardly be solved by simply adopting technical limitations. Instead, its deep social roots stress the importance of education and communication with parents, teachers and healthcare professionals.

The literature divides strategies of parental approach in mainly two categories: restrictive mediation and active mediation. Restrictive mediation mostly consists of defining rules about the use of Internet in terms of timing, setting and type of online activity, and possibly making use of the aforementioned technical aids. Active mediation, on the contrary, requires a sharper awareness from parents who qualify themselves as promoters of a safe and responsible use of Internet. This kind of mediation seems to be favoured by Italian parents (56%) and mostly chosen when dealing with younger boys and girls. **These mediation strategies have been shown their effectiveness in contrasting the use of [sexually explicit material], and many studies confirm that careful parental control and supervision remain key protective factors**.

(Def.'s Resp., Dkt. # 27-2, at 9–10 (citing Niccolò Principi, et al., *Consumption of sexually explicit internet material and its effects on minors' health: latest evidence from the literature*,74 Minerva Pediatr., 332 (June 2022) ("Principi Article") (internal citations omitted) (emphasis added)).

In short, Defendant's own study suggests several ways that H.B. 1181 is flawed. As the study points out, pop-up ads, not pornographic websites, are the most common forms of sexual material encountered by adolescents. The study also

confirms that blocking pornographic websites and material altogether is extremely difficult to accomplish through "legal bans." And most crucially, the study highlights the importance of content filtering alongside parental intervention as the most effective method of limiting any harm to minors. Defendant cannot claim that age-verification is narrowly tailored when one of their own key studies suggests that parental-led content-filtering is a more effective alternative.

(c) <u>Content filtering is more tailored to sexual material than age verification</u>

Content-filtering also helps address the under-inclusivity issue. At the hearing, Defendant argued that if H.B. 1181 covered more websites, such as search engines, then Plaintiffs would instead argue that it is overbroad. The point is well-taken, but it misses a crucial aspect: the law would be overbroad because age verification is a broad method of enforcement. Under H.B. 1181, age verification works by requiring a user's age at a website's landing page. This forces Texas (and other states) to choose some broad threshold (e.g., one-third) for what percentage of a website must be sexual before requiring age verification. But this is not true for content filtering, which applies to the material on a webpage, not just the site as a whole. So users can browse Reddit, but will be screened from the sexual material within the site by the content filter. (Sonnier Decl., Dkt. # 31-1, at 3–4). Similarly, a user can search Google, but not encounter pornographic images. (<u>Id.</u>) This is the

definition of tailoring: content filtering, as opposed to age verification, can more precisely screen out sexual content for minors without limiting access to other speech.

Content filtering is especially tailored because parents can choose the level of access. In other words, parents with an 8-year-old can filter out content inappropriate for an 8-year-old, while parents with a 17-year-old can filter out content inappropriate for a 17-year-old. Using age verification, a 17-year-old will be denied access to material simply because it might be inappropriate for a young minor. Content filtering, by contrast, allows for much more precise restrictions within age groups.

In general, content filtering also comports with the notion that parents, not the government, should make key decisions on how to raise their children. *See* United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 824–25 (2000) ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."). Likewise, even as it upheld obscenity laws, Ginsberg affirmed that "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." 390 U.S. at 639.

Content filtering allows parents to determine the level of access that their children should have, and it encourages those parents to have discussions with their children regarding safe online browsing. As the Principi article notes, it is this combination that is most effective for preventing unwanted exposure to online pornography. (Principi article, Dkt. # 27-2, at 9–10). Age verification, by contrast, places little to no control in the hands of parents and caretakers.[14] Thus, content filtering keeps the "parents' claim to authority in their own household to direct the rearing of their children . . . ." Id.: *see also* Brown, 564 U.S. at 832–35 (2011) (detailing the Founding Era's attitudes towards raising children and noting that the "history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children.") (Thomas, J., dissenting).

### (d) Content filtering is less burdensome and more effective

Again, changes to the internet since 2003 have made age verification more—not less—cumbersome than alternatives. Parental controls are commonplace on devices. They require little effort to set up and are far less restrictive because they do not target adults' devices.

---

[14] Parents may only allow access through age verification by providing their ID or credentials to a minor. This is unlikely in light of the obvious awkwardness of a teenager asking their parents' permission each time they wish to view sexual content.

Moreover, content filtering is likely to be more effective because it will place a more comprehensive ban on pornography compared to geography-based age restrictions, which can be circumvented through a virtual private network ("VPN") or a browser using Tor.  Adult controls, by contrast, typically prevent VPNs (or Tor-capable browsers) from being installed on devices in the first place. (*See* Sonnier Decl., Dkt. # 31-1, at 3–4). And minors who wish to access pornography are more likely to know how to use Tor or VPNs. (Sonnier Decl., Dkt. # 5-1, at 45).

In addition, content filtering blocks out pornography from foreign websites, while age verification is only effective as far as the state's jurisdiction can reach. This is particularly troublesome for Texas because, based on the parties here alone, foreign websites constitute some of the largest online pornographic websites globally. If they are not subject to personal jurisdiction in the state, they will have no legal obligation to comply with the H.B. 1181. Age verification is thus limited to Texas's jurisdictional reach. Content filtering, by contrast, works at the device level and does not depend on any material's country of origin.

Defendant disputes the effects of content filtering and argues that it is only as effective as the caretakers' ability to implement it. But even as Defendant's technical expert noted at the hearing, content filtering is designed for parents and caretakers to be easy to use in a family. The technical knowledge required to

implement content-filtering is quite basic, and usually requires only a few steps.

(Sonnier Decl., Dkt. # 31-1, at 3–4; Dkt. # 5-2, at 15–17). And the legislature made

no findings regarding difficulty of use when it passed the law.

At the hearing, Defendant's expert repeatedly emphasized that parents often

fail to implement parental controls on minors' devices. But Defendant has not

pointed to any measures Texas has taken to educate parents about content filtering.

And more problematically, the argument disregards the steps Texas *could* take to

ensure content filtering's use, including incentives for its use or civil penalties for

parents or caretakers who refuse to implement the tool. Indeed, draft bills of H.B.

1181 included such a measure, but it was abandoned without discussion. (Pls.'

Reply, Dkt. # 31, at 7). In Ashcroft v. ACLU, the Supreme Court gave this precise

argument "little weight," noting that the government has ample means of

encouraging content filtering's use. 542 U.S. at 669–70. In short, Texas cannot

show that content filtering would be ineffective when it has detailed no efforts to

promote its use.

(e) Texas has not met its burden

In sum, Plaintiffs have shown that content filtering offers a more tailored,

less restrictive method of ensuring that minors do not access adult sexual content.

This finding is not surprising, because Defendant offers zero evidence that the

legislature even considered the law's tailoring or made any effort whatsoever to

choose the least-restrictive measure. To satisfy strict scrutiny, Texas must provide evidence supporting the Legislature's judgments. *See* Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 195–96 (1997). This is Texas's burden to meet—not Plaintiffs'. Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 171 (2015). But it is virtually impossible for Texas to make this showing when the Legislature did not consider the issue at all. *See, e.g.*, Ass'n of Club Executives of Dallas, Inc. v. City of Dallas, Texas, 604 F. Supp. 3d 414, 426 (N.D. Tex. 2022) ("[N]o evidence was presented that the City considered less restrictive means of achieving its stated interest"); Brewer v. City of Albuquerque, 18 F.4th 1205, 1255 (10th Cir. 2021) ("[W]hile such a less-restrictive-means analysis need not entail the government affirmatively proving that it tried less-restrictive mean . . . it does entail the government giving serious consideration to such less-restrictive means before opting for a particular regulation."). The state cannot show that it made *any* analysis as to the differences between age verification and content filtering, despite established Supreme Court precedent favoring the latter. Ashcroft v. ACLU, 542 U.S. at 668. The complete failure of the legislature to consider less-restrictive alternatives is fatal at the preliminary injunction stage.

Based on the evidence in the parties' briefing, declarations, and hearing testimony, it is clear that age verification is considerably more intrusive while less

effective than other alternatives. For that reason, it does not withstand strict scrutiny.

      F.      <u>H.B. 1181 Unconstitutionally Compels Speech</u>

There is no doubt that H.B. 1181 forces the adult video companies into compelled speech. The law requires that they post three disclaimers, calling pornography "potentially biologically addictive [and] proven to harm human brain development" among other purported neurological issues. H.B. 1181 § 129B.004(1). The sites must also state, "Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses." <u>Id.</u> It must also state, "Pornography increases the demand for prostitution, child exploitation, and child pornography." <u>Id.</u> Finally, sites must provide the number of a national mental health illness hotline.  <u>Id.</u>

This is compelled speech. The government is forcing commercial sites to speak and broadcast a proposition that they disagree with. The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." <u>Janus</u>, 138 S. Ct. at 2463 (collecting cases) (quotations omitted). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command . . . ." <u>Id.</u>; *see also* <u>Nat'l Inst. of Fam. & Life Advocs. v. Becerra</u>, 138 S. Ct. 2361, 2371 (2018)

("NIFLA"). Even if, as Defendant argues, the law compels only commercial

speech, it does not pass constitutional muster.

      i.      Strict Scrutiny Applies to the Disclosures

      (a) The law targets speech by its content, not its commercial

      nature

Although H.B. 1181 targets for-profit websites, the speech it regulates is

likely non-commercial. First, H.B. 1181's compelled disclosures are content-based,

regardless of whether they regulate commercial activity. *See* Cincinnati v.

Discovery Network, 507 U.S. 410, 429–30 (1993) ("It is the absence of a neutral

justification . . . that prevents the city from defending its [] policy as content

neutral."); Sorrell v. IMS Health Inc., 564 U.S. 552, 565 (2011) ("Government's

content-based burdens must satisfy the same rigorous scrutiny as its content-based

bans. . . . Commercial speech is no exception."); Intl. Outdoor, Inc. v. City of Troy,

Michigan, 974 F.3d 690, 706 (6th Cir. 2020) (applying strict scrutiny standard to

content-based commercial regulations); Reed, 576 U.S. at 166 ("Because strict

scrutiny applies either when a law is content based on its face or when the purpose

and justification for the law are content based, a court must evaluate each question

before it concludes that the law is content neutral and thus subject to a lower level

of scrutiny."). H.B. 1181 targets speech based upon the "subject matter [and] its

content." Reed, 576 U.S. at 163. Speakers who promote the regulated subject

matter must then place disclosures on their advertisements and landing pages. The threshold inquiry examines the content of a website, not whether something is an advertisement. H.B. 1181 cannot have effect without reference to content. Therefore, because the law targets speech based on its content, it is subject to strict scrutiny. Discovery Network, 507 U.S. at 429–30; Reed, 576 U.S. at 166.

Separately, the regulation is also content-based under the logic of NIFLA. The heath disclosure notice "compel[s] individuals to speak a particular message" and "such notices alter the content of their speech." NIFLA, 138 S. Ct. at 2371 (cleaned up). As in NIFLA, individuals must "provide a government-drafted script" regarding the controversial effects of pornography, "as well as contact information" for mental health services. Id. And just like NIFLA, the speakers must provide information that is "devoted to opposing" the speaker's actual preferred message. Id. Because the compelled disclosure alters the content of Plaintiffs' speech, H.B 1181 is content-based under NIFLA.[15] The logic of NIFLA demands that the law be subject to strict scrutiny.

(b) The proposed targets are not commercial transactions

Even setting aside Discovery Network and Reed, H.B. 1181 does not regulate commercial transactions related to speech. "[T]he core notion of commercial speech [is] speech which does no more than propose a commercial

---

[15] This applies even if, as Defendant argues, Plaintiffs produce only obscene material.

transaction." <u>Bolger v. Youngs Drug Prod. Corp.</u>, 463 U.S. 60, 66 (1983) (cleaned

up). Alternatively, speech may be commercial if it constitutes "expression related

solely to the economic interests of the speaker and its audience." <u>Cent. Hudson Gas</u>

<u>& Elec. Corp. v. Pub. Serv. Comm'n of New York</u>, 447 U.S. 557, 561 (1980).

Unlike cigarettes, lightbulbs, or food content, where compelled disclosures have

been upheld, sexual material is not a fungible consumer good. Rather, "[s]exual

expression which is indecent but not obscene is protected by the First

Amendment." <u>ACLU v. Reno</u>, 521 U.S. at 875. At the outset, then, doctrines

surrounding commercial speech disclosures likely do not apply, because the law

regulates First Amendment-protected activity beyond "propos[ing] a commercial

transaction." And while performers may earn money on sexual expression, they do

not have a "sole" economic interest in that performance.

     <u>Volokh v. James</u> is helpful. 22-CV-10195 (ALC), 2023 WL 1991435, at *7–8

(S.D.N.Y. Feb. 14, 2023). There, the court dealt with a requirement that certain

online platforms create a mechanism to file complaints about "hateful speech" and

disclose the policy for dealing with the complaints. <u>Id.</u> at *1–2. The court found

that the disclosures did not constitute commercial speech because "the policy

requirement compels a social media network to speak about the range of protected

speech it will allow its users to engage (or not engage) in." <u>Id.</u> at 7. The court noted

that "lodestars in deciding what level of scrutiny to apply to a compelled statement

must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." Id. at *8 (citing Riley, 487 U.S. at 796). "Where speech is 'inextricably intertwined with otherwise fully protected speech, it does not retain any of its potential commercial character.'" Id. Like Volokh, the law targets protected speech based on its content outside of commercial applications. The lessened commercial speech standard does not apply.

Defendant argues that the speech is commercial because the landing pages for the paid subscription sites "is nothing more than a place to click and then follow a prompt to enter your payment information . . . ." (Def.'s Resp., Dkt. # 27, at 16). Again, this ignores the content-based nature of the regulation in the first place. But even setting that aside, the argument is dubious. First, existing subscribers will have already paid, so the "proposed commercial transaction" will only apply to new visitors. For returning subscribers, the page is not proposing a transaction. Second, by way of example, several newspapers offer landing pages (or paywalls) that force visitors to purchase a subscription before reading an article. Yet it is doubtful that these websites would have diminished First Amendment rights as a result.[16] It is the content the websites offer, and not the existence of a paywall, that should determine its commercial nature, because paid

---

[16] Similarly, it is doubtful that the government could regulate shrink-wrapped books in a bookstore differently than others because those books require a transaction before accessing the content therein.

access that makes speech commercially viable is "inextricably intertwined" with the speech itself. Riley, 487 U.S. at 796.

Defendant is on slightly stronger footing as to the requirements for advertisements, but the Court still finds them to be inextricably intertwined with non-commercial speech. Plainly, the advertisements by themselves are commercial, to the extent they link to paid-subscription websites, because they propose a transaction. Under Bolger, courts should examine (1) an advertising format, (2) reference to a specific product, and (3) economic motivation for publication. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983).

Setting aside the content-based nature of H.B. 1181 as a whole, the advertisements likely constitute commercial speech, even when those advertisements relate to protected speech. Id. at 66. Plainly, they meet the first and third criteria of Bolger. However, it is a close call whether those advertisements are inextricably intertwined with protected speech. See Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 958 (9th Cir. 2012) ("[T]he inextricably intertwined test operates as a narrow exception to the general principle that speech meeting the Bolger factors will be treated as commercial speech."); Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore, 879 F.3d 101, 108–09 (4th Cir. 2018). Assuming that the law is not content based as a whole, the compelled disclosures are likely commercial as applied to advertising. However,

the difficulty regarding the "inextricably intertwined" standard shows why the compelled disclosures must be considered content-based at the outset. To ignore the content-based nature of the regulation overall would be to allow the government to regulate disfavored speech with less scrutiny, so long as the government only targets the commercial aspects of that speech. Nonetheless, because Defendant considers the disclosures commercial speech, the Court will also analyze them under commercial speech precedent.

ii.     <u>The compelled disclosures do not survive strict scrutiny</u>

Assuming that strict scrutiny applies, the compelled disclosures do not pass constitutional muster. Under strict scrutiny, the law must be narrowly tailored to serve a compelling government interest. *See, e.g.*, <u>Playboy Entm't Grp., Inc.</u>, 529 U.S.at 813 (2000). As previously stated, the state has a compelling interest in preventing minors from accessing pornography. However, for many reasons, the disclosures are not narrowly tailored. First, and most critically, the disclosures do not target a minor's access to pornography because a minor will be screened out by the age-verification mechanism. Assuming age-verification works, minors will not be able to access the content on pornographic websites. As a result, the law targets the group *outside* the state's interest (i.e., adults who wish to view legal explicit

59

materials).[17] A law cannot be narrowly tailored to the state's interest when it targets the group exactly outside of the government's stated interest.

More generally, the state has not met its burden that the disclosures are narrowly tailored in general. They require large fonts, multiple warnings, and phone numbers to mental health helplines. But the state provides virtually no evidence that this is an effective method to combat children's access to sexual material. The messages themselves do not mention health effects on minors. And the language requires a relatively high reading level, such as "potentially biologically addictive," "desensitizes brain development," and "increases conditioned responses." H.B. 1181 § 129B.004. Quite plainly, these are not disclosures that most minors would understand. Moreover, the disclosures are restrictive, impinging on the website's First Amendment expression by forcing them to speak government messages that have not been shown to reduce or deter minors' access to pornography. *See* 303 Creative LLC v. Elenis, 143 S. Ct. 2298, 2312 (2023) ("[T]he government may not compel a person to speak its own preferred messages."). Under strict scrutiny, the disclosures do not survive.

      iii.    H.B. 1181 Fails as a Commercial Speech Regulation

---

[17] The state has not argued a compelling interest in preventing *adults* from accessing pornography. Indeed, Defendant argues that the law is permissible precisely because it *does not* restrict adult access. (Def.'s Resp., Dkt. # 27, at 13).

(a) <u>The regulations do not directly advance a substantial</u>

<u>government interest</u>

Even using commercial speech standards, the disclosures do not pass muster.

For a commercial speech regulation to survive, it must directly advance a

substantial government interest and be narrowly tailored so as not to be more

extensive than necessary. <u>Cent. Hudson</u>, 447 U.S. at 566. For the same reasons that

the law fails strict scrutiny, it fails the more relaxed commercial speech standard.

Although the compelled disclosures apply almost exclusively to adults, the state

claims its interest is in "protecting children from porn." (Def.'s Resp., Dkt. # 27, at

16). This is not "directly advancing" the interest because only adults can access the

material on websites that post this warning.  Moreover, the disclosures are plainly

more excessive than necessary, requiring the parties to post in all caps, three times,

"TEXAS HEALTH AND HUMAN SERVICES WARNING." H.B. 1181 §

129.B.004. And, as discussed below, the disclosures state scientific findings as a

matter of fact, when in reality, they range from heavily contested to unsupported by

the evidence. *See infra*, Section III.F.iii.b.

In its response, the state does not assert an interest in protecting *adults* from

non-obscene pornography, who will be the actual target of the messages. It is likely

that this interest would not be substantial or permissible. The mere fact that non-

obscene pornography greatly offends some adults does not justify its restriction to

all adults. *See* <u>Carey v. Population Services Int'l</u>, 431 U.S. 678, 701 (1977)

("[W]here obscenity is not involved, we have consistently held that the fact that

protected speech may be offensive to some does not justify its suppression.");

<u>Matal v. Tam</u>, 582 U.S. 218, 243–44 ("Giving offense is a viewpoint. We have said

time and time again that the public expression of ideas may not be prohibited

merely because the ideas are themselves offensive to some of their hearers.")

(cleaned up); *see also* Robert C. Post, *Cultural Heterogeneity and Law:*

*Pornography, Blasphemy, and the First Amendment,* 76 Cal. L. Rev. 297, 325–26

(1988) ("[T]he government would acquire enormous and intolerable powers of

censorship if it were to be given the authority to penalize any speech that would

tend to induce in an audience disagreeable attitudinal changes with respect to

future conduct.").

 This applies equally to commercial speech. <u>C. Hudson</u>, 447 U.S. at 578 ("No

differences between commercial speech and other protected speech justify

suppression of commercial speech in order to influence public conduct through

manipulation of the availability of information.") (Blackmun, J., concurring);

<u>Zauderer v. Off. of Disc. Counsel of S. Ct. of Ohio</u>, 471 U.S. 626, 651 (1985)

(differentiating government regulations meant to protect consumers from those that

seek to "prescribe what shall be orthodox in politics, nationalism, religion, or other

matters of opinion") (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)).

In short, if the interest is in protecting children, then it may arguably be substantial, but it is advanced indirectly. If the interest is in changing adults' attitudes on porn and sexuality, then the state cannot claim a valid, substantial interest. Either way, the compelled messages fail under Central Hudson.

(b) Zauderer does not apply

Defendant argues that H.B. 1181 regulates commercial speech in a manner that is "truthful, non-misleading, and [requires] relevant disclosures" and is therefore constitutional. (Def.'s Resp., Dkt. # 27, at 13 (citing Texas Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 577 (5th Cir. 2012)). But Texas Med. Providers dealt with speech regarding abortion, and the case adopted its language from since-overruled abortion precedent regarding "undue burdens." Texas Med. Providers, 667 F.3d at 577 (citing Planned Parenthood of S.E. Pennsylvania v. Casey, 505 U.S. 833 (1992), *overruled by* Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022)). It does not apply to other forms of commercial speech. Instead, the relaxed standard for certain compelled disclosures applies if they contain "purely factual and uncontroversial information." Zauderer, 471 U.S. at 651. If the information is "purely factual and uncontroversial," the government must only show that the compelled disclosures reasonably relate to a

substantial government interest and are not "unjustified or unduly burdensome."
Id.

At the initial stage, H.B. 1181 still fails, because the government lacks a
substantial interest that reasonably relates to the regulation. It is unreasonable to
warn *adults* about the dangers of legal pornography in order to protect *minors*. But
even assuming this was a cognizable interest, Zauderer would still not apply. First,
H.B. 1181's messages are unduly burdensome. The requirement requires no fewer
than four distinct messages to be presented each time a person visits the landing
page or advertisement. The disclosures must be in 14-point font size, which is
again unclear and burdensome because digital fonts on webpages are not measured
in points. This is particularly difficult for advertisements, because they rarely take
up an entire page. Often, online advertisements are limited to a small sliver of a
webpage. Requiring large font sizes in the context of advertisements would likely
be overly burdensome because they risk swallowing up the entire advertisement
itself. *See* Ibanez v. Fla. Dept. of Bus. and Prof. Reg., Bd. of Accountancy, 512
U.S. 136, 146 (1994) (holding a compelled message was unconstitutional when it
"effectively rule[d] out" the initial message). And the warnings themselves are
somewhat deceptive. Defendant has not shown that the Texas Health and Human
Services Commission has actually endorsed the message or made the relevant
medical findings, despite requiring speakers to display "TEXAS HEALTH AND

HUMAN SERVICES WARNING" three separate times in all caps.[18] Because of the size and repeated nature of the warnings, as well as their potential for misleading visitors, they are likely to be unduly burdensome.

Second, the disclosures are deeply controversial. To receive the more lenient Zauderer standard, the message at issue must be "purely factual and uncontroversial information." Id. Outside of factual and non-controversial information, Zauderer's relaxed standard does not apply. See Hurley v. Irish–Am. Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 573 (1995). The warnings are controversial, both as a matter of fact and opinion.

The Court assumes, at the preliminary injunction stage, that the health disclosures—as opposed to the mental health hotline—are "purely factual."[19] Regardless of their accuracy, the health disclosures purport to show scientific findings. The mental health line, however, is not factual. It does not assert a fact, and instead requires companies to post the number of a mental health hotline. The implication, when viewers see the notice, is that consumption of pornography (or any sexual material) is so associated with mental illness that those viewing it

---

[18] Ironically, while Zauderer allowed the government to regulate deceptive speech, here, it is the government's message that is potentially deceptive. 471 U.S. at 651.

[19] In particular, whether the disclosures are "purely factual" depends on whether scientifically contested statements are still "factual." See, e.g., Nat'l Ass'n of Manufacturers v. S.E.C., 800 F.3d 518, 528 (D.C. Cir. 2015); Am. Meat Inst. v. U.S. Dep't of Agric., 760 F.3d 18, 22 (D.C. Cir. 2014); Am. Beverage Ass'n v. City & Cnty. of San Francisco, 916 F.3d 749, 763 (9th Cir. 2019) (Ikuta, J., concurring in part and dissenting in part). But the Court reserves the "purely factual" question for a later stage, because factual or not, the disclosures are plainly controversial.

should consider seeking professional crisis help. The statement itself is not factual, and it necessarily places a severe stigma on both the websites and its visitors.[20]

Much more seriously, however, is the deep controversy regarding the benefits and drawbacks of consumption of pornography and other sexual materials. Just like debates involving abortion, pornography is "anything but an uncontroversial topic." Natl. Inst. of Fam. and Life Advocates v. Becerra, 138 S. Ct. 2361, 2372 (2018). Defendant's own exhibit admits this. (Principi article, Dkt. # 27, at 2 ("Scientific evidence supporting the negative effects of exposure to [sexually explicit internet material] is controversial, and studies addressing this topic are difficult because of important methodological discrepancies.")). As a political, religious, and social matter, consumption of pornography raises difficult and intensely debated questions about what level and type of sexual exposure is dangerous or healthy. See, e.g., Jeneanne Orlowski, *Beyond Gratification: The Benefits of Pornography and the Demedicalization of Female Sexuality*, 8 Modern Am. 53 (Fall 2012) (arguing for constitutional protection of non-obscene pornography); Andrea Dworkin, *Against the Male Flood: Censorship, Pornography, and Equality*, 8 Harv. Women's L.J. 1 (1985) (arguing, among other

---

[20] For an expression to be purely factual, "it must be information with an objective truth or existence." R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin., 6:20-CV-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) (appeal docketed, Feb. 6, 2023) (citing Lawrence Solum, Legal Theory Lexicon: Fact and Value, https://lsolum.typepad.com/legaltheory/2019/07/legal-theory-lexicon-fact-and-value.html (July 7, 2019)).

things, that pornography depicts and leads to the subordination of women);

Athanasia Daskalopoulou & Maria Carolina Zanette, *Women's Consumption of Pornography: Pleasure, Contestation, and Empowerment*, 54 Sociology 969 (2020) (noting that female consumption of pornography is both "empowering and disciplining" for women); Samuel L. Perry, *Banning Because of Science or In Spite of it? Scientific Authority, Religious Conservatism, and Support for Outlawing Pornography, 1984–2018*, 100 Social Forces 1385 (March 2022) (examining scientific citations in anti-pornography advocacy and suggesting that the anti-pornography movement is growing "more connected to religious conservatism than views about scientific authority"). The intense debate and endless sociological studies regarding pornography show that it is a deeply controversial subject. The government cannot compel a proponent of pornography to display a highly controversial "disclosure" that is profoundly antithetical to their beliefs.

Beyond the differing moral values regarding pornography, the state's health disclosures are factually disputed. Plaintiffs introduce substantial evidence showing that Texas's health disclosures are either inaccurate or contested by existing medical research. Dr. David Ley, for example, is a clinical psychologist in the states of New Mexico and North Carolina who specializes in treating sexuality issues. (Ley Decl., Dkt # 5-3, at 1–4). As Ley states, "There currently exists no generally accepted, peer-reviewed research studies or scientific evidence which

indicate that viewing adult oriented erotic material causes physical, neurological, or psychological damage such as 'weakened brain function' or 'impaired brain development.'" (Id.) Included in Ley's declaration are more than 30 psychological studies and metanalyses contradicting the state's position on pornography. (Id.) Moreover, Ley points out that the mental health hotline number is unsupported because the standard manual of classification of mental disorders, the DSM-5-TR, does not consider pornography addiction as a mental health disorder, and in fact, explicitly rejected that categorization as unsupported in 2022. (Id. at 5–6). Finally, the hotline, which links to the Substance Abuse and Mental Health Services Administration helpline, will be of little to no aid because they are likely not trained to deal with pornographic use or addiction. (Id. at 5–7).

Defendant, meanwhile, introduces evidence suggesting that pornography *is* dangerous for *children* to consume. One study of boys in Belgium, for example, suggests that "an increased use of Internet pornography decreased boys' academic performance six months later." (Bouché Decl. Dkt. # 26-8, at 2). Another meta-analysis suggests that pornography is harmful to adolescents but encourages parental intervention alongside content filtering to mitigate these harms. (Principi Article, Dkt. #. 27-6, at 9–10). These studies, however, are inapplicable to the compelled disclosures, which make no mention of the effects on children and are primarily targeted at adults.

68

Each portion of the compelled message is politically and scientifically controversial. This is a far cry from cigarette warnings. Unlike cigarettes, pornography is the center of a moral debate that strikes at the heart of a pluralistic society, involving contested issues of sexual freedom, religious values, and gender roles. And the relevant science, shows, at best, substantial disagreement amongst physicians and psychologists regarding the effects of pornography.[21] Even if the disclosures are commercial speech, Zauderer cannot apply.

G.     Section 230

Separate from the First Amendment claim, Plaintiffs argue that Section 230 of the CDA preempts H.B. 1181. (Mot. Prelim. Inj., Dkt. # 5, at 17–18). The CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Websites are the most common interactive computer services." Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1097 (9th Cir. 2019).

In Doe v. MySpace, Inc., the Fifth Circuit held that "Congress provided broad immunity under the CDA to Web-based service providers for all claims

---

[21] At worst for Texas, the science shows that many of their claims are entirely without support. For example, one disclosure requires websites to state that pornography "desensitizes brain reward circuits [and] increases conditioned responses" for viewers. H.B. 1181 129B.004. Defendant's study, however, shows that "sensation seeking" is predictive of pornography consumption, not the other way around. (Bouché Decl. Dkt. # 26-8, at 2). No other studies appear to support the position.

stemming from their publication of information created by third parties[.]" 528

F.3d 413, 418 (5th Cir. 2008). This includes sexual materials. *See, e.g.*,

Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805, 813, 828 (M.D. Tenn. 2013)

(applying section 230 to a Tennessee law "criminaliz[ing] the sale of certain sex-

oriented advertisements"). Under section 230, "[p]arties complaining that they

were harmed by a Web site's publication of user-generated content . . . may sue the

third-party user who generated the content." MySpace, 528 F.3d at 419. But they

cannot sue "the interactive computer service that enabled them to publish the

content online." Id.

Defendant seeks to differentiate MySpace because the case dealt with a

negligence claim, which she characterizes as an "individualized harm." (Def.'s

Resp., Dkt. # 27, at 19). MySpace makes no such distinction. The case dealt with a

claim for individualized harm but did not limit its holding to those sorts of harms.

Nor does it make sense that Congress's goal of "[paving] the way for a robust new

forum for public speech" would be served by treating individual tort claims

differently than state regulatory violations. Bennett v. Google, LLC,

882 F.3d 1163, 1166 (D.C. Cir. 2018) (cleaned up). The text of the CDA is clear:

"No cause of action may be brought and no liability may be imposed under any

State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

"[A]ny" state law necessarily includes those brought by state governments, so

Defendant's distinction between individual vs. regulatory claims is without merit.[22]

The Fifth Circuit "and other circuits have consistently given [Section 230(c)] a wide scope." Google, Inc. v. Hood, 822 F.3d 212, 220-21 (5th Cir. 2016) (quoting MySpace, 528 F.3d at 418). "The expansive scope of CDA immunity has been found to encompass state tort claims, alleged violations of state statutory law, requests for injunctive relief, and purported violations of federal statutes not specifically excepted by § 230(e)." Hinton v. Amazon.com.dedc, LLC, 72 F. Supp. 3d 685, 689 (S.D. Miss. 2014) (citing cases).

Next, Defendant argues that Section 230 does not apply because only the domestic websites are protected by the law, and those websites only post their own content—not those of third parties. (Def.'s Resp., Dkt. # 27, at 19–20 (citing AOSI, 140 S. Ct. at 2087)). AOSI does not deal with protection under Section 230, and the Supreme Court's dicta regarding extraterritoriality deals with the statutory rights of "foreign citizens *abroad*"—not those speaking within the country. AOSI, 140 S. Ct. at 2087. Cases that do discuss Section 230, dealing with conduct that occurs domestically, have extended the law's protection to foreign publishers. *See* Force v. Facebook, Inc., 934 F.3d 53, 74 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2761 (2020); Fairfield Sentry Ltd. (In Liquidation) by and through Krys v.

---

[22] Even if Section 230 did apply exclusively to individual harms, the law would still be preempted, because H.B. 1181 creates increased penalties when an individual minor accesses a violating website. H.B. 1181 § 129B.006(b). Pure regulatory violations lead to $10,000.00 in damages, but the state imposes an additional $240,000.00 in damages for a minor's access to the website.

Citibank, N.A. London, 630 F. Supp. 3d 463, 495 (S.D.N.Y. 2022).[23] As the Second

Circuit held in Force:

> "[W]e conclude from the text of Section 230, particularly
> the words "shall be treated," that its primary purpose is
> limiting civil liability in American courts. The regulated
> conduct—the litigation of civil claims in federal courts—
> occurs entirely domestically in its application here. We
> thus hold that the presumption against extraterritoriality is
> no barrier to the application of Section 230(c)(1) in this
> case."

934 F.3d at 74.

Thus, the foreign website Plaintiffs may claim the protection of Section 230

when failing to do so would subject them to imminent liability for speech that

occurs in the United States. Force, 934 F.3d at 74. Because the foreign website

Plaintiffs host content provided by other parties, they receive protection under

Section 230. MySpace, 528 F.3d at 419.

As Defendant notes, the second element of immunity under § 230(c)

"requires that the claims are all based on content provided by *another* information

content provider." Wells v. YouTube, LLC, 3:20-CV-2849-S-BH, 2021 WL

2652966, at *3 (N.D. Tex. May 17, 2021) (emphasis added), *adopted* 3:20-CV-

2849-S-BH, 2021 WL 2652514 (N.D. Tex. June 28, 2021). To the extent that the

---

[23] The Ninth Circuit came to a similar conclusion, finding that the "relevant conduct occurs where immunity is imposed . . . ." Gonzalez v. Google LLC, 2 F.4th 871, 888 (9th Cir. 2021). The Supreme Court granted cert, but declined to reach the Section 230 analysis because it found that the statute at issue did not apply to the Defendants' conduct. Gonzalez v. Google LLC, 598 U.S. 617 (2023); Twitter, Inc. v. Taamneh, 598 U.S. 471 (2023).

domestic website Plaintiffs and foreign website Plaintiffs create or develop the content they themselves post, they are not entitled to immunity. 47 U.S.C. § 230(c)(1); *id.* § 230(f)(3). Based on Plaintiffs' pleadings, it is clear that certain websites create their own content to be posted. For example, MG Premium Ltd owns the website Brazzers.com and creates content for the site. Those Plaintiffs that develop and post their own content are not entitled to an injunction on Section 230 grounds. Still, other Plaintiffs, such as WebGroup, which operates XVideos, only hosts third-party content, and therefore is entitled to Section 230 protection.

Because certain Plaintiffs are likely to succeed on the Section 230 claims, they are entitled to a preliminary injunction. "[S]ection 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1175 (9th Cir. 2008); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254 (4th Cir. 2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and . . . is effectively lost if a case is erroneously permitted to go to trial."). Because Section 230 provides immunity, rather than a simple defense to liability, those Plaintiffs are entitled to an injunction.

Specifically, Plaintiffs MG Freesites LTD, WebGroup Czech Republic, NKL Associates, s.r.o., and MediaMe SRL shall be entitled to an injunction under Section 230.

## IV. DISCUSSION – HARM AND EQUITIES

A.    Irrepable Harm

Plaintiffs are likely to suffer irreparable harm in the absence of an injunction. To show irreparable harm, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." Humana, Inc. v. Avram A. Jacobson, M.D., P.A., 804 F.2d 1390, 1394 (5th Cir. 1986). In addition, ongoing, non-recoverable compliance costs constitute irreparable harm, even where the district court does not consider evidence of the costs credible, so long as the harm is more than de minimis. Rest. L. Ctr. v. U.S. Dept. of Lab., 66 F.4th 593 (5th Cir. 2023).

Without a preliminary injunction, Plaintiffs will suffer several types of irreparable harm. First, they will endure non-recoverable compliance costs. Under Fifth Circuit precedent, "[N]onrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." Id. (citing Louisiana v. Biden, 55 F.4th 1017, 1034 (5th Cir. 2022)). "Complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable

compliance costs." Id. A court should emphasize compliance costs' recoverability, rather than their magnitude. Id.

Defendant's argument directly contradicts the Fifth Circuit's instruction in Restaurant Law. Defendant states that "Plaintiffs provide insufficient evidence to show that any alleged monetary losses are significant" in light of their large global operations. (Def.'s Resp., Dkt. # 27, at 22). This runs headfirst into the Restaurant Law's holding that "the key inquiry is 'not so much the magnitude but the irreparability.'" 66 F.4th at 597 (citing Texas v. EPA, 829 F.3d 405, 433 (5th Cir. 2016)). Like Restaurant Law, Plaintiffs' monetary injuries are nonrecoverable—Defendant does not contend otherwise. And they are more than de minimis, because Plaintiffs will have to find, contract with, and integrate age verification systems into their websites. These services come at substantial cost—at the cheapest around $40,000.00 per 100,000 visits. (Compl., Dkt. # 1, at 18; Sonnier Decl., Dkt. # 5-2, at 54). Under Restaurant Law, the ongoing compliance costs constitute irreparable harm.

Second, Plaintiffs will incur irreparable harm through violations of their First Amendment rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). In ACLU v. Ashcroft, the Third Circuit considered this issue so obvious that it devoted no more than a footnote to the

question. 322 F.3d at 251 n.11 (noting that likelihood of success on the merits "is the only [prong] about which any real debate exists"). A party cannot speak freely when they must first verify the age of each audience member, and this has a particular chilling effect when the identity of audience members is potentially stored by third parties or the government.

Irreparable harm is particularly acute in the context of compelled speech because the association of a speaker with the compelled message cannot be easily undone. *See* Barnette, 319 U.S. at 633 (noting that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence). This harm includes, as Plaintiffs argue, a loss of goodwill. H.B. 1181 will force Plaintiffs to display a controversial position as though it were scientific fact, and this will result in incalculable damages to their goodwill and reputation. Wright & Miller, Federal Practice and Procedure: Civil § 2948.1 ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

Defendant argues that these losses are "compensable." (Def.'s Resp., Dkt. # 27, at 21–22). But to be compensable, damages must be capable of calculation or estimation. Innovative Manpower Sols., LLC v. Ironman Staffing, LLC, 929 F. Supp. 2d 597, 620 (W.D. La. 2013). Here, they are not, because the loss of goodwill and visitors may endure for years beyond this litigation. Second, and

more seriously, Defendant ignores that the state is entitled to sovereign immunity from monetary claims. VanDerStok v. Garland, No. 4:22-CV-00691-O, 2022 WL 4809376, at *3 (N.D. Tex. Oct. 1, 2022) (citing Wages & White Lion Invs., L.L.C. v. FDA, 16 F.4th 1130, 1142 (5th Cir. 2021)); Kimel v. Florida Bd. of Regents, 528 U.S. 62, 72–73 (2000). Because the monetary losses are significant and non-recoverable, their imminent occurrence constitutes irreparable harm.

Finally, in the context of Section 230, Plaintiffs will suffer irreparable harm by having to expend non-recoverable resources litigating lawsuits where federal law expressly prohibits causes of action from being brought. 47 U.S.C. § 230(e)(3).

In short, Plaintiffs have shown that their First Amendment rights will likely be violated if the statute takes effect, and that they will suffer irreparable harm absent an injunction. Defendant suggests this injury is speculative and not-imminent, (Def.'s Resp., Dkt. # 27, at 21–23), but this is doubtful. H.B. 1181 takes effect on September 1—mere days from today. That is imminent. Nor is the harm speculative. The Attorney General has not disavowed enforcement. To the contrary, her brief suggests a genuine belief that the law should be vigorously enforced because of the severe harms purportedly associated with what is legal pornography. (Id. at 1–5). It is not credible for the Attorney General to state that "[p]orn is absolutely terrible for our kids" but simultaneously claim that they will not enforce a law ostensibly aimed at preventing that very harm. Because the threat of

enforcement is real and imminent, Plaintiffs' harm is non-speculative. It is axiomatic that a plaintiff need not wait for actual prosecution to seek a pre-enforcement challenge. *See* Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979). In short, Plaintiffs have more than met their burden of irreparable harm.

      B.    The Balance of Harms and Public Interest Favor an Injunction

"[E]nforcement of an unconstitutional law is always contrary to the public interest." Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013). "Injunctions protecting First Amendment freedoms are always in the public interest." Opulent Life Church v. City of Holly Springs, Miss., 697 F.3d 279, 298 (5th Cir. 2012) (quoting Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006)). The Fifth Circuit recently reaffirmed this principle, explicitly noting that although the government "suffers a form of irreparable injury" when it is enjoined from enforcing its statutes, it likewise has no "interest in enforcing a regulation that violates federal law." All. for Hippocratic Med., 2023 WL 5266026, at *28 (quoting Maryland v. King, 567 U.S. 1301, 1303 (2012)). As the circuit court noted, when assessing the state's interest in a law that conflicts with federal statutes or the Constitution, the "government/public-interest analysis collapses with the merits." Id. Because H.B. 1181 is likely unconstitutional, the state cannot claim an interest in its enforcement. Id.

C.    Scope of the Injunction

The Court finds that H.B. 1181 is unconstitutional on its face. The statute is not narrowly tailored and chills the speech of Plaintiffs and adults who wish to access sexual materials. "[I]f the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is proper." Whole Woman's Health v. Hellerstedt, 579 U.S. 582, (2016) (cleaned up), *abrogated on other grounds by* Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022). A statute that is unconstitutional on its face "is invalid in toto— and therefore incapable of any valid application." People for Ethical Treatment of Animals v. Hinckley, 526 F. Supp. 3d 218, 226 (S.D. Tex. 2021) (cleaned up). H.B. 1181 is unconstitutional on its face. The text of the law is facially content based because it screens out sexual content for regulation. *See infra*, Section III.C.i. And the law is not narrowly tailored because it substantially regulates protected speech, is severely underinclusive, and uses overly restrictive enforcement methods. *See infra*, Section III.D. "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling" protected speech. Citizens United v. Fed. Election Commn., 558 U.S. 310, 329 (2010); Fallon, *supra* note 10, at 1344–48; *see also* Am. Civ. Liberties Union v. Mukasey, 534 F.3d (affirming nationwide injunction against Attorney General for enforcement of COPA as unconstitutional on its face), *cert denied* 129 S. Ct. 1033. Accordingly, the Court

79

will enjoin Defendant Colmenero from taking any enforcement action under H.B.
1181 pending further order or final judgment.[24]

## V. CONCLUSION

At the core of Defendant's argument is the suggestion that H.B. 1181 is
constitutional if the Supreme Court changes its precedent on obscenity. Defendant
may certainly attempt a challenge to <u>Miller</u> and <u>Reno</u> at the Supreme Court. But it
cannot argue that it is likely to succeed on the merits as they currently stand based
upon the mere possibility of a change in precedent. Nor can Defendant argue that
the status quo is maintained at the district court level by disregarding Supreme
Court precedent. The status quo has been—and still is today—that content filtering
is a narrower alternative than age verification. <u>Ashcroft v. ACLU</u>, 542 U.S. at 667.

The Court agrees that the state has a legitimate goal in protecting children
from sexually explicit material online. But that goal, however crucial, does not
negate this Court's burden to ensure that the laws passed in its pursuit comport
with established First Amendment doctrine. There are viable and constitutional
means to achieve Texas's goal, and nothing in this order prevents the state from
pursuing those means. *See* <u>ACLU v. Gonzales</u>, 478 F. Supp. 2d 775 (E.D. Pa.
2007), *aff'd*, 534 F.3d 181. ("I may not turn a blind eye to the law in order to

---

[24] As previously stated, the injunction for Plaintiffs' Section 230 claims shall apply only to Plaintiffs MG
Freesites LTD, WebGroup Czech Republic, NKL Associates, s.r.o., and MediaMe SRL.

attempt to satisfy my urge to protect this nation's youth by upholding a flawed statute, especially when a more effective and less restrictive alternative is readily available[.]").

Because the Court finds that H.B. 1181 violates the First Amendment of the United States Constitution, it will **GRANT** Plaintiffs' motion for a preliminary injunction, (Dkt. # 5), as to their First Amendment claims and **GRANT** the motion in part and **DENY** the motion in part as to their Section 230 claims.

Defendant Angela Colmenero, in her official capacity as Attorney General for the State of Texas, is preliminarily **ENJOINED** from enforcing any provision of H.B. 1181.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, August 31, 2023.

_____

David Alan Ezra
Senior United States District Judge