```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                   AUSTIN DIVISION

 3  FREE SPEECH COALITION, INC.  )
    Plaintiff,                   )
 4                               ) Case Number
    vs.                          ) 1:23-CV-00917-DAE
 5                               )
    ANGELA COLMENERO, In her     )
 6  official capacity as Interim ) Austin, Texas
    Attorney General for the     )
 7  State of Texas,              )
    Defendant.                   ) August 23, 2023
 8  ********************************************************

 9        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
             BEFORE THE HONORABLE DAVID A. EZRA
10           SENIOR UNITED STATES DISTRICT JUDGE

11  APPEARANCES:
    FOR THE PLAINTIFF:
12  Scott L. Cole
    Michael T. Zeller
13  Derek Shaffer
    Arian Joseph Koochesfahani
14  Taylor Comerford
    Emily Couture
15  Quinn Emanuel Urquhart & Sullivan, LLP

16  FOR THE DEFENDANT:
    John T. Ramsey
17  Kelsey L Warren
    Office of the Attorney General of Texas

18

19

20

21  COURT REPORTER:
    Angela M. Hailey, CSR, CRR, RPR, RMR
22  Official Court Reporter, U.S.D.C.
    262 West Nueva Street
23  San Antonio, Texas  78207
    Phone(210)244-5048; angela_hailey@txwd.uscourts.gov
24
    Proceedings reported by stenotype, transcript produced by
25  computer-aided transcription.
```

1                           **I N D E X**

2   **WITNESS:**                              **PAGE**

3   **TONY ALLEN**

4   By Ms. Warren                          6, 26

5   By Mr. Zeller                            19

1    *(Wednesday, August 23, 2023, 1:30 p.m.)*

2                                   *  *  *

3              COURT SECURITY OFFICER:  All rise.

4              COURTROOM DEPUTY CLERK:  Austin, 23-CV-917, Free

5    Speech Coalition, Inc., et al versus Angela Colmenero, in her

6    official capacity as Interim Attorney General for the State of

7    Texas.

8              THE COURT:  All right.  Good afternoon.  Can I have

9    appearances please.

10             MR. COLE:  Your Honor, Scott Cole with Quinn Emanuel

11   for the plaintiffs, together with Michael Zeller, Derek

12   Shaffer, Arian Koochesfahani, Taylor Comerford, and Emily

13   Couture.

14             THE COURT:  All right.

15             MR. RAMSEY:  Your Honor, I'm John Ramsey here on

16   behalf of the State, or defendant Colmenero.  I have with me

17   Kelsey Warren.

18             THE COURT:  Good afternoon, all of you.  Now, I do

19   understand that you have witnesses on standby, but to be honest

20   with you, the Court has spent a considerable amount of time

21   going through the materials that have been submitted.  We have

22   declarations and other materials submitted from both sides.

23   Maybe I'm missing something, but I fail to see what witnesses

24   who have already given declarations and are going to say the

25   same thing on the stand that they've already said are going to

1    add today.  So I really don't think it's necessary, unless

2    there's something that you see that I don't see.

3         MR. SHAFFER:  Your Honor, Derek Shaffer for the

4    plaintiffs.  We agree with that, Your Honor, and we're prepared

5    if it comes up a particular factual issue to offer a witness

6    that would be helpful to the Court, but we agree with Your

7    Honor's assessment, that papers should suffice.

8         THE COURT:  I mean, we know what the statute says, we

9    know what the arguments are.  I don't know where the dispute

10   is.

11        MR. RAMSEY:  We have with us an expert on age

12   verification technology, and so to the extent that this Court

13   is going to be trying to make a decision regarding whether or

14   not the age verification law is effective and the least

15   restrictive means for which the State is trying to pursue its

16   compelling interest, we want to make this witness available,

17   especially if there are any questions in the Court's mind about

18   whether the law is effective in the least restrictive means to

19   achieve the government's interest.

20        THE COURT:  Didn't he present a declaration?

21        MR. RAMSEY:  He did, he sent a declaration.

22        THE COURT:  So is he going to say anything different

23   than he said in his declaration?

24        MR. RAMSEY:  I think he might have some information

25   that would be responsive to the reply brief.  At the same time,

1    Your Honor, I'm happy to go along with the plaintiff's counsel

2    and proceed on argument.  And if it seems to you that you still

3    want more information about the exact technology involved and

4    how effective it is, we could at that point call Mr. Allen to

5    the stand.

6          THE COURT:  Do you have any problem with him taking

7    the stand and cross-examining him?

8          MR. SHAFFER:  We don't, Your Honor.

9          THE COURT:  All right.  Let's call him to the stand if

10   you wish to.  Other than that, I don't see any need for any of

11   the other witnesses.  I think I appreciate and understand what

12   this technology is, because you have the declaration, but go

13   ahead and call him.

14         MR. RAMSEY:  Do I understand, Your Honor, you would

15   like to start the proceeding by calling Mr. Allen?

16         THE COURT:  Right.  I don't need an opening statement

17   here.  I've got a ton of briefing here.  We don't have a jury.

18         MS. WARREN:  Your Honor, with that, we would call Tony

19   Allen to the stand.  Your Honor, would you like me to use the

20   podium at counsel table or the actual podium?

21         THE COURT:  No, use the podium here.

22         MS. WARREN:  Yes, Your Honor.

23         COURTROOM DEPUTY CLERK:  Please raise your right hand.

24                         *   *   *

25         *(Oath administered, and TONY ALLEN, defense witness,*

1   *Sworn.)*

2                        *   *   *

3        THE WITNESS:  I do.

4        MS. WARREN:  May I proceed, Your Honor?

5        THE COURT:  Yes.

6        *(1:35 p.m.)*

7                  DIRECT EXAMINATION

8   BY MS. WARREN:

9   Q.  Good afternoon, Mr. Allen.  Can you please introduce

10  yourself to the Court?

11  A.  My name is Tony Allen, I am a global subject matter expert

12  on age verification and age assurance.

13  Q.  I apologize, if I can ask you to make sure you're speaking

14  a little slower than normal just so we can all understand, it's

15  a big room.

16  A.  Okay.

17  Q.  I want you to just go ahead and tell us a little bit about

18  age verification technology, the three kinds of age

19  verification technology that's available to sites such as the

20  plaintiff websites?

21  A.  Yes, so generally speaking, age verification technology is

22  split into three distinct areas.  One is related to what is

23  known as age verification, so that is looking at gaming

24  information about how old you are from official documents or

25  sources such as your driving license or passport or other

1  documentation.  Another one referred to as age estimation deals

2  with looking at you and using computer technology to assess how

3  old you are from your appearance or from your voice or from

4  other biometric features.  And the third one is age inference

5  which is inferring how old you are from the existence of

6  something else.

7  Q.  So the first category is the document verification; is that

8  right?

9  A.  Mainly, yes, it can be against either documents or against

10 things like digital wallets or apps or digital information.

11 Q.  What kind of documents would age verification use to verify

12 your age?  You said driver's license, passport.  Anything else?

13 A.  Yeah, anything from authoritative source, so things like a

14 firearms license or a ID card, an actual ID card or Social

15 Security data or anything else really.

16 Q.  And can you walk us through how that process would work?

17 Say I wanted to gain access to one of the plaintiff websites,

18 let's say Porn Hub, and say they had age verification

19 technology in place.  Can you walk us through what it would

20 look like, the steps I would need to take to verify my age

21 using the document system?

22 A.  So the steps are the same across the areas, so they might

23 be in a different order, but they're broadly the same steps, so

24 generally speaking, you would have to present a document that

25 you wish to rely on.

1    Q.  Let me stop you right there.  I want to start on the web

2    page, on the web page I'm trying to access.  Tell me what I'm

3    going to see.

4    A.  Okay.  So you would be -- you'd try to access it, it would

5    come up with a screen which would say we need to verify how old

6    you are.  Generally speaking, that would go off to another

7    site, to a place where that happens, either a third-party site

8    where you would carry out the process of verifying your age

9    through that site.

10   Q.  And then what would I have to do on that third-party

11   verification site in order to verify my age?

12   A.  So it will ask you to produce a document, so if you're

13   using your driving license, for instance, you would present

14   that document and you could do that to a camera on your Smart

15   phone or on your screen, or in some cases it will allow you to

16   upload a document from a trusted wallet or a digital mobile

17   driving license or something like that, if you have that

18   available to you.

19   Q.  Can I ask you to bring that mic just a little bit closer to

20   you please, or you closer to the mic?  Thank you.

21   A.  Is that better?

22   Q.  That's better.  Thank you.  So once I have presented those

23   documents, either taken a picture or used a digital wallet,

24   then what happens in the age verification software?

25   A.  So then it has to verify that you're the person presenting

1  it, so asking you to present your face, usually your face or

2  image of yourself, and it will then verify the-- in technical

3  terms that's called one-to-one matching, but in normal parlance

4  it's called selfie matching.

5  Q.  Once that is finished, how long will it take for me to be

6  able to access the website that I am trying to access?

7  A.  It's fairly instantaneous, so as soon as it carried out

8  those two things, it will then send back a piece of code to the

9  website.  That code doesn't contain any information other than

10  a transaction code and the answer to the question, *Is this*

11  *person over 18?  Yes or No.*  That enables the website then to

12  allow you to carry on to view the products and services that

13  you want to view.

14  Q.  What happens to the data that I have presented to the age

15  verification website, like my passport or my driver's license

16  and the actual selfie of my face, what happens to that data?

17  A.  In most cases it's instantly deleted, they don't keep it,

18  but there are sometimes legal requirements that they do have to

19  keep it.  So the way that the sites work is that unless there

20  is a legal requirement that they have to keep it, they would

21  delete it.  If there is a legal requirement they have to delete

22  it, which is indeed the case with this particular piece of

23  legislation, they would instantly delete it, it's not kept.

24  The only thing that's kept is the transaction ID.  And if law

25  enforcement came along and said the website have told us that

1  they've carried out age verification, they got this

2  transaction, the age verification service provider would be

3  able to tell them, yes, that's a genuine transaction ID, yes,

4  that was carried out on a particular day, yes, they looked at a

5  driving license, but they wouldn't be able to show them the

6  driving license or the information or the selfie or anything

7  else that they were presented with.

8  Q.  You mentioned that some statutes require age verification

9  technology to retain the information.  Do you know if that's

10 the case here in Texas with HB 1181?

11 A.  In HB 1181, it specifically says you can't retain it.  I'm

12 not sure about your gambling legislation because it's normally

13 gambling legislation which requires the retention of the data,

14 and I haven't looked at the gambling legislation here in Texas,

15 but it wouldn't be uncommon for gambling legislation to require

16 the retention.  But in the case of HB 1181, it specifically

17 prohibits from retaining the information.

18 Q.  And that would be any kind of age verification, any of the

19 three types that you described?

20 A.  Yes.

21 Q.  Let's talk about the second kind of age verification, I

22 think that was age estimation; is that correct?

23 A.  That's correct, yes.

24 Q.  Can you just give us a brief overview of how that works?

25 A.  So similar to age verification, you go onto a website, it

1   will direct you to somewhere to verify your age, you select the

2   option to use age estimation, and you would present either your

3   face or you would say a short sentence, if it's doing voice or

4   there's other technologies out there as well.  And it's very

5   similar to how you open your cell phone, so if you use face ID

6   on your phone just as an example.

7   Q.  Would age estimation software would actually take a

8   photograph of your face?

9   A.  No, it doesn't take a photograph of your face.  What it

10  does is it takes data points.  It doesn't take enough data

11  points to be able to recreate your face in an image, but it

12  uses those data points and the algorithms that train it to be

13  able to make an estimation of how old you are from those

14  points.

15  Q.  So it's kind of like whenever I take a -- whenever I try to

16  open my phone with my glasses on versus my glasses off, it's

17  not actually looking at a picture of my face, it's looking at

18  certain points of data on my face?

19  A.  Yeah, I can get very technical, there are 126 of them that

20  it uses as part of the international standards on how it does

21  these, how it does these things, but it doesn't have enough

22  there to be able to -- if someone says show me the dots, it

23  wouldn't be enough to show me a picture of you.

24  Q.  But even those dots, those cannot be retained under the

25  Texas law?

1    A.   That's correct.

2    Q.   And then what was the third kind of age verification that

3    you mentioned?

4    A.   Age inference, that is being able to infer that you're over

5    18 from the existence of some other fact.  So as example you

6    might be a commercial airline pilot which would require you to

7    be over 18 to hold that role or you might have a .gov e-mail

8    address.  There are all kinds of reasons why you might be able

9    to infer that someone is over 18.

10   Q.   So I might be able to verify my age using my .gov e-mail

11   address?

12   A.   You could, yes, so that would work by the age verification

13   service provider effectively pinging you a message and then

14   giving you a code and you enter that code.  It's normally six

15   digits, doesn't have to be, but it's normally a six-digit code

16   that you enter in and that would verify that you have access to

17   that e-mail address, and from that they can infer that you're

18   over 18.

19   Q.   And I certainly wouldn't want my employer to know that I

20   was accessing pornography, so is that something that anybody

21   would ever be able to figure out if I supplied my government

22   e-mail address?

23   A.   So, first of all, the age verification providers, they are

24   not -- they don't give a reason why they're asking, so they

25   could be asking for any reason.  It could be access to

 1  pornography, it could be to buy liquor, could be to buy
 2  cigarettes, it could be any reason at all that requires that
 3  age verification.  The second thing I would say about that is
 4  generally speaking your e-mail address is not kept, unless you
 5  want to go on to create an account, but that's the next stage
 6  of the process.  If you go back to the porn site and you want
 7  to create an account with them to be able to access in the
 8  future, you may choose to use that e-mail address or you may
 9  choose to use a different e-mail address at that point.  You
10  don't necessarily have to use the same one to create your
11  account and do your age verification.
12  Q.  I want to switch gears a little bit and talk about
13  something that Dr. Sonnier brought up in his declaration that
14  accompanied the reply brief in this case.  He was discussing
15  essentially parental controls.  What is the technical term?
16  A.  Parental controls or filtering software.
17  Q.  Filtering software.
18  A.  Device-based software, various other things.
19  Q.  Can you explain to us what filtering software is?
20  A.  Yes, it's basically tools that can be used in most or
21  pretty much all the browsers or routers which are in your home
22  have these tools where you can set within that filters.  Now,
23  these filters are widely available.  They are used extensively,
24  so here in this building, for instance, you will have a filter
25  that will prevent people on the PCs that we have here from

1   accessing certain sites, so they are set up to be able to do

2   that.

3   Q.  And how effective are those in the home as opposed to in a

4   business?

5   A.  One of the key differences -- I mean, here in a federal

6   building you've got the filtering software working, but you

7   also have an IT team here all the time checking that that's

8   working and working properly, set up properly, operating

9   properly, got all the correct fills, it's got all the correct

10  updates.  That's their job and that's what they do, that's how

11  they keep you protected in this building.  At home you don't

12  have that, so you do rely to a certain extent on, first of all,

13  parents knowing they're available and then understanding how to

14  implement them and how to put them into place.  And then even

15  thereafter, how to keep them updated, how to deal with the fact

16  that children get older and so, therefore, what they might want

17  to experience changes over a period of time.  So the studies

18  and research there has been on filtering that they work, as a

19  tool they work, but they rely on parental knowledge and

20  information and education, and they rely on them keeping them

21  up to date.  And it's those two latter things that generally

22  are lacking.

23  Q.  So what if a parent downloaded some kind of filtering

24  software or got it from their carrier and just decided to set

25  one of the predetermined levels of security, say medium

1   security, what would they have to do to maintain that security

2   on the devices connected to their network?

3   A.  So it depends on the settings that they set, it also

4   depends on the filters, different ones do different things, but

5   generally speaking you're right, they do present you with an

6   option to have -- effectively have a recommended filter or a

7   user filter, you can usually set those at low, medium, high.

8   You can then also create alongside those they're sometimes

9   called white lists or black lists depending on the filtering

10  software.  But you can create ones that you want to give

11  special permission to or ones that you want to deliberately

12  prevent from accessing.  So it depends on the software and the

13  filter and how you want to set it up.

14  Q.  Are you aware of research as to the effectiveness of these

15  filtering softwares and their ability to prevent children from

16  accessing sites that they shouldn't be accessing such as

17  pornographic websites?

18  A.  Yeah, I mean, the research I've seen generally comes to the

19  conclusion that while that filtering software is capable of

20  working, it isn't being deployed in the home in a way that

21  makes it effective.

22  Q.  We don't all have IT Departments at home?

23  A.  Yeah.

24  Q.  And I want to briefly touch on --

25           THE COURT:  Just a minute.  Do you need an IT

1  Department to deploy a filtering software in your home?

2          THE WITNESS:  You don't need an IT Department, you

3  just need --

4          THE COURT:  You just need software.

5          THE WITNESS:  You need the software and you need some

6  knowledge about what you're setting up.

7          THE COURT:  You don't need an IT Department.

8          THE WITNESS:  No.

9          THE COURT:  These things are meant to be deployed by

10 individuals, isn't that true?

11         THE WITNESS:  They can be deployed by individuals,

12 yes.

13         THE COURT:  Okay.  I just want to be sure that I

14 wasn't missing something here.

15         THE WITNESS:  Fine.

16 BY MS. WARREN:

17 Q.  Let's explore that just a little bit more.  So if I was to

18 set parental controls on devices in my house and then I never

19 touched them again, what could happen?

20 A.  Generally they will work, they will do what you set them to

21 do.  As you go through usage of the Internet, what will happen

22 is that when your children either use the permission function

23 or they ask to change something or ask to access something,

24 that then gets set within those controls and that becomes

25 continuous.  And depending on how good they are would depend on

1  how much they're updated for either new sites or new access

2  means or new browsers or new functionality.  That depends on

3  how good the filtering software is and whether it's being done

4  at a device level on your phone or at a router level, i.e.,

5  where you connect to WiFi, where it's being deployed, so

6  there's lots of dependencies there.

7  Q.  If I was to set up the software at a router level and then

8  the router needed a hard reset, would that then reset the

9  controls?

10  A.  With a hard reset it would take you right back to the

11  factory settings, so you would have to go through the process

12  again.  If you just switch it on and off again, it doesn't have

13  that impact, it normally will retain the settings if you're

14  just powering it down and powering it up again.

15  Q.  I want to talk about VPNs just briefly.  What is a VPN?

16  A.  So a VPN is a virtual private network, it effectively is a

17  method by which you can hide where you are in your -- from your

18  Internet address, and enable you to browse a web from an

19  anonymous location.

20  Q.  How do age verification websites grapple with the, I guess,

21  threat of a VPN circumventing their system?

22  A.  Yeah, there are various different ways.  Some of them will

23  look at geo location software that supports the age

24  verification function, some of them will have things that try

25  to detect whether or not it is from a known VPN, IP address.

1    I'm being technical, an IP address, the Internet protocol

2    address.  Some of them will look for dynamic VPNs.  There are

3    various different ways in which they use to detect that.  There

4    are also people that connect not so much via VPN, but via

5    things like cell tower networks so they can use geo location

6    software in relation to that as well.

7              MS. WARREN:  Your Honor, we have nothing further at

8    this time.

9              THE COURT:  I have a question about VPN because

10   there's been a lot of talk about that.  I know that, for

11   instance the -- you're from England originally?

12             THE WITNESS:  Yes.

13             THE COURT:  You're familiar with the BBC?

14             THE WITNESS:  Yes.

15             THE COURT:  And you're not supposed to be able to get

16   the BBC iPlayer unless you are in the UK, but VPNs have been

17   very successful in circumventing the BBC, wouldn't you agree?

18             THE WITNESS:  Yeah, they're used for that for Netflix.

19             THE COURT:  Netflix as well.  There's a different

20   Netflix in the UK than there is in the United States and

21   they've got very sophisticated software that's trying to stop

22   that, but they've been very unsuccessful; isn't that correct?

23             THE WITNESS:  Yes, that's correct.

24             THE COURT:  Any cross-examination?

25             MR. ZELLER:  Just very briefly.  Mike Zeller for

1    plaintiffs.

2            *(1:52 p.m.)*

3                       CROSS-EXAMINATION

4    BY MR. ZELLER:

5    Q.  Just to start off, is there anything that you said here in

6    your testimony today that you think was not in your

7    declaration, so we can focus on that?

8    A.  I think the bit more detail around the issues to do with

9    parental controls and filtering software, I think I covered it

10   very briefly in my declaration.

11   Q.  You don't think you adequately addressed that in your

12   declaration?

13   A.  I covered it briefly, but I think I've covered it in more

14   depth in the questions.

15   Q.  You understand that the law that's at issue here today

16   doesn't require any particular kind of age verification of the

17   various methods that you've mentioned, right?

18   A.  No, I think it's open about your choice, whichever you want

19   to do.

20   Q.  And you acknowledge that at least some of those methods

21   require the disclosure of personal information, passports,

22   driver's license, other kinds of highly personal information

23   for at least some of these age verification methods to even

24   function at all, right?

25   A.  Yes, some of them do.

1   Q.  Does content filtering require that the users impart to

2   third parties their personal information of that kind?

3   A.  Depending on the type of one it is, then generally no.

4   Some of them do, some of them don't.

5   Q.  The law that's at issue here today doesn't require that any

6   of the third-party age verification technologies that you

7   mentioned actually meet the standards of what you refer to as

8   this Age Verification Providers Association, right?

9   A.  No, I think the law is just generally you have to apply age

10  verification, I think it uses the term commercially reasonable

11  sources or something like that.

12  Q.  Right, but they don't have to meet any particular standard

13  such as an industry standard, right?

14  A.  Not by the law, no.

15  Q.  And the law doesn't actually prohibit the, say, the sharing

16  of this personal information with third parties during the

17  validation process, right?

18  A.  Just let me just unpick that slightly.  The process would

19  be that the -- what we call the relying party, the website that

20  wants to allow the user access would refer the user to a third

21  party to collect that information and process it, they wouldn't

22  collect it themselves, they then send it on to the third party.

23  Q.  The law only says that it cannot be stored, right?  It

24  doesn't say it can't be transmitted elsewhere, correct?

25  A.  It says it can't be kept, yes.

1    Q.  Now, you mentioned parental controls, but that's only one

2    kind of content filtering, correct?

3    A.  Yes.

4    Q.  And you're aware that content filtering is widely adopted

5    here in the United States by corporate America in order to stop

6    employees from, and blocking employees from seeing adult

7    websites or other kinds of sites that the employer doesn't want

8    to see, right?

9    A.  Yes, that's what I was describing--

10   Q.  In fact, many, many tens of billions of dollars are spent

11   on that every year by corporate America with this technology,

12   right?

13   A.  I'm quite sure that's true, yes.

14   Q.  And you do understand that at least by that measure,

15   content filtering is far more successful than these age

16   verification methods that you've mentioned, correct?

17   A.  I think that's an entirely different context.  I think they

18   are successful at content filtering and removing these from

19   access in the workplace, and the evidence doesn't suggest

20   that's quite the same in the home.

21   Q.  You'll acknowledge that content filtering is far more

22   ubiquitous as a method to block access to adult websites in the

23   United States today than age verification?

24   A.  Yes.

25   Q.  You understand that the -- I think you've already addressed

1  that there are certain kinds of technologies that the law does

2  not address at all here, such as VPN technology, right?

3  A.  There's nothing specific in this legislation about VPNs.

4  Q.  And you also understand the law has exceptions in the sense

5  that it doesn't apply to social media sites, correct?

6  A.  I believe that's correct, although I'm not a legal expert

7  on the interpretation of that law.

8  Q.  And you understand that adult images and pornographic

9  materials and that sort of thing are widely available on social

10  media sites, correct?

11  A.  Yes, correct.

12  Q.  You also understand the same is true for search engines?

13  A.  Yes.

14  Q.  You referred I think briefly in your testimony to some

15  research that you were relying on?  What are you referring to

16  specifically?

17  A.  In relation to content filtering?

18  Q.  Yes.

19  A.  Yeah, there's been lots of research done on this.  I think

20  the one I particularly highlighted was research done from the

21  Oxford Internet Institute in relation to the effectiveness of

22  parental content filtering and on the access that I think that

23  particular survey was about adolescent boys having access to

24  pornography.

25  Q.  Are you referring to this Nash study?

PRELIMINARY INJUNCTION HEARING                23

1   A.   Yes.

2   Q.   And that's referred in your declaration, correct?

3   A.   Yes.

4   Q.   So you're not relying on anything else in your testimony

5   here today other than what you've already cited in your

6   declaration, correct?

7   A.   That was just an example of research in this base, there

8   has been other research in this base too.

9   Q.   The Nash study doesn't say anything actually about the

10  effectiveness of the technology itself, does it?

11  A.   No, as I said, the technology itself works.

12  Q.   You mentioned this concept of white listing, right?  And

13  that's one way that certain kinds of software, say, parental

14  controls, can ensure that even new websites that have, say, for

15  example, malicious content on them are, in fact, blocked by

16  that software, right?

17  A.   The other way around.  White listing is where you permit

18  access to something.  Black listing is where it's blocking it.

19  Q.   Maybe I poorly phrased it.  What I'm driving at is is you

20  understand that by using white listing software, that that will

21  block access to new websites because it's not listed on the

22  white list, right?

23  A.   Not necessarily.  It depends on the settings in the

24  individual filter control.  Generally speaking, white listing

25  is where you specifically go in and say I do want to give

1   permission to be able to access this site.

2   Q.  You're aware that most of what you're calling this parental

3   control software blocks access to new websites, correct?

4   A.  Some of it does.  Some of it uses labeling, called the RTA

5   label which is restricted to adults label, some of it uses

6   that.  If the website contains that particular RTA coding, that

7   it would pick that up as part of its filtering function.

8   Q.  And you'll agree with me that content filtering software in

9   many iterations actually has a dynamic realtime process where

10  it scans the website, even if it's a new one and has never been

11  encountered by the software previously to block it if it falls

12  in the category of, say, adult website, correct?

13  A.  If they are labeled with the things like the RTA label,

14  then it will spot those and it will add them to its list of

15  restricted sites.

16  Q.  When you say "label", what do you mean by that?

17  A.  So there's a function on the website which is fairly widely

18  used in the adult industry, not universally used, but it's

19  fairly widely used, which is called Restricted To Adults, the

20  RTA, it's run by a U.S. NGO and it is used by things like

21  filtering software to be able to pick up sites, as the name

22  says, restricted to adults.

23  Q.  You're aware that this content filtering will actually

24  block adult websites even if it had not encountered that

25  website before specifically because, say, for example, it was

1   new?

2   A.   It would need to know that it was not a website, it would

3   need to do that and so some of them do have artificial

4   intelligence tools as part of them that look at sites to see

5   what kind of content do they have.  Some of them rely on the

6   company behind the software maintaining continuous surveillance

7   of the Internet, and some of them rely on things like, as I

8   said, the RTA label, some of them rely on data put out by law

9   enforcement agencies of websites of concern and they will rely

10  on different things.

11          THE COURT:  Let me ask you a question before we go any

12  further.  This legislation doesn't require any adult websites

13  that are seeking to have customers in Texas, doesn't require

14  them to have an RTA function; is that right?

15          THE WITNESS:  No.

16          THE COURT:  I didn't see any legislation that requires

17  an RTA.  But if the Texas legislature were to pass a different

18  law that required an RTA label or chip or whatever it is, code,

19  in the website and then gave parents the choice of placing

20  blocking software, filtering software on their computers,

21  anything accessing anything that could be accessed by their

22  children, the RTA code would then work with that software to

23  block the software; is that right?

24          THE WITNESS:  It should, yes.

25          THE COURT:  Okay.

1          MR. ZELLER:  I have nothing further, Your Honor.

2    Thank you.

3          THE COURT:  Any redirect?

4          MS. WARREN:  Very briefly, Your Honor.

5          THE COURT:  Okay.

6          *(2:02 p.m.)*

7                     REDIRECT EXAMINATION

8    BY MS. WARREN:

9    Q.  Mr. Allen, how difficult would it be for websites like

10   PornHub and XNXX to use this age verification technology, is it

11   completely new to them?

12   A.  It's not new to them, they use it elsewhere in the world.

13   They already have age verification technology built into their

14   systems.  There are a number of global providers of age

15   verification technology, one of them actually based right here

16   in the City of Austin, one of the main ones in the world, and

17   they have this functionality already.

18          MS. WARREN:  Thank you.  Nothing further, Your Honor.

19          MR. ZELLER:  Nothing further, Your Honor.

20          THE COURT:  Sir, thank you very much.  You can step

21   down.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  Do we have any other witnesses?  Do you

24   want to call somebody, some expert you want to call?

25          MR. SHAFFER:  Thank you, Your Honor, not from the

1    plaintiffs.

2           THE COURT:  Since the plaintiffs are the ones that are

3    seeking this injunction, you can go first.

4           MR. SHAFFER:  Thank you, Your Honor.  Derek Shaffer

5    for the plaintiffs.  Your Honor, we're here challenging what is

6    an entirely new an unprecedented statutory regime in Texas

7    before it takes effect.  HR 1181 imposes hundreds of thousands

8    of dollars in liability on anyone who provides the disfavored

9    content over the Internet without complying with Texas's newly

10   minted burdens and strictures of age verification.  This is not

11   the first time something like this has been attempted, Your

12   Honor.  As you know, this is the latest in a string of similar

13   efforts by other jurisdictions including the United States

14   government to shut down or straightjacket disfavored speech on

15   the Internet.  All of those efforts have been couched as

16   protecting minors and all of them have been uniformly rejected

17   by courts from the U.S. Supreme Court on down the line as

18   violating the First Amendment.  All we're respectfully asking

19   today is that this Court grant a preliminary injunction so as

20   to preserve the status quo while the Court adjudicates the

21   First Amendment and other merits.  As I'll explain, and I think

22   the merits of our First Amendment challenge are strong and this

23   is a case for granting a preliminary injunction.  I know Your

24   Honor's read the papers, so my most important job of course is

25   to answer Your Honor's questions, but do I want --

1           THE COURT:  Before you go any further, one of your

2     arguments in your papers and you repeated it just now was that

3     a great cost, that's not your only argument, your primary

4     argument is the effect that this will have on your client's

5     consumers, scare them away, you know, I think counsel for the

6     state said I don't think I want my employer to know that I

7     was -- I'm sure she isn't accessing pornographic websites, but

8     I wouldn't want my employer at the Attorney General's Office to

9     know that I was accessing a pornographic website.  I can buy

10    that, I can see where she's coming from.  I don't think any

11    person would necessarily want to have their private business

12    out there for the world to see through a hack or something

13    else.  So that's really your main argument, but you also have

14    the money argument.

15          Now, the witness just suggested that your clients

16    actually already have this software in place and they're

17    already using it.

18          MR. SHAFFER:  Your Honor, I would respectfully have to

19    talk to the witness about what he is referring to as far as

20    U.S. age verification.  Let me just focus on Your Honor's

21    question.

22          THE COURT:  Well, you had the opportunity.  He was

23    right up here on the stand.  You want me to call him back?

24          MR. SHAFFER:  Let me address it this way, Your Honor,

25    and see if it suffices.  These third parties that Mr. Allen was

1   referring to, they don't verify a user's age for free.  There's
2   a cost for every single one of those.  So age verification, I
3   think it's common ground between us and the State that there
4   are costs, they are designedly costs that follow from using
5   this age verification.  As Your Honor also noted and as we've
6   set forth in our papers, there are hacks, there are leaks that
7   have them, and yes, that may be directed at a third party, but
8   that's a hit to our clients as far as how their users will feel
9   about whether they're interested in safeguarding properly,
10  whether they've been betrayed if anything goes wrong with this
11  change, so that's a deterrent, that is a hit to good will.  But
12  also, Your Honor, if you put these two things together, the
13  chilling effect on the users, and it was in my mind as it was
14  in Your Honor's mind as it was in the State's mind in examining
15  Mr. Allen, there is a huge invasion that is associated with
16  going through this process with a computer to identify who that
17  individual is and what their age is.  And that's happening in a
18  context, Your Honor, where this law also requires when they
19  reach the site that there be warnings that all this site, to
20  summarize what the State wants, is mandating to have put on
21  there, it's this is bad for you, it is rotting your brain, it
22  is contributing to social diseases, and that's after someone
23  has gone through the age verification.  So the users are being
24  made pariahs and the websites are being made pariahs, and it
25  is, Your Honor, in some sense a big red scarlet letter that

 1   every user has to wear.  So I think that there is a huge

 2   chilling effect on the expression and the consumption of the

 3   expression, but there's a bottom line impact too, Your Honor.

 4   So the sites will be paying for an age verification process

 5   that is chilling and deterring users in a context where the

 6   State is making very clear that we don't want you and like you

 7   accessing the site and it's been determined who you are in

 8   Texas before you're getting to it.  And you put all that

 9   together and I submit it's just --

10         THE COURT:  Make no mistake about it, counsel, I think

11   the State of Texas has a legitimate interest in keeping

12   pornography away from minors, particularly young minors, okay.

13   There is, in my view, with the appropriate legislation properly

14   tailored, the State of Texas has a legitimate, absolutely

15   legitimate and understandable interest in keeping children away

16   from pornography.  The real question is whether this

17   legislation does it without trampling on constitutional rights.

18   That's the question.

19         MR. SHAFFER:  I don't mean to dissuade, Your Honor

20   from that position, I didn't mean in my earlier --

21         THE COURT:  No, I think that in your papers you have

22   acknowledged that they have that right.

23         MR. SHAFFER:  As has the U.S. Supreme Court in cases

24   including *Reno v. ACLU* and *Ashcroft v. ACLU*, in which for the

25   reasons Your Honor was suggesting, the U.S. Supreme Court

1   nonetheless struck down the federal statutes at issue because

2   they were subject to strict scrutiny and they didn't pass

3   strict scrutiny.  And I would note, Your Honor, in terms of the

4   interest Your Honor articulates, a law that was tailored around

5   that would look fundamentally different from the law that's

6   before the Court.  A law that is meant to prevent adult content

7   from reaching minors would block adult content, not based upon

8   the websites from which it comes, but the fact that it is

9   getting to a minor.  So search engines would be of concern,

10  social media would be of concern, websites that have 20 or

11  25 percent of their content, hard core pornographic adult

12  content that Texas has determined unsuitable for minors, that

13  too would be subject to restriction.  None of that, in fact, is

14  subject to the law.  All of that content can continue to flow

15  to minors after September 1st no differently than was true

16  before this law was passed.  So what is this law really doing,

17  Your Honor?  It's going after disfavored speakers, specific

18  websites that Texas wants to keep people away from.  Not only

19  that, Your Honor, it's not just the minors who are having their

20  access restricted, you know from the law, you know from the

21  State their premise is minors after this law is passed will not

22  be able to access those websites in Texas if you credit the

23  State's submission.  But still the law goes further and says

24  there need to be these health warnings, detailed health

25  warnings in 14-point font at the websites telling presumably

1   adult users that they should not be looking at the website.  So

2   I would just underline for Your Honor that the interest that

3   Your Honor articulates is disconnected from the law that is

4   before the Court and that the law that is before the Court is

5   not by any stretch of Supreme Court precedent or otherwise, it

6   is not narrowly tailored and using the least restrictive means

7   for making sure that specific adult content does not find its

8   way to minors.  And I would submit, Your Honor, that Your

9   Honor's decision as to likely success, it's just likely success

10  that you're assessing right now, it is really controlled by the

11  Supreme Court's decisions in *Reno v. ACLU* and in *Ashcroft v.*

12  *ACLU*.  That's essentially what the Supreme Court held.

13          The first question for Your Honor, of course, is what

14  is the standard of scrutiny.  And the Supreme Court has made

15  very clear that when the regulation sweeps beyond obscenity as

16  defined in Miller, content-based regulation is subject to

17  strict scrutiny.

18          THE COURT:  I'm not troubled by the -- there's no

19  question in my view what the standard is.  One of the things

20  that does concern me in looking at this law is the fact that

21  I'm having a hard time -- when you look at the law, and I'm

22  going to be asking counsel, I don't know who's arguing for the

23  State, or the Interim Attorney General, if we're being correct.

24  If you look at the statute, it treats a five-year-old the same

25  as it treats a 17-year-old and you don't know where the -- so

1    for instance, if you turn on public broadcasting, there are

2    shows on public broadcasting, some of which come from overseas

3    and which have very graphic, not pornographic, I wouldn't

4    think, but certainly mature, very mature content with love

5    making and all of that kind of thing going on during the show.

6    Now, a five-year-old or a seven-year-old or a ten-year-old or

7    maybe even a 13 or 14-year-old, probably not a good idea that

8    they be looking at that.  A 17-year-old that's about to turn

9    18, that would be a parent's decision and they may be very

10   mature.  They're seniors in high school ready to go off to

11   college.  This would not be something that would be a big shock

12   to them or that their parents necessarily would have a

13   significant concern with them watching PBS.  So this is one of

14   the problems.  I have a hard time trying to figure out, because

15   it just says -- the law says, I believe the language has

16   something to do with offensive to the minor or harmful to the

17   minor.  What minor?  Which minor?

18          MR. SHAFFER:  Your Honor, that is one of the problems

19   with the test, but it's a problem that is solved, of course, by

20   content filtering.  Because what Your Honor articulates, what's

21   the difference between a five-year-old and 17-year-old, that's

22   something that content filtering can be sensitive to because

23   that technology can evolve and it can be responsive to what is

24   the age of the children in the house and you can have settings

25   that correspond with that, as opposed to this blunt, and as

 1   Your Honor points out, potentially inapposite gating of the age

 2   verification.  But I also want to note something else for Your

 3   Honor.  This law does not regulate movies, those are not

 4   subject to the law.  It does not regulate news broadcasts even

 5   when those come through websites, so there's a categorical

 6   carve-out.  If you could imagine a news website that was

 7   devoted to things that are sexually laced and inappropriate for

 8   minors, HR 1181 doesn't do anything to them.  There's a total

 9   cart 1181 does not regulate that at all.  There's an express

10   exception for that.  Same thing for social media, so even a

11   five-year-old, even the five-year-old is not being protected by

12   this law.

13           THE COURT:  Well, I think websites like YouTube try

14   to -- they do have a parental thing built into them so the

15   parent can select, you know, what kind of filtering they want

16   on YouTube.  There's also YouTube for kids which doesn't

17   theoretically -- but you're right, there is content on YouTube

18   which I think, from what I've read at least, is very close to

19   pornographic.

20           MR. SHAFFER:  That's my understanding and experience

21   too, Your Honor, but I would just --

22           THE COURT:  They try to filter it out, but it's there.

23           MR. SHAFFER:  The filtering that Your Honor is

24   describing, the YouTube default can be adjusted by a user.

25   That's not something that a minor can't circumvent if they so

1   wish.

2          THE COURT:  Because you have a password, a parental

3   password.

4          MR. SHAFFER:  You could have a parental password

5   perhaps specific to that website, Your Honor, but for search

6   engines too, and I don't know of any such thing, if you use

7   Bing, for instance, and I know that -- I would commend to Your

8   Honor the declaration from Mr. Sonnier who explains that minors

9   can go on search engines and change the default safe setting

10  and then they will see exactly the same pornographic images

11  that they could find on websites.  They can see videos, they

12  can see images of those, and again this law is not even trying

13  to regulate that.

14         I would just submit to Your Honor that once we agree

15  that strict scrutiny is the standard here, I think that answers

16  the question of likelihood of success because it is the

17  extraordinarily rare case in which the State is able to satisfy

18  strict scrutiny, and I think it is also apparent that this is

19  not that case.  The legislative record is blank at best,

20  nothing that you heard from Mr. Allen is reflected in inquiries

21  by the Texas legislature.  There is no legislative history,

22  there is no legislative finding, there is no consideration of

23  less restrictive alternatives.

24         THE COURT:  Well, there was at one time, my

25  recollection is that, and I don't know why it was taken out,

1   originally as this legislation was proposed, it was based

2   around a filtering concept.  Then my recollection is a State

3   Senator had that removed and this was installed, this regime.

4   Am I wrong here?

5          MR. SHAFFER:  I defer to Your Honor's very precise

6   recitation of that.  My understanding had been it was both, so

7   that the law would have said you both need to have content

8   filtering and the age verification, and then without

9   explanation it became only the one.

10         THE COURT:  That may be a correct interpretation, but

11  the filtering was taken out.  I know that.

12         MR. SHAFFER:  And I can tell Your Honor having really

13  drilled down on the question, what did the legislature

14  articulate as the rationale for why filters don't work and the

15  State --

16         THE COURT:  All I know is it disappeared and I can't

17  understand why the filtering disappeared, but I think it did

18  disappear.  So let's just leave it at that.

19         MR. SHAFFER:  But I think the fact, Your Honor, that

20  the legislative record doesn't speak to this is telling and

21  ultimately dispositive.  You have the Supreme Court in Reno and

22  in Ashcroft specifically noting that content filtering is a

23  less restrictive alternative in those cases, so I think it

24  would be --

25         THE COURT:  Well, the State's argument is that that

1    was a long time ago and things have changed.

2          MR. SHAFFER:  Your Honor, I heard Mr. Allen as you

3    heard Mr. Allen.  I think what I took away from his testimony

4    is that content filtering is not theoretical, it is here, it is

5    widespread, it is effective, it is evolving.  If there's been

6    any shortcoming, it's been a shortcoming of adoption from which

7    it would follow that the government has good work that it can

8    do in encouraging the adoption of content filtering.  It could

9    say here is what we recommend for parents --

10         THE COURT:  Could the government pass -- I don't know,

11   I haven't looked at this, but would it be constitutional for

12   the government to pass a statute that says that parents have to

13   install content filtering?  How about the State legislature

14   passing a statute that says any device sold in the State of

15   Texas has to have content filtering software installed to

16   protect minors from pornography or other objectionable sites.

17   I just wonder.  I don't know, because I haven't looked at it.

18   I'm not saying that's constitutional, I don't know, because

19   these things are made out of state, they're shipped into state,

20   maybe that's preempted.  Who knows?  I don't know.

21         MR. SHAFFER:  I have no brief on behalf of the parents

22   or on behalf of the manufacturers, Your Honor.  I will say my

23   clients would of course prefer those options, but I think what

24   the government --

25         THE COURT:  I do know that parents can purchase and

1   install on their children's devices and on their router,

2   because we've heard it from the State's own expert, effective

3   content filtering software.

4          MR. SHAFFER:  And you will also see, Your Honor, in

5   Mr. Sonnier's declarations that some of this content filtering

6   is available for free, so it's not like parents face costs in

7   obtaining it, from which it could follow that the State could

8   educate, could encourage, could potentially require that there

9   not be anything misleading or misrepresented on websites as to

10  adult content so as to pair with content filtering, as Your

11  Honor was suggesting to Mr. Allen.  All of those would be less

12  restrictive alternatives by comparison of what you have here,

13  and I think it suffices to note none of them have even been

14  explored or considered by the legislature before it lept to

15  this more extreme and intrusive approach which is exactly what

16  the U.S. Supreme Court had warned against.  So I think that

17  there's more legislative homework that needs to be done before

18  the State has a real shock at potentially satisfying strict

19  scrutiny and rectifying the failures of the statutes that were

20  previously before the U.S. Supreme Court.

21          Apart from that, Your Honor, you have conspicuous

22  defects in this law that I've been alluding to.  It's

23  conspicuous under inclusiveness.  And here I would recommend to

24  Your Honor the decision of the Supreme Court in Brown v. I

25  think it's Entertainment Merchants where the California statute

1    was regulating video games that were deemed unsuitable for

2    minors, but there was no such regulation of violence that was

3    appearing in movies, in books, and it was directed solely

4    against the video game industry which was perceived as a

5    particular scourge, but it was too under-inclusive, that law,

6    to possibly satisfy strict scrutiny.  And I'm sorry to say

7    this, Your Honor, but I do think it is clear from the law that

8    although it is couched as solely about protecting minors, that

9    is truly an incoherent claim as to the purpose because of these

10   health disclaimers, Your Honor.  Because the health disclaimers

11   are there even after minors have been screened out.

12        What I think Texas is really trying to do here and is

13   not permitted to do is to single out a particular industry that

14   has a particular amount of sexual content.  That's really what

15   the law is going after, and that's quite different from the

16   purpose that Your Honor articulated specifically to protect

17   minors.  This is a statute that is jerrymandered to effectuate

18   viewpoint and speaker-base discrimination.  To go after the

19   adult content industry, specific companies that are associated

20   with that and to go after the kind of pro porn, the sex

21   positive viewpoint that is associated with that industry and

22   others who supply exactly the same content, they are screened

23   out from having to answer to the law.  They are especially

24   carved out and exempted.  That, Your Honor, I think makes it

25   essentially impossible, certainly difficult to defend the law

1    successfully, again assessing likelihood of success, I think

2    Your Honor has it.

3            The last thing, Your Honor, there's no real defense of

4    their compelled speech portion of this.  I think my friends for

5    the State don't even defend putting on the -- insisting that

6    every website have references to the substance abuse and mental

7    health hotlines.  And saying things that I think are based

8    on -- making an industry that believes differently in good

9    faith and quite vigorously believes differently, making that

10   industry have to mouth the State's words based on pseudo

11   science that we think is false in critical respects and

12   certainly controversial.  That's enough to say that that's

13   unconstitutional.

14           THE COURT:  Thank you very much, counsel.

15           MR. SHAFFER:  Thank you, Your Honor.

16           THE COURT:  All right, counsel.  Very interested to

17   hear what you have to say about this law.

18           MR. RAMSEY:  Thank you, Your Honor.  John Ramsey for

19   AG Colmenero.  And first, while we're all here, I'd like an

20   agreement that if the 89th legislature passes a law that

21   requires RTA tags and forces a penalty for those who don't

22   comply, that the Free Speech Coalition will agree.

23           MR. SHAFFER:  Your Honor, we're not here to stipulate

24   to any theoretical laws, but I can tell you that Mr. Ramsey

25   would have a stronger defense if that were the law before the

 1   Court.

 2          MR. RAMSEY:  Of course, just joking.  I want to talk

 3   about a few things.  I obviously want to get into the heart of

 4   this, but also I feel like there's a little bit of housekeeping

 5   I want to do to make sure we're talking about the same thing

 6   because there's been a lot of talking about consumers and

 7   there's been a lot of talking about different disparate

 8   plaintiffs.  And I want to start by making sure who we're

 9   talking about and who is in this case and who has a right to

10   bring this case.

11          THE COURT:  I know all about who is in the case.  I've

12   very carefully reviewed all of the pleadings, I understand your

13   standing arguments.

14          MR. RAMSEY:  Well, it's not just standing arguments,

15   Your Honor, and I am here to answer your question, so I'm going

16   to try again and if you still think this is not something you

17   need to here --

18          THE COURT:  I don't know what it is that you're going

19   to tell me, but if you're just going to recite that you don't

20   think so and so has standing, you've already made that argument

21   in your papers.

22          MR. RAMSEY:  Okay.  Well, it's not just about

23   standing, though, it is about whether they have a valid claim

24   and whether they can then win under the four prongs, the four

25   prerequisites of PI.  So for instance, a foreign organization

1    has no constitutional rights.  The Supreme Court in *Agency For*

2    *International Development vs. The Aliance For An Open*

3    *Society* --

4              THE COURT:  There's a difference between a foreign

5    organization that is operating outside the United States and

6    attempting to enforce constitutional rights and a foreign

7    organization that is operating within the United States.

8    There's two big differences.

9              MR. RAMSEY:  So I disagree, Your Honor, because first

10   of all, the plaintiffs --

11             THE COURT:  I'll look at it again, but I've seen cases

12   directly on point.

13             MR. RAMSEY:  Well, the plaintiffs in this case and in

14   the Ninth Circuit District Court have specifically stated to

15   the Court, have represented to the United States District Court

16   that they are not operating in the United States, that they do

17   not direct their content to the United States, and as a result

18   they were dismissed because the Court, the District Court in

19   California said that it did not have personal jurisdiction over

20   MG Freesites, so --

21             THE COURT:  There are plaintiffs in this case that do

22   operate in the United States and are located in the United

23   States.  That doesn't help the law.

24             MR. RAMSEY:  Well, it does when you go to apply the

25   factors because when you look at the harm, for instance, to the

1   plaintiffs, well, the domestic websites, they're already

2   subscription based, they're already taking payment, they

3   already require you to sign up and give an e-mail address.  So

4   when you go to analyze whether this is, for instance, we've

5   heard a lot of discussion about whether this is going to chill

6   people coming to the website.  Well, these are people who are

7   already given their e-mail address, already have payment on

8   file, so asking them to verify has no impact at all.  There's

9   certainly been no evidence it has any impact whatsoever on that

10  population.  So if we're talking about websites and the only

11  ones here that have constitutional rights are the ones that are

12  here in America.  Well, it's a totally different, it's a

13  totally different application of the facts.

14          And that brings me to also this idea that the Free

15  Speech Coalition represents Texas consumers.  They do not.  The

16  Free Speech Coalition has brought associational standing.  As

17  an association, they can bring a claim on behalf of their

18  members.  Their members do not include citizens of Texas, they

19  are not advocating for porn consumers.  Several times in their

20  brief they indicate they are advocating for porn producers and

21  that is it.  So there is no associational standing that they

22  get to go to consumers.  They do point to the *American Book*

23  *Sellers versus Virginia* case.  And in that case, they say,

24  well, the plaintiffs brought suit on behalf of book buyers.

25  Well, the plaintiffs were book stores, brick and mortar book

1    stores, and that is third party standing.

2              THE COURT:  Are you saying that porn sites cannot have

3    associational standing, is that your argument?

4              MR. RAMSEY:  No.  Free Speech Coalition can have

5    associational standing on behalf of its members which are porn

6    sites.

7              THE COURT:  Right.

8              MR. RAMSEY:  What we're hearing is this argument that

9    they're protecting the consumer.  There is no one who has

10   brought this suit on behalf of the Texas consumer.

11             THE COURT:  I did not sense that.  What I sensed is,

12   yes, I mean by implication, but their concern is for their

13   financial wellbeing.  They're saying, look, we provide a

14   service, i.e., not one that maybe you and I might be interested

15   in, but other people may be, obviously are.  It's a multi

16   billion-dollar business in the United States, I think, if I

17   have read correctly.

18             MR. RAMSEY:  Yes.

19             THE COURT:  And I think you would agree with me, you

20   are agreeing with me, so somebody is looking at this stuff.

21   And their concern is that their consumers, people that they

22   deal with are going to be scared away, are not going to want to

23   participate in the content that they have to offer because

24   they're going to have to put their driver's license or their,

25   heaven knows, their passport, or whoever knows, whatever it is

1  there, and they're going to be concerned, certainly given

2  what's happened -- I would say, I think you made the argument

3  in your papers that this is old news, these old cases.  To be

4  honest with you, I think the concern over identity theft and

5  hacking and people losing control of their personal information

6  is greater today than it was in 2006.  Heaven knows.  The

7  federal court system was hacked.  Major governmental entities

8  with huge firewalls and all kinds of security systems have been

9  hacked.  Major United States corporations including in the

10  defense industry have been hacked.  Why wouldn't somebody who

11  was attempting to access a pornography site, let's say someone

12  who has a professional occupation, let's say a doctor, for

13  instance, who for whatever it is they want to access a porn

14  site.  They're going to be concerned that they're going to turn

15  their license over, and I don't know that they're going to be

16  particularly comforted by the suggestion in the statute that

17  their information is going to be in some ethereal way after

18  it's transferred to a third party, somehow disappears.  I think

19  their concern might be that it might reappear in a hack, and I

20  think that's a major concern, I would think, and I would think

21  a huge problem for these websites if they have to comply with

22  this statute.  So how do you address that?  Are you going to

23  tell me that people wouldn't have a legitimate concern that

24  their personal information would be potentially -- maybe it's

25  irrational, I don't know that it's irrational.

1        MR. RAMSEY:  I want to take that point by point, if I

2    may.  Because we started that conversation talking about

3    domestic corporations and if someone was bringing this case on

4    behalf of consumers, and I understand Your Honor to be saying

5    that no one is actually bringing on behalf of consumers,

6    they're bringing it on behalf of themselves and they're fearful

7    of losing consumers.

8        THE COURT:  I think that's a legitimate concern on

9    their part.  Maybe they should lose their consumers, I don't

10   know.  That's what the State of Texas wants to happen.

11       MR. RAMSEY:  I don't know if that's true, Your Honor,

12   and a couple points --

13       THE COURT:  I think it is.

14       MR. RAMSEY:  They certainly want them to lose their

15   child customers, that's for sure.  We can agree on that.

16       THE COURT:  I think they should lose any child

17   customers that they have.  I don't know that this law does it.

18       MR. RAMSEY:  I still want to address your points.

19   Because if we're talking about the fear that they're going to

20   lose customers, that's why it's really important to figure out

21   the playing field here.  If we're talking about just these

22   domestic companies, they already are collecting information

23   about their customers.  Their customers are already going in

24   and putting in their e-mail address and they have a specific

25   account, and they have payment information.  So we can all just

 1    pretend that they would lose customers, but there's no evidence

 2    of that.  There's absolutely no evidence of that.  So then to

 3    the extent that their point is that they may lose an audience,

 4    the Supreme Court is very clear, they do not have the right to

 5    an unlimited audience when what they purvey is material harmful

 6    to children.  There's a Supreme Court case that says that

 7    exactly.  It's Bethel Independent School District and they

 8    specifically say that someone does not have the right -- I'm

 9    quoting as close as I can, you don't have a right to an

10    unlimited audience when that is what you are purveying.  And I

11    want to push back because really if anybody represents the

12    Texas consumers, it's me here today.  And the Texans, those who

13    view pornography and those who do not, elected representatives

14    to go to Austin and vote on legislation, and they voted.  Their

15    representatives voted almost unanimously to pass this law.  So

16    sure, maybe someone doesn't want their .gov account on a porn

17    site.  That's a very, very different question than whether or

18    not they'd be willing to verify their age to make sure our kids

19    don't view porn.  And the Texas legislature has said yes, they

20    will.  So no one here has brought a claim on behalf of

21    consumers.  No one, by the way, has proven that they would lose

22    any consumers, certainly not the domestic corporations.  And

23    PornHub has done this abroad.  Where is their data that when

24    they implemented this in Germany they lost any more viewers

25    than you would expect from kids stopping to view porn?  We

 1   can't just assume here, especially not this level.

 2          THE COURT:  Well, Germany doesn't have the United

 3   States Constitution.  We do.

 4          MR. RAMSEY:  That's a different question when we go to

 5   apply strict scrutiny.  But the question is whether they lost

 6   viewers, whether people say I'm not willing to give my personal

 7   information to save the children of Germany from pornography.

 8   Where is the evidence?  We can't just assume that the people of

 9   Texas, those who view pornography, are not willing to give

10   their information.  I know you talked about a doctor and maybe

11   he's afraid.  First of all, these websites are totally

12   independent of porn websites, and Mr. Allen made that clear.

13   If for instance, if for some reason despite the fact that

14   there's no evidence--

15          THE COURT:  We don't have websites in existence, we

16   don't know where these are going, nothing has been set up, the

17   law isn't in effect.  We don't know what websites these are

18   that are going to be utilized, if they have to be utilized.  We

19   have no idea.  The State doesn't have any idea.

20          MR. RAMSEY:  There are age verification services in

21   the United States.

22          THE COURT:  There's lots of age verification services

23   in the United States for a bundle of different things.  There's

24   no question about that, but that's not the point.  The point is

25   which ones are they and how secure are they, and do you know?

 1  I don't know.  I don't think anybody knows how secure they are.

 2  Believe me, I've had plenty of lawsuits where people were

 3  secure and they weren't secure.

 4          MR. RAMSEY:  In that regard, then, it's just a couple

 5  of things.  One, we do have these, people are using these age

 6  verification websites for different purposes in America.  So to

 7  the extent that their information got out just like it does in

 8  hacks all over the country for reasons totally unrelated to

 9  this legislation, it would not identify anything embarrassing.

10          THE COURT:  How do you address the argument raised by

11  counsel that this applies to the pornography industry, as we

12  understand it generally, but does not apply to social media or

13  movies or a multitude of other things where children can

14  readily access pornography?  I mean, for instance, there are

15  multiple movies out there that children can simply go on

16  Netflix and watch, Netflix or Stars or one of the other

17  services and get and watch, Criterion, whatever their parents

18  happen to have on the television or they can get access through

19  an iPad, you know, Samsung Tab, or a computer.  They can get

20  access to all of this stuff.  Some of it is as raw as any

21  pornography.

22          MR. RAMSEY:  Your Honor, I promise you it's not.

23          THE COURT:  I don't know, I'm not a consumer of

24  either, but I will tell you I have read aplenty because I've

25  had cases where movies like Caligula or others are very, very

1    pornographic.  What was that movie that had Marlon Brando?

2            MR. SHAFFER:  Last Tango in Paris, Your Honor.

3            THE COURT:  Great example, where a woman was sexually

4    assaulted on the camera.  You can watch that on one of these

5    sites.  Children can get access to that, but this law doesn't

6    apply to that.  I'm having a hard time understanding why not.

7            MR. RAMSEY:  I hope I can help.  So first of all --

8            THE COURT:  I hope you can too, that's why I'm asking

9    you.  You're a good lawyer.

10           MR. RAMSEY:  We'll see.  I appreciate it.  So a couple

11   things.  I did research for this case, and I spent three years

12   as a human trafficking prosecutor --

13           THE COURT:  Congratulations, you did good work then.

14   That's something the State of Texas really needs to drill down

15   on.  As the federal government, that's a horrible situation.

16           MR. RAMSEY:  Before that, I spent a year in Kenya

17   helping Nairobi prosecutors prosecute child sexual assault.

18           THE COURT:  That's good stuff.

19           MR. RAMSEY:  I have never seen something as disturbing

20   as I saw when I did the research for this case.  I cannot tell

21   you, the pornography that you're talking about from 1970s, what

22   we have today is not different in degree, it is different in

23   kind.  It is unbelievable.

24           THE COURT:  Well, it may be in certain instances, but

25   the point is that I don't think a parent who wants to have

1    their child protected from pornography would be interested in

2    having them watch Last Tango in Paris or Caligula or any of the

3    other grossly graphic movies that are out there just because

4    you may be able to find a particular porn site that has human

5    bondage or some disturbing content in it.

6              MR. RAMSEY:  When you say particular porn site, I want

7    to be clear we're talking about the largest porn sites in the

8    world.  When you talk about Last Tango in Paris, you're talking

9    about --

10             THE COURT:  The audience for that movie, by the way,

11   is pretty substantial.  There's a lot of people that have seen

12   that movie.

13             MR. RAMSEY:  I want to back up even further.  First of

14   all--

15             THE COURT:  It's still out there, you can still watch

16   it.

17             MR. RAMSEY:  The State does regulate, for instance, an

18   adult movie complex, that you have to be 18 or older to enter a

19   pornographic movie.

20             THE COURT:  You don't have to be 18 years old to watch

21   Last Tango in Paris on your computer.

22             MR. RAMSEY:  No, but if you were to --

23             THE COURT:  That's what we're talking about.

24             MR. RAMSEY:  And this is, of course, the difficulty

25   in--

 1          THE COURT:  We're not talking about adult movie

 2    theaters, very few of those left around.

 3          MR. RAMSEY:  Well, I just want to be clear that when

 4    we talk about we don't regulate movies, we do, in fact,

 5    regulate adult movie theaters and the book stores that sell

 6    pornographic movies.

 7          THE COURT:  I didn't say adult movie theaters.  I said

 8    the law doesn't prevent, as I understand it, the law has an

 9    exemption for movies, the law has an exemption for social media

10    sites.  Not pornographic movies, but regular movies.  Certainly

11    has an exemption for social media sites.

12          MR. RAMSEY:  It doesn't have an exemption for social

13    media sites.

14          THE COURT:  Well, maybe counsel is wrong.

15          MR. RAMSEY:  What the law says, it says, *A commercial*

16    *entity that knowingly intentionally publishes or distributes*

17    *material on Internet website including a social media platform*

18    *more than one-third of which is sexual material harmful to*

19    *minors shall use reasonable verification.*

20          THE COURT:  More than one-third.

21          MR. RAMSEY:  Yes.

22          THE COURT:  But that's not the point.  If you're a

23    minor and you want to see some salacious material on YouTube,

24    you go to the search engine and you find the salacious

25    material.  It isn't going to be more than a third of YouTube,

 1 | but it doesn't matter.

 2 |       MR. RAMSEY:  And this is the balance the State tried

 3 | to walk, because if it included all that stuff, we would be

 4 | over here on overbreadth, so we have tried to tailor the case

 5 | to the problem.  And to be clear, if you go and you watch Last

 6 | Tango in Paris, it is not then followed by 300,000 more videos

 7 | where you can spend 500 years watching pornography far, far,

 8 | far more graphic than Last Tango in Paris.  So if you view the

 9 | pornography today, and I didn't go to law school thinking I'd

10 | ever tell a federal judge to go look at pornography, but here

11 | we are --

12 |       THE COURT:  It ain't happening.

13 |       MR. RAMSEY:  The thing is that's the evidence in this

14 | case and when Potter Stewart said, you know, I know it when I

15 | see it, he followed that, and the video at stake here is not

16 | it.  He watched one video.  The evidence here is unbelievable,

17 | Your Honor.  And if you watch the evidence and you don't turn

18 | away from it and you see what -- geez, Louise, I've learned too

19 | much in this last week.  But the point is if you actually view

20 | the evidence, there's no doubt, Your Honor, that this is

21 | causing depression in young people, that it's causing anxiety

22 | and I don't know --

23 |       THE COURT:  I don't know, counsel, that you really

24 | want to go there because I'm not entirely convinced that that

25 | warning has a medical basis.  It is, to say the least,

 1   controversial.  There are tons of websites, not websites, tons

 2   of articles and other things which have been produced in this

 3   case showing the exact opposite.  There are some that show what

 4   you've suggested.  It's very controversial as to whether it

 5   does or it doesn't.  Now, my personal view, probably not a good

 6   thing.  I think the children shouldn't have access to

 7   pornography.  I've said that before.  I think the State has an

 8   absolute and legitimate interest in stopping children, if they

 9   can, legitimately and constitutionally from seeing pornography.

10   The question is whether the sledgehammer approach, which the

11   State has used in this law, is the approach that is

12   appropriate.  I think that maybe a scalpel approach would have

13   been better.  I think content filtering would be better than

14   attempting to have them go through this whole thing which I

15   think is troublesome.

16              MR. RAMSEY:  We haven't talked about content

17   filtering.

18              THE COURT:  We have talked about content filtering.

19              MR. RAMSEY:  You and I have not.  I have a whole new

20   perspective, Your Honor.

21              THE COURT:  You have a whole new perspective?

22              MR. RAMSEY:  Their declarant said this is widely

23   available.

24              THE COURT:  What is?

25              MR. RAMSEY:  Content filtering.

1              THE COURT:  It is.

2              MR. RAMSEY:  It's widely available, it's out there.

3    And yet in a 2002 study, 75 percent of teenagers age 13 to 17

4    were viewing pornography.  So it's out there.  We all know it's

5    out there and yet it's not working.  That's clear from the

6    data.

7              THE COURT:  Do you know, has the State of Texas made

8    any concerted effort to have parents employ content filtering?

9    I know that the State of Texas is quite active doing a whole

10   bunch of things.  I know that Judge Albright just had a major

11   hearing last week on a statute where the State of Texas is

12   trying to remove lots and lots of books from the library if

13   they have any mention of I guess we might say adult subjects in

14   them.  I don't know, I wasn't at the hearing, but it didn't

15   look like it was going well for the State.  I don't know what

16   Judge Albright is going to do.

17             MR. RAMSEY:  Is that what someone would say about this

18   hearing?

19             THE COURT:  I don't think so.  Let me tell you a quick

20   story.  I had a big case in Hawaii, my home state, and I really

21   grilled Kathleen Sullivan, former Dean at Stanford Law School,

22   and gave her a very I wouldn't say a hard time, I was certainly

23   probing her position.  And at the end of the hearing, I guess

24   her client got nervous and they ended up settling the case the

25   day before I was about to rule for Kathleen Sullivan's client,

 1   in a 100-page opinion which I had drafted, which ended up going

 2   into the trash can.  Actually, no, because one of the

 3   professors at the University of Hawaii Law School wanted to see

 4   it.  So I may rule against your client, I may not, but just

 5   because I'm probing you doesn't mean a thing.  I have been a

 6   law professor for 38 years.

 7            MR. RAMSEY:  I want to answer your question.  I'm not

 8   aware of all the efforts the State makes, I can speak

 9   personally.

10            THE COURT:  There's nothing in the record that

11   indicates the State has made any significant efforts at all.

12            MR. RAMSEY:  I can tell you our school district has

13   sent e-mails about content filtering.

14            THE COURT:  Maybe they have and I think that's good,

15   but I think maybe they need to do more.  Even if this law is

16   found to be constitutional, content filtering would still be an

17   excellent tool to be used by parents.  You know, the State has

18   placed a lot of gravitas, so to speak, in giving parents the

19   right to control the life of their children rather than third

20   parties.  Right?  We hear that all the time from Governor

21   Abbott, we hear it from others, you know, State senators, Dan

22   Patrick, a lot of people have said this.  Should be the

23   parents, right, who control their children's life, control

24   their content.  This law takes that right out of the hands of

25   the parents and puts it somewhere else because the parents

1    don't have any control over the operation of this law.  This

2    law operates not with -- I mean the parents obviously, one

3    would hope, wouldn't make devices available where their

4    children can get this kind of material, but they don't always

5    have control over it, but if you put on a child's computer, if

6    you put on their laptop, if you put on their -- I mean their

7    stand-alone computer, their laptop if they have one, their

8    iPad, their cell phone blocking software, the child can't get

9    access unless they use somebody else's, which this law doesn't

10   help you with.

11       MR. RAMSEY:  And a couple things.  So first of all, I

12   don't think this law takes anything away from parents.  And you

13   had asked a question earlier about parental rights and that is

14   something I have just happened to have briefed before in

15   Appellate Court and parents have a lot of rights in their

16   raising their kids and if there was a law that --

17       THE COURT:  I'm not saying for a moment that I don't

18   support parental rights.

19       MR. RAMSEY:  Ideally parents are taking care of

20   everything.  But obviously we also have the DFPS, we also have

21   all kinds of situations where we know that parents aren't

22   taking care of everything.  And the Supreme Court has spoken

23   directly to this as well in *Ginsburg versus The State of New*

24   *York*, which is a case, by the way, that is reaffirmed in Brown

25   versus Media Entertainment that was issued in 2011 regarding

1    video games, and Ginsburg says this, *"While supervision of*

2    *children's reading..."* because that's what it was back then

3    *"... may be best left to parents, the knowledge that parental*

4    *control or guidance cannot always be provided and society's*

5    *transcendent interest in protecting the welfare of children*

6    *justifies reasonable regulation of sale of material to them.*

7              So we acknowledge that parents are in charge, but this

8    is also a brave new world and I can speak -- and I don't want

9    to be under oath here, but I have four young children, each of

10   them has a tablet, two of them have an iPod, no iPhone, but

11   iPod that is connected to our WiFi, they all four have

12   computers from their school.  And of course, I have a phone and

13   my wife has a phone, and at times they're not on the same

14   service.  It is, quite frankly, a lot to keep up with and I am

15   obviously as you can tell probably from my background I am

16   really on top of it.  It is not easy.  And that is what the

17   statistics show, even though we all know it's out there, even

18   though we're educated, it is really difficult to keep up with.

19             THE COURT:  All you have to do is go to the Google

20   Play Store or the App Store if you have an Apple and download

21   children protective software and install it and there it is,

22   and you put a lock on it and it takes five minutes.

23             MR. RAMSEY:  Until it blocks something that your kid

24   needs and you have to go to different devices and only allow it

25   on that kid's account.

1          THE COURT:  The kid wouldn't need pornography, one

2    would hope.

3          MR. RAMSEY:  Absolutely not, absolutely not.  So but

4    all that to say it is not as simple as click of a button or

5    else parents would be doing it.  I think we all know that

6    parents care about their kids and parents are trying not to

7    have their kids look at pornography and yet the stats are

8    clear.  So to be clear, no one is saying filtering does not

9    work.  I'm not saying it's belt and suspenders, but it might be

10   hat and gloves.  We need it all.  So yes, parents do their part

11   when they can do it, but there is a government interest in

12   making sure that for those kids whose parents are overwhelmed,

13   for those parents who don't know how to do it, that when those

14   fall through, we also have age verification, or when there's a

15   kid on the bus next to your kid on the way home from school

16   with 30 minutes and nothing to do, they are carrying this

17   around everywhere.  And so the State of Texas legitimately says

18   this is awful for our kids.  And it's not a puritanical thing,

19   Germany and France aren't doing it because they're puritanical.

20   It's because it is so bad for the kids.  So with regard to the

21   advancement of technology and how just ubiquitous the Internet

22   is, this is where we have landed.  Content filtering yes, age

23   verification for sure.

24         THE COURT:  The arguments that you're making are

25   pretty much the same arguments that were made to the United

1    States Supreme Court when the federal government attempted to

2    pass very similar legislation and the Supreme Court wasn't

3    buying it.

4           MR. RAMSEY:  The Supreme Court had never seen an

5    iPhone.  It is so different.

6           THE COURT:  They had computers in those days.

7           MR. RAMSEY:  And in Ashcroft when it got sent back

8    down, the Court said one way the parents could monitor their

9    children and screen them on the Internet was to put the

10   computer in the living room.  That is the technology that they

11   were looking at, where a parent could literally say that's the

12   computer --

13          THE COURT:  Then it got redecided and then the Supreme

14   Court refused to take it the second time because it was even a

15   harder decision.  Counsel, I understand your argument.  We're

16   running out of time.  I've given you more time, I need to hear

17   from the other side on rebuttal.  Thank you very much.  I've

18   got all your papers and your argument.  You're an excellent

19   lawyer, you've done a good job for your client.  I know exactly

20   what your position is.

21          MR. RAMSEY:  Appreciate it.

22          THE COURT:  He's made some very cogent points, I

23   think.

24          MR. SHAFFER:  Your Honor, I don't disagree and I have

25   great respect for Mr. Ramsey and the experience and perspective

1    he brings to this, but I don't think Your Honor should be

2    hearing from the lawyer defending the statute without having

3    heard from the legislature.  Any of what Mr. Ramsey is saying

4    about wrestling with different alternatives, about

5    determinations that age verification will actually work, the

6    extent that Mr. Ramsey makes the point that kids are going to

7    find their way to adult content, I think he persuades everyone,

8    Your Honor.  I think that the scepticism is that age

9    verification requirements are going to talismanically change

10   the nature of technology and keep kids away from bad content.

11   And even if Your Honor were to indulge what I think is a far

12   fetched and implausible hypothetical there, this law is not

13   requiring that there be age verification.

14        THE COURT:  He said, for instance, that it doesn't

15   allow pornography use on social media sites, they're not

16   exempted.

17        MR. SHAFFER:  Well, Your Honor, unless I misheard or

18   misremember Mr. Allen's testimony, he testified to the opposite

19   because he too had read the law, and the way that you avoid any

20   application of the law is take all of your adult content that's

21   really inappropriate for kids and make sure that you have

22   75 percent additional content and you'll never have to answer

23   to this.  And all of that content, as Your Honor points out,

24   will be available to minors who will have ample content, all

25   the content that Mr. Ramsey decries from his homework -- and by

1    the way, Your Honor, I've done my homework, I've seen the

2    opposite.  I've seen content on these sites that is, to me,

3    I've seen content that is political, that is parody, that is

4    soft core, that would not pass any sort of obscenity test.

5    Now, all of that is subject to these very onerous requirements

6    and threat of massive enforcement penalties simply because the

7    providers of that content are part of the adult content

8    industry where more than a third of their content would answer

9    to a different description, all of it is swept in, all of it is

10   subject to age verification, all of it is subject to the

11   disclaimers or else you're subject to the crushing fines that

12   are imposed under the law.

13          So going back, though, Your Honor, to all of the other

14   content that is out there on the Internet, it is only that

15   content that happens to be parked on the adult content industry

16   sites that is subject to the law.  Everything else still gets

17   through unfettered.  It's YouTube, it's search engines, it's

18   social media, it's movies, all of that, Your Honor, is not

19   subject to the law.  And if the legislature was as sincere as

20   Mr. Ramsey is in its convictions and was spending the time to

21   do the homework and to build the legislative record, then Your

22   Honor, I think you'd see a very different law.  I think you'd

23   have to see tailoring that is fundamentally different from what

24   you have in this law.  But at the very least, you would have a

25   legislative record, Your Honor, that is capable of withstanding

1    strict scrutiny.  Mr. Ramsey's arguments, excellent delivery of

2    them here today by Mr. Ramsey, that, Your Honor, is not a

3    ticket for withstanding strict scrutiny, and it's certainly not

4    a reason why Texas is likely to succeed in showing that this

5    law does not violate the First Amendment.  All I'm here to tell

6    Your Honor is that we are entitled to preserve the status quo,

7    to prevent a new law from taking effect in ways that will

8    irreversibly damage --

9             THE COURT:  What about his argument that your clients

10   are being hypocritical because they're complying with a similar

11   law in Germany?

12            MR. SHAFFER:  Your Honor, it's just not true that that

13   is a similar law that they are complying with in Germany.  I

14   know, for instance, these disclaimers are sui-generous, the

15   likes of which have never been used before.  Those are being

16   used in tandem with the State of Texas taking a stance that

17   they don't like this content and they are subjecting users to

18   unspecified means of age verification.  And understand, Your

19   Honor, that this is a very vague law.  Mr. Ramsey is telling

20   you some things about the law that I think are irreconcilable

21   with it, others that I find, frankly, surprising.  And when you

22   have no specificity about the age verification, how it works,

23   whether information can be shared during transmission with

24   third parties, what third parties are going to be suitable for

25   age verification, that's creating uncertainty and doubt and

1    concern on the part of the users, yes, Your Honor, but also for

2    our clients.  For companies that are going to have to comply

3    with this law or else face stiff penalties, they should at

4    least be told, here is what we mean by age verification, here

5    is what will suffice for purposes of age verification, here is

6    how often you need to do the age verification in order to

7    comply.  None of that is specified by the law.  Here we're

8    dealing with First Amendment rights.  This is content-based

9    regulation of expression.  And before the State does that, Your

10   Honor, as the Supreme Court pointed out in *Reno v. ACLU* where

11   the vagueness problem was specifically identified before day

12   one of needing to comply, they should be clear about what are

13   the parameters.

14        THE COURT:  How do you explain away his reference to

15   Ginsburg?

16        MR. SHAFFER:  Sorry, Justice Ginsburg?

17        THE COURT:  No, no.

18        MR. SHAFFER:  The Ginsburg case.

19        THE COURT:  I knew Justice Ginsburg very well, she was

20   a fine woman.

21        MR. SHAFFER:  She was.  The Ginsburg case, Your Honor,

22   was not an Internet case and the Supreme Court was very clear

23   about that in *Reno v. ACLU.*  I think the Ginsburg case stands

24   for the proposition that you so well articulated.  If the State

25   is advancing the purpose of protecting minors by preventing

1    them from accessing adult content that is inappropriate for

2    them, if that is its true purpose, if that is its sole purpose,

3    and it adopts means that are properly tailored to that

4    interest, that can withstand judicial scrutiny.  Your Honor has

5    no quarrel with that, and I have no quarrel with that.  That

6    is, with all due respect to Mr. Ramsey, not relevant to what

7    this Court needs to decide in looking at this law passed by the

8    State of Texas regulating the Internet, regulating the Internet

9    in ways that intrude upon the rights of adults, in fact, as I

10   note and Mr. Ramsey did not deny it, is designedly, it is

11   designedly meant to interfere with adults' access to adult

12   content.  That's what the disclaimers tell you.  That's what

13   the gerrymandering of the law tells you.

14         THE COURT:  Just like I had to call it a day for

15   Mr. Ramsey, I'm going to call it a day for you.

16         MR. SHAFFER:  Thank you, Your Honor.

17         THE COURT:  Thank you very much.  Counsel, I want to

18   thank you so much for your briefing in this matter.  It's been

19   thorough, both counsel for the State have done an excellent

20   job, and I appreciate it.  Listen, federal judges at every

21   level, and I sit by designation on the Ninth Circuit Court of

22   Appeals on a regular basis and have for 30 years, so I know

23   that they appreciate, the Court of Appeals appreciates it as

24   much as the District Court does, good lawyering, and that is

25   true for both sides.  I think there's been very good lawyering

1    here.  You could not have a more opposing views of this statute

2    because you're both zealous advocates for the rights of your

3    client and that's what you're supposed to do in a federal

4    court.  You're supposed to advocate for your client.  It

5    doesn't necessarily mean that you agree or disagree with their

6    personal opinions, but it does mean that you do the very best

7    job possible to represent their interest ethically and I think

8    professionally, and both sides have done that.  I don't give

9    this kind of accolade out lightly, believe me.  I've been a

10   federal judge for almost 36 years now.  I've been around and

11   I've seen good lawyering and I've seen not so good lawyering in

12   my career.  And I was a trial lawyer before that in the federal

13   system, so I do appreciate good lawyering.

14          All right.  I'm going to take this under advisement.

15   We do have a deadline here.  I unfortunately had a different

16   State case yesterday having to do with floating buoys and

17   concrete blocks.  I've got to get that one out pretty quickly

18   too, and then tomorrow I've got yet another one, so this is my

19   week for preliminary injunction hearings, so I'm going to do

20   the very best I can to get this out as promptly as I can

21   consistent with giving it the kind of treatment that it

22   deserves.  And I'm glad to have been able to hear from you.  I

23   think your arguments have been enlightening and helpful, and I

24   try to put out a reasoned opinion.  I don't just put the Court

25   has heard the preliminary injunction motion, the motion is

1    denied or the motion is granted, you know, two pages.  I don't

2    do that.  You're going to get a reasoned decision.  A lot of

3    judges think that's foolish because it gives the Appellate

4    Court an opportunity to microscope your decision and find flaws

5    in it, so be it.  That's okay.  My job is to provide a

6    thorough, reasoned opinion, and you will get one.  You may not

7    agree with it.  Somebody is not going to agree with it, but I

8    will relate something to you that a judge who sat on the

9    federal bench for almost 50 years said to me when I first

10   became a federal judge.  He was a great guy, he was a mentor of

11   mine.  He said, *"David, I want you to remember something..."* he

12   was an old Kansas rancher.  He said, *"When people walk out of*

13   *the courthouse, half the lawyers are going to think you're the*

14   *front end of the horse and the other half are going to think*

15   *you're the other side, and you just have to live with it."*

16   Thank you very much.

17             COURT SECURITY OFFICER:  All rise.

18             *(3:09 p.m.)*

19                          *   *   *

20

21

22

23

24

25

1                    *   *   *   *   *

2  UNITED STATES DISTRICT COURT

3  WESTERN DISTRICT OF TEXAS

4

5       I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.  I

7  further certify that the transcript fees and format comply with

8  those prescribed by the Court and the Judicial Conference of

9  the United States.

10

11  Date signed:  September 1, 2023

12

13  /s/ Angela M. Hailey

14  Angela M. Hailey, CSR, CRR, RPR, RMR
    Official Court Reporter
15  262 West Nueva Street
    San Antonio, Texas  78207
16  (210)244-5048

17

18

19

20

21

22

23

24

25